**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| LAURIE A. HANNA, derivatively on behalf of STEM, INC. F/K/A STAR PEAK ENERGY TRANSITION CORP., | C.A. No. |
| | **JURY TRIAL DEMANDED** |
| Plaintiff, | |
| vs. | |
| JOHN CARRINGTON, ERIC SCHEYER, WILLIAM BUSH, MICHAEL D. WILDS, MICHAEL C. MORGAN, ADAM E. DALEY, ALEC LITOWITZ, DESIRÉE ROGERS, C. PARK SHAPER, DAVID BUZBY, ANIL TAMMINEEDI, LISA L. TROE, LAURA D'ANDREA TYSON, LARSH JOHNSON, PRAKESH PATEL, ALAN RUSSO, BRYAN HO, and STAR PEAK SPONSOR LLC, | |
| Defendants, | |
| and | |
| STEM, INC. F/K/A STAR PEAK ENERGY TRANSITION CORP., | |
| Nominal Defendant. | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**INTRODUCTION**

Plaintiff Laurie A. Hanna ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Stem, Inc. f/k/a Star Peak Energy Transition Corp. ("Stem" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants John

Carrington ("Carrington"), Eric Scheyer ("Scheyer"), William Bush ("Bush"), Michael D. Wilds ("Wilds"), Michael C. Morgan ("Morgan"), Adam E. Daley ("Daley"), Alec Litowitz ("Litowitz"), Desirée Rogers ("Rogers"), C. Park Shaper ("Shaper"), David Buzby ("Buzby"), Anil Tammineedi ("Tammineedi"), Lisa L. Troe ("Troe"), Laura D'Andrea Tyson ("Tyson"), Jane Woodward ("Woodward"), Larsh Johnson ("Johnson"), Prakesh Patel ("Patel"), Alan Russo ("Russo"), Bryan Ho ("Ho"), and Star Peak Sponsor LLC (the "Sponsor") (together, the "Individual Defendants," and collectively with Stem, "Defendants") for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), breaches of fiduciary duties, waste of corporate assets, unjust enrichment and/or aiding and abetting thereof, and for contribution under Sections 10(b) and 21D of the Exchange Act and Section 11(f) of the Securities Act of 1933 (the "Securities Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Stem, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Company's current and former directors and the former officers and/or directors of legacy Stem, Inc. ("Legacy Stem") between December 4, 2020, through April 3, 2023, inclusive (the

"Relevant Period").

2.      Stem purports to be a "global leader in artificial intelligence ('AI')-driven clean energy storage solutions and services." The Company offers energy storage systems, such as batteries, along with its AI software platform, Athena, to give customers the ability to "automatically" maximize energy storage. Stem does not make its own batteries but instead sources its storage systems from original equipment manufacturers ("OEMs") including Tesla, Samsung, LG Chem, and Panasonic. The Company resells these battery systems to customers such as commercial and industrial ("C&I") enterprises, independent power producers, renewable project developers, and energy grid operators with energy storage systems.

3.      Star Peak Energy Transition Corp. ("STPK") previously operated as a special purpose acquisition company ("SPAC"), a publicly traded corporation with a two-year life span formed with the sole purpose of effecting a merger, or "combination," with a privately held business to enable it to go public. STPK was incorporated in Delaware on October 29, 2018. Leading up to the Merger (defined below), STPK represented to investors that it was specifically seeking a private company in the energy and infrastructure sector to take public. The Company's Sponsor was Star Peak Sponsor LLC, a Delaware limited liability company, and its CEO was Defendant Scheyer, who also served as a director.

4.      On November 8, 2018, the Sponsor purchased 2,875,000 shares ("Founder Shares") of STPK Class B common stock for $25,000. On July 13, 2020, a stock split resulted in the Sponsor holding 10,062,500 Founder Shares. The Founder Shares would automatically convert into Class A common stock upon the consummation of a business combination. However, as the Founder Shares did not entitle the Individual Defendants to redemption rights, the Founder Shares would have expired worthless if STPK failed to timely complete a business combination by the two-year

deadline. On July 29, 2020, the Sponsor transferred 40,000 Founder Shares to Defendants Rogers and Shaper, who were considered the independent directors on the STPK Board at the time.

5.     The managing members of the Sponsor were Star Peak 19, LLC, Star Peak L LLC and Star Peak M LLC. Defendant Scheyer was the sole member of and controlled Star Peak 19, LLC, Defendant Litowitz was the sole member of and controlled Star Peak L LLC, and Defendant Morgan was the sole member of and controlled Star Peak M LLC. Thus, Defendants Scheyer, Litowitz, and Morgan, who together represented a majority of STPK's Board, were significantly interested in effectuating any business combination by dint of their ownership and control of the Sponsor, or else risked losing out on windfalls from the Founder Shares.

6.     STPK undertook its initial public offering ("IPO") on August 20, 2020, offering 35,000,000 units at $10.00 per unit for gross proceeds of $350 million, excluding costs. That day, the net proceeds of the $350 million sale of units and concurrent private placements (described below) were placed in a trust account (the "Trust"). On August 26, 2020, STPK undertook an additional sale of 3,358,504 units at $10.00 per unit, generating $33.6 million in further proceeds, excluding costs. In conjunction with the offering, STPK also engaged in a private placement with the Sponsor, whereby the Sponsor obtained 6,733,333 warrants and an additional 447,901 warrants ("Private Placement Warrants") at $1.50 each, generating gross proceeds of $10.1 million and $0.7 million. Like the Founder Shares, the Private Placement Warrants would have expired worthless if STPK failed to timely complete a business combination, as the Private Placement Warrants did not entitle the Individual Defendants to redemption rights.

7.     Because certain of the Individual Defendants had either a direct or indirect economic interest in the Founder Shares and Private Placement Warrants, their financial interests were misaligned with those of STPK shareholders. These conflicts of interest only worsened once

STPK determined it would complete a business combination with Legacy Stem. Pursuant to STPK's Certificate of Incorporation, STPK had only 24 months from the date of the IPO, or until August 20, 2022, to complete a business combination. This meant that, in the event STPK failed to complete a business combination by that time, STPK would have had to: (1) cease all its operations, except those made for the purposes of winding up the Company's affairs and liquidating; (2) redeem public shares; and (3) dissolve and liquidate the funds held in the Trust to return to STPK's investors. As noted above, because each of STPK's officers and directors agreed to waive their rights to liquidating distributions from the Trust, the Founder Shares and Private Placement Warrants would have been rendered worthless to them in the event STPK failed to timely complete a business combination.

8.       On December 4, 2020, the Company filed a current report with the SEC on Form 8-K with several exhibits announcing that it had entered into a definitive agreement to merge with Legacy Stem that would purportedly result in a $1.35 billion post-combined entity. The Company filed a registration statement in connection with the proposed merger on December 17, 2020, on Form S-4 with the SEC (the "Registration Statement"), followed by a joint prospectus and proxy statement on Form 424B3 (the "Merger Proxy," and together with the Registration Statement, the "Offering Documents"). On April 28, 2021, the Company consummated a business combination with Legacy Stem and STPK Merger Sub Corp. ("Merger Sub"), a private Delaware company and wholly-owned subsidiary of STPK, whereby Merger Sub merged with and into Legacy Stem, with Legacy Stem surviving as a wholly owned subsidiary of STPK (the "Merger"). The Company's leadership was also replaced in large part by Legacy Stem's leadership. Upon completion of the Merger, the Company changed its name to Stem, Inc. and took on the operations of Legacy Stem as its own.

9.     The Merger Proxy represented to investors that the aggregate value of the consideration to be paid by STPK in the Merger was approximately $650 million through the issuance of approximately 65,000,000 shares of "New Stem" common stock issued by STPK to existing Legacy Stem shareholders. The Merger Proxy stated the following about what STPK paid as consideration for the Merger:

> At the effective time of the merger, each outstanding share of Existing Stem Common Stock, including common stock held by prior owners of Stem Preferred Stock, Convertible Notes and Stem Warrants, (in each case, other than shares owned by Stem as treasury stock, dissenting shares and restricted shares) will be cancelled and converted into the right to receive the number of shares of New Stem Common Stock in a ratio (the "Exchange Ratio") equal to: (a)(i)(A) $650 million plus (B) the aggregate exercise price of all Stem Options whether vested or unvested, outstanding immediately prior to the Effective Time divided by (ii) $10.00 divided by (b) the total number of shares of Existing Stem Common Stock outstanding immediately prior to the Effective Time, expressed on a fully-diluted basis (including the number of Existing Stem Common Stock issued or issuable upon the Stem Preferred Conversion, the Convertible Notes Conversion and the Stem Warrant Exercise (assuming that all Stem warrants have been exercised) and including the aggregate number of shares issuable upon the exercise of all Stem Options, whether vested or unvested, outstanding immediately prior to the Effective Time in accordance with their respective terms).

10.     As a result, Legacy Stem shareholders received significant shares in the post-Merger Company from the Company that were more valuable than what Legacy Stem was worth, and STPK shareholders received shares that were much less valuable than what the Company was worth, thereby damaging the Company and STPK's shareholders.[1]

11.     One of Legacy Stem's touted advantages over other prospects in the energy and infrastructure market, as was often communicated by the Individual Defendants during the Relevant Period, was its "high-margin" software related services, which purportedly provided Legacy Stem (and hence, the post-Merger Company) with persistent revenue via long-term service

---

[1] Shareholders that did not redeem at $10 per share before the Merger closed became holders of Stem common stock and were damaged thereby.

agreements with customers that ranged from 10 to 20 years. Indeed, throughout the Relevant Period, certain of the Individual Defendants maintained that 100% of Stem's revenue from services came from this recurring business.

12.     However, unbeknownst to the shareholders who approved the Merger, (i.e., STPK's shareholders), the value of the Merger was not in line with Defendants' representations leading up to and after the Merger. Rather, Defendants misleadingly touted the proposed Merger and Stem's prospects leading up to the Merger and thereafter, including in annual reports filed on Forms 10-K and in quarterly reports filed on Forms 10-Q with the SEC. For example, the Offering Documents contained false and misleading statements and omissions about Legacy Stem's internal controls over financial reporting, its and the post-Merger Company's business prospects and competitive standing, Legacy Stem's software revenue, and the expected benefits that would result from Legacy Stem's partnerships.

13.     Specifically, Stem represented that its Athena software system was a "fully automated" AI software that generated "energy forecasts" and "real-time optimization and automated controls." Stem also maintained that Athena was "learning" and gaining "deep insights to better inform the improvement of [its] algorithms in predicting economically optimal charge and discharge intervals of energy storage systems." Stem also maintained that Athena was fully automated, representing that **"[W]hat Athena does is it's analyzing these large data sets and making real-time decisions that automatically respond to changing conditions in the energy market**."[2] Athena's appeal for customers was its purported ability to help energy grid operators to transition to clean energy sources and, as a result, reduce carbon emissions. Additionally, Athena was touted as being able to automatically handle system discharges across multiple utility

---

[2] All Emphasis is added unless otherwise noted.

territories and work with utility companies to provide instantaneous grid support wherever necessary.

14.     Initially, Legacy Stem focused its business on behind-the-meter ("BTM")[3] projects for C&I customers. However, in its quest to effectuate the Merger, Legacy Stem claimed that it had morphed into a "high-margin" software business, powered by Athena, that could transform the much more profitable front-of-the-meter ("FTM")[4] market. Indeed, the FTM market was ***ten times*** larger than the BTM market. Moreover, Legacy Stem's emphasis on expanding its software business was necessary to attract investors to the post-Merger Company since, at the time of the Merger, the Company's hardware sales (batteries) were a small facet of the Company's overall business, while software made up gross margins of more than eighty percent.

15.     For this reason, beginning on December 4, 2020, Legacy Stem, in the same press release that announced the Merger, represented to the public: (1) that it was "a global leader in artificial intelligence (AI)-driven clean energy storage systems" and (2) that Legacy Stem would "expand globally and continue to advance its Athena™ software platform." The press release also suggested that the proposed Merger would transform Legacy Stem by securing the capital needed to fully fund Legacy Stem and would further be "transformative for us and we expect it to significantly accelerate our growth." The Individual Defendants further maintained that the Merger "positions [Legacy] Stem to capitalize on significant growth opportunities[]" and that the

---

[3] BTM refers to "energy-related activities that occur on the consumer's side, typically within or close to their premises. It involves the generation, consumption, storage, and management of energy using various distributed energy resources (DERs) located on-site. These resources can include solar panels, wind turbines, batteries, fuel cells, and even small-scale cogeneration systems." https://www.sseenergysolutions.co.uk/behind-the-meter-and-in-front-of-the-meter.

[4] FTM refers to "energy-related activities that occur on the utility side of the grid, typically involving large-scale energy generation, transmission, and distribution infrastructure. These activities are primarily managed by utility companies and are designed to meet the energy demand of a wide range of consumers."

combined "[b]alance sheet supports significant market expansion[,] [representing a] strong balance sheet with approximately $525 million of cash to fully finance all U.S. and international forecasted growth."

16.     The press release also anticipated that the Company would turn a profit by the end of fiscal year 2022, have gross margins of 12% for fiscal year 2020, and have gross margins of 28% for fiscal year 2022, all powered by software sales. In addition to forecasting extraordinary growth, the press release announcing the Merger stated that Legacy Stem had a "[c]apital light business model" and further represented that "Athena™ AI-driven software leads to strong operating leverage with low expected capital intensity."

17.     Leading up to the Merger, the Individual Defendants repeatedly represented to investors that, upon completion of the Merger, Stem would quickly transition from a business centered on BTM to a business focused on FTM deals. Unbeknownst to investors, this shift in marketing strategy was effectuated because Legacy Stem's BTM business was suffering and could not come anywhere close to supporting the kind of growth the Individual Defendants had been forecasting to investors. Specifically, the transition from hardware sales to software sales was highly important to Stem's business model, both present and future, since the Company could only markup prices on hardware (batteries) between 10 and 20 percent. As a result, hardware sales had low gross margins. However, on the other hand, software sales carried extremely high markups and could support gross margins higher than 80 percent.

18.     Legacy Stem's BTM business was initially successful due to subsidizing programs such as California's favorable Self-Generation Incentive Program ("SGIP") which provided rebates to BTM customers who installed qualified distributed energy systems. However, by 2020, SGIP's funds and, along with them, Legacy's Stem BTM profits, ran dry. For this reason, Legacy

Stem pivoted to the much more lucrative FTM market, despite the fact that the Athena software platform was only in its development stage, and in any event, was not even functional for FTM needs.

19.     Despite this reality, the Individual Defendants told investors that Legacy Stem was successfully integrating its Athena software product into a large energy grid FTM project in Massachusetts. However, the Individual Defendants did not disclose to investors that Company employees were manually completing functions—functions that the Athena platform should have been completing automatically and autonomously—on Microsoft Excel spreadsheets.

20.     Making matters worse, Legacy Stem desperately needed cash from the Merger to stay afloat, thereby incentivizing the Individual Defendants to publicly represent to investors that the Company's pipeline of FTM project deals was much more robust than it truly was. Indeed, the Individual Defendants caused Stem to include phantom deals (*i.e.*, deals that had little to no chance of becoming signed contract purchase agreements) in the Company's pipeline and in the Company's quarterly reports in order to artificially inflate the value of the Company's deal pipeline.

21.     The truth started to emerge on March 15, 2021. That day, the Company filed an amendment to the Registration Statement with the SEC, revealing material weaknesses in Legacy Stem's internal controls over financial reporting that had not previously been disclosed. The material weaknesses related to Legacy Stem's accounting for "deferred cost of goods sold and inventory," "the review of certain revenue recognition calculations," and the "revenue of internal-use capitalized software calculations."

22.     On this news, the stock price dropped 3.36%, from a close of $35.43 per share on March 12, 2021, to close at $34.24 per share on March 15, 2021.  Nonetheless, the stock price

remained artificially inflated given the undisclosed facts about the Company's post-Merger business, prospects, revenues tied to software, and expected benefits stemming from Stem's partnerships.

23.     On March 30, 2021, Defendants solicited the Merger Proxy, which sought shareholders to, *inter alia*, approve the Merger and an incentive plan that materially benefitted the Company's officers and directors. Specifically, the Merger Proxy sought shareholder approval of 5 proposals to: (i) consider and approve the Merger; (ii) approve certain charter proposals; (iii) consider and vote to approve the issuance of shares on the New York Stock Exchange ("NYSE") following the closing of the Merger and pursuant to agreements related to the Merger; (iv) approve an incentive plan that provided a cap of $600,000 for director compensation and for incentive awards for employees and non-employee directors, including certain awards provided to officers on the close of the Merger (the "Incentive Plan"); and (v) consider and vote upon a proposal to adjourn the special meeting to a later date if needed to permit further solicitation of proxies if there were not enough support for the Merger or the other proposals by the time of the special meeting.

24.     As a result of the material misrepresentations and omissions made by the Individual Defendants in the Merger Proxy and statements leading up to the close of the transaction, shareholders were deceived into approving the unfavorable Merger given the true value of Legacy Stem, the competitive standing and financial prospects of the post-Merger Company, and significant conflicts of interest, which ultimately harmed the Company and its investors and squandered Company assets. As a further result of the material misrepresentations and omissions made by the Individual Defendants in the Merger Proxy and in statements leading up to the close of the Merger, STPK shareholders were unaware of material undisclosed risks and were deceived into approving the unfavorable Merger—for which the Company overpaid for Legacy Stem—

instead of redeeming their initial investments, which were valued greater than any interest they later obtained in the Company, given the true value of Legacy Stem (collectively, the "Overpayment Misconduct"). At all relevant times, the Individual Defendants—most of whom served as executives and/or directors at STPK or Legacy Stem, solicited the Merger Proxy, and were privy to information about the proposed transaction, its risks, and its expected benefits— knew or recklessly disregarded the true value of the Merger and its prospects in favor of their own self interests. Those at STPK sought to cash out on their investments in the Company rather than risk STPK's dissolution, which would have rendered the warrants and/or shares they held in the Company utterly meaningless. Those at Legacy Stem were motivated to effectuate the Merger largely as a result of: (1) receiving material benefits that they otherwise would not have received without the Merger; and (2) the access to capital for Legacy Stem that came with the Merger. For certain of the Individual Defendants, that included lucrative executive positions and packages; for others, it meant high compensation ceilings and consistent incentive awards for years to come.

25.     Still, shareholders and the public remained in the dark regarding the issues plaguing Legacy Stem (and later, the post-Merger Company) until well after the Merger closed. On February 24, 2022, Stem issued a press release announcing a strategic partnership it had entered into with Available Power, LLC ("Available Power"), a company focused on developing and distributing energy resources in the real estate market. The partnership would purportedly provide Stem with upwards of $500 million and exclusive rights to 100 energy storage projects in Texas. Notably, such an agreement was larger than the combined total of all the Company's prior projects. The Company credited the partnership to Athena, which it acquired from Legacy Stem in connection with the Merger. The arrangement thus confirmed the purported strength of the Merger, including the financial prospects and revenue stream it provided to the Company and its investors.

26.    Later that same day, on February 24, 2022, after markets closed, Stem released markedly low financial results for the fiscal year ended December 31, 2021, including revenue of $127.4 million, which missed expected estimates by nearly $20 million. The results were also far removed from the guidance the Company provided in November 2021. As a result of this news, Stem's stock price declined by 21%, from a close of $11.24 per share on February 24, 2022, to close at $8.81 per share on February 25, 2022. Yet, the full truth would not come to light for almost a year.

27.    On January 5, 2023, Stem disclosed that its "bookings backlog" for 2022 was partially offset by a "Stem-initiated contract cancellation" resulting from "partner non-performance[.]" The partner in question was Available Power.  On this news, Stem's stock price declined by 8.78%, from a close of $8.54 per share on January 4, 2023, to close at $7.79 per share on January 5, 2023.

28.    Then, on January 11, 2023, Blue Orca Capital ("Blue Orca") published a scathing report which revealed additional information about Stem's software revenues. In relevant part, the Blue Orca report revealed that, despite Defendants' repeated assertions to the contrary, the Company's software revenues did not account for 100% of its revenues. In fact, the report found the opposite, revealing that software revenues provided "a tiny fraction of [the Company's] reported" revenues. The report further asserted that the Company's lucrative agreement with Available Power was a phantom partnership. Indeed, the Company initially stated it had a booking with Available Power (a non-binding letter of intent that stated Available Power was supposed to provide purchase orders to the Company within two months of the issuing of the letter of intent), but Available Power never sent Stem any purchase orders. And, since Stem needed purchase orders to buy the hardware for the deal, Stem could not properly record the Available Power deal as a

sale. Despite this, Stem broke Company policy and ordered the hardware for the deal anyway—solely based upon the letter of intent. The Company issued a response to the Blue Orca report the next day. Notably, in its response, Stem failed to acknowledge or address several allegations including that the percentage of its software revenues was false or that it funded the Available Power partnership.

29.    On February 16, 2023, after markets closed, the Company reported disappointing financial results for the fourth quarter of 2022, revealing missed estimates and revenue of $156 million, among other things. On this news, the Company's stock price fell more than 14%, from a close of $9.74 per share on February 16, 2023, to close at $8.30 per share on February 17, 2023.

30.    At this point in time, the Company's stock price had plummeted 69.32% from its initial closing price of $27.05 per share, representing just how value destructive the Merger was.

31.    The truth fully emerged on April 3, 2023 when Bank of America downgraded the Company's stock from "neutral" to "underperform" and lowered its target price for Stem from $9 to $5. The next day, *Seeking Alpha* reported on Bank of America's analysis of Stem's stock. On April 4, 2023, the Company's stock price dropped 7.4%, from a close of $5.91 on April 3, 2023, to close at $5.47 per share on April 4, 2023.

32.    All told, Defendants successfully deceived the investing public into approving the Merger, and with it, lucrative arrangements that materially benefitted insiders at STPK and Legacy Stem to the Company's detriment. The full truth remained hidden from investors until well after the Merger closed and the value of the Company's securities tanked to new lows. As certain of the Individual Defendants had either a direct or indirect economic interest in founder shares or private placement units issued to them, detailed below, their financial interests were misaligned with those of the Company and its shareholders.

33.     During the Relevant Period, the Individual Defendants caused the Company to make to the investing public a series of materially false and misleading statements regarding the business, operations, and prospects of the Company. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company was engaged in the Overpayment Misconduct; (2) Legacy Stem's business and competitive standing were overstated, particularly concerning its strategic partnerships and revenues tied to its software; (3) Stem's Athena software platform was not fully automated, was not a "robust AI platform," and did not produce strong gross margins for the Company; (4) the Company's pipeline of contract deals, especially FTM deals, was exaggerated and contained fraudulent entries to inflate the appearance of Stem's business prospects; (5) Legacy Stem needed the capital infusion from the Merger to continue as a going concern; (6) the Company overstated its gross margins and exaggerated its business and financial prospects; (7) the Company's deal with Available Power was illusory; (8) the Company's software revenue did not account for 100%  of its  services revenue; and (9) Legacy Stem's and Stem's internal controls over financial reporting were wholly inadequate. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

34.     The Individual Defendants further breached their fiduciary duties and engaged in other misconduct to the Company's detriment and/or aided and abetted the same by engaging in, allowing and/or facilitating the Overpayment Misconduct. At the same time, eight of the Individual Defendants profited by over $32 million from improper insider sales, which were undertaken with knowledge of non-public information.

35.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

36.     As a result of the Individual Defendants' misconduct, the Company and several of its current and/or former officers and directors have become the subject of a consolidated securities fraud class lawsuit pending in the United States District Court for the Northern District of California (the "Securities Class Action"). The Company is also faced with the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein, including by receiving awards under the Incentive Plan—and in connection, will have to expend many millions of dollars.

37.     In light of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of the Individual Defendants' liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors ("Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

38.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Securities Act and the Exchange Act.

39.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

40.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

41.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of California or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

42.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

43.     Plaintiff is a current shareholder of Stem common stock. Plaintiff has continuously held Stem common stock at all relevant times.

### Nominal Defendant Stem

44.     Nominal Defendant Stem is a Delaware corporation with principal executive offices at 100 California St., 14th Fl., San Francisco, CA 94111. Stem's common stock trades on the NYSE under the ticker symbol "STEM."

### Defendant Carrington

45.     Defendant Carrington has served as a Company director and CEO since the close

of the Merger in April 2021. He previously served as the CEO and director at Legacy Stem from December 2013. According to the Company's proxy statement filed on Schedule 14A with the SEC on April 21, 2023 (the "2023 Proxy Statement"), as of March 3, 2023, Defendant Carrington beneficially owned 2,973,886 shares of Company common stock. Given that the price per share of the Company's common stock was $8.79 when markets closed on March 3, 2023, Defendant Carrington beneficially owned approximately $26.1 million worth of Stem stock.

46.     For the fiscal year ended December 31, 2021, Defendant Carrington received $40,565,992 in total compensation from the Company, including $475,795 in salary, $37,815,664 in stock awards, $1,654,948 in option awards, $594,825 in non-equity incentive plan compensation, and $24,760 in all other compensation. For the fiscal year ended December 31, 2022, Defendant Carrington received $3,140,333 in total compensation from the Company, including $550,215 in salary, $999,999 in stock awards, $978,778 in option awards, and $611,340 in non-equity incentive plan compensation.

47.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Carrington made the following sales of Company stock:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| 3/20/2023 | 13,216 | $6.33 | $83,670 |
| 11/16/2022 | 28,570 | $13.82 | $394,837 |
| 11/17/2022 | 28,570 | $13.6 | $388,466 |
| 10/5/2022 | 28,570 | $13.71 | $391,723 |
| 10/6/2022 | 28,570 | $14.13 | $403,579 |
| 9/13/2022 | 28,570 | $16.12 | $460,605 |

| 9/14/2022 | 28,570 | $16.82 | $480,404 |
| 8/16/2022 | 28,570 | $16.25 | $464,233 |
| 8/17/2022 | 28,570 | $15.32 | $437,806 |
| 7/20/2022 | 28,570 | $8.92 | $254,844 |
| 7/21/2022 | 28,570 | $9.17 | $261,958 |
| 6/8/2022 | 28,570 | $9.34 | $266,929 |
| 6/9/2022 | 28,570 | $8.99 | $256,901 |
| 5/19/2022 | 28,580 | $7.73 | $220,951 |
| 5/20/2022 | 28,580 | $7.48 | $213,864 |
| 5/10/2022 | 5,198 | $7.32 | $38,049 |
| 12/8/2021 | 200 | $20 | $4,001 |
| 12/9/2021 | 19,621 | $20.11 | $394,578 |
| 12/1/2021 | 22,375 | $21.14 | $472,918 |
| 12/2/2021 | 6,401 | $20.36 | $130,311 |
| 11/17/2021 | 44,750 | $22.38 | $1,001,639 |
| 11/16/2021 | 44,750 | $24.55 | $1,098,791 |

Thus, in total, before the fraud was exposed, he sold 556,511 shares of Company common stock on inside information, for which he received approximately $8.1 million in proceeds. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

48.     The 2023 Proxy Statement stated the following about Defendant Carrington:

***John Carrington***. Mr. Carrington has served as our Chief Executive Officer and a member of our Board since the closing of the Merger in April 2021, and was our Chief Executive Officer and a member of the board of directors of Legacy Stem from December 2013 until the Merger. Mr. Carrington leads the energy storage and analytics

movement at the Company. He has more than 25 years of leadership experience at technology, energy and industrial companies. In 2013, Mr. Carrington joined Stem from MiaSolé, the world's largest CIGS-based thin film solar company. From 2011 to 2013, he served as Chief Executive Officer and Director at MiaSolé. Prior to MiaSolé, from 2008 to 2009, he was the Executive Vice President of Marketing and Business Development at First Solar. From 1991 to 2008, Mr. Carrington worked at General Electric Company, most recently as General Manager and Chief Marketing Officer of GE Plastics. Mr. Carrington earned his B.S. in Economics from the University of Colorado.

Mr. Carrington is qualified to serve as a director due to his extensive executive experience in the energy and technology sectors. Additionally, as CEO of Stem, he possesses a deep knowledge of our business operations, financial strategy and operational strategy, as well as the industry, all of which enhance his contributions to our Board. The Board believes that Mr. Carrington's service as the Company's Chief Executive Officer is an important link between management and the Board, enabling the Board to perform its oversight function with the benefit of his perspectives on the Company's business and operations.

**Defendant Scheyer**

49.     Defendant Scheyer served as STPK's CEO and as a director of the Company from the time of its IPO until the close of the Merger in April 2021.

50.     According to the Merger Proxy, Defendant Scheyer beneficially owned 9,509,626 Founder Shares, comprised of Class Common B stock of the Company as of February 16, 2021, through his ownership interest and control over the Sponsor, representing 10.1% of the Company's shares as of that date.

51.     The Company's Merger Proxy stated the following about Defendant Scheyer:

**Eric Scheyer** serves as our Chief Executive Officer and on our board of directors and has served in these capacities since the IPO. Mr. Scheyer is a Partner at Magnetar and has served as the Head of the Magnetar Energy & Infrastructure Group since inception. Mr. Scheyer is a member of Magnetar's management committee and investment committee, and Chairman of the Magnetar Energy & Infrastructure Group's investment committee. Mr. Scheyer has long-standing relationships and significant experience investing in the energy, energy infrastructure and renewables sectors. Mr. Scheyer serves on the board of Directors of Great Elm Capital Group, Inc. (NASD: GEC). Mr. Scheyer previously served on the board of managers of the general partner of Lightfoot Capital Partners, LP and the board of directors of Arc Logistics Partners LP. (NYSE: ARCX) Previously, Mr. Scheyer was a principal of Decorel Incorporated, where he served as President of Decorel S.A. de C.V. and Executive Vice President of Decorel Inc. until the sale of the company to Newell

Rubbermaid. Mr. Scheyer received a B.A. from Trinity College.

**Defendant Bush**

52.    Defendant Bush has served as the Company's CFO since the close of the Merger in April 2021. He previously served as the CFO of Legacy Stem since November 2016. According to the 2023 Proxy Statement, as of March 3, 2023, Defendant Bush beneficially owned 771,514 shares of Company common stock. Given that the price per share of the Company's common stock was $8.79 when markets closed on March 3, 2023, Defendant Bush beneficially owned approximately $6.7 million worth of Stem stock.

53.    For the fiscal year ended December 31, 2021, Defendant Bush received $4,309,336 in total compensation from the Company, including $374,167 in salary, $2,938,958 in stock awards, $661,980 in option awards, $315,000 in non-equity incentive plan compensation, and $19,231 in all other compensation. For the fiscal year ended December 31, 2022, Defendant Bush received $2,479,221 in total compensation from the Company, including $425,712 in salary, $874,995 in stock awards, $856,424 in option awards, and $322,090 in non-equity incentive plan compensation.

54.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Bush made the following sales of Company stock:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| 11/15/2022 | 30,000 | $14.67 | $439,980.00 |
| 8/15/2022 | 60,642 | $ 6.47 | $998,652.00 |
| 8/16/2022 | 23,583 | $16.28 | $383,860.00 |
| 5/17/2022 | 37,284 | $7.62 | $284,141.00 |

| 5/10/2022 | 2,080 | $7.32 | $15,225.00 |
| 12/1/2021 | 10,000 | $21.13 | $211,320.00 |
| 12/2/2021 | 3,000 | $20.34 | $61,032.00 |
| 11/17/2021 | 12,456 | $22.35 | $278,391.00 |
| 11/16/2021 | 12,456 | $24.55 | $305,857.00 |

Thus, in total, before the fraud was exposed, he sold 191,501 shares of Company common stock on inside information, for which he received approximately $2.9 million in proceeds. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

55. The 2023 Proxy Statement stated the following about Defendant Bush:

*William Bush*. Mr. Bush has served as our Chief Financial Officer since the closing of the Merger in April 2021, and served as the Chief Financial Officer of Legacy Stem from November 2016 until the Merger. Mr. Bush manages the Company's corporate and project financing efforts. Mr. Bush has served on the board of directors of Appreciate Holdings, Inc. (Nasdaq: SFR) since December 2022. From 2010 to 2016, Mr. Bush served as Chief Financial Officer of Borrego Solar Systems Inc., a solar and energy storage company. Mr. Bush has served as Chief Financial Officer for numerous high-growth solar, software and online media companies, and co-founded Buzzsaw.com, a spinoff of Autodesk, Inc., in 1999. Mr. Bush also served as Corporate Controller for Autodesk, Inc. (Nasdaq: ADSK), a software company, from 1997 to 1999 and previously worked for seven years in public accounting with Ernst & Young LLP and PricewaterhouseCoopers LLP. Mr. Bush earned his B.S. in Business Administration from the University of California, Berkeley and is a Certified Public Accountant.

**Defendant Wilds**

56. Defendant Wilds served as the Company's CFO and CAO from the time of its IPO until the Merger closed in April 2021.

57. The Company's Merger Proxy stated the following about Defendant Wilds:

**Michael D. Wilds** serves as our Chief Financial Officer and Chief Accounting Officer and has served in these capacities since the IPO. Mr. Wilds joined Magnetar in 2006, and is Chief Operating Officer of the Magnetar Energy &

Infrastructure Group. Prior to joining Magnetar, Mr. Wilds served as the Chief Executive Officer of the affiliated companies of The Kansas Farm Bureau. Mr. Wilds also spent 20 years with Koch Industries, Inc. where he served in various senior roles, both domestic and international, including as Chief Financial Officer of Koch Industries International. Mr. Wilds earned a B.S. in Business Administration from Kansas State University.

**Defendant Morgan**

58.     Defendant Morgan has served as the Chairman of the Company's Board since August 2020. He also serves as Chair of the Compensation Committee. According to the 2023 Proxy Statement, as of March 3, 2023, Defendant Morgan beneficially owned 1,851,642 shares of Company common stock. Given that the price per share of the Company's common stock was $8.79 when markets closed on March 3, 2023, Defendant Morgan beneficially owned approximately $16.2 million worth of Stem stock. As disclosed in the Merger Proxy, like Defendant Scheyer, Defendant Morgan beneficially owned 9,509,626 Founder Shares, comprised of shares of Class Common B stock of the Company as of February 16, 2021, through his ownership interest and control over the Sponsor, representing 10.2% of the Company's shares as of that date

59.     For the fiscal year ended December 31, 2021, Defendant Morgan received $221,399 in total compensation from the Company, including $20,436 in fees earned or cash paid, and $200,963 in stock awards. For the fiscal year ended December 31, 2022, Defendant Morgan received $279,124 in total compensation from the Company, including $60,000 in fees earned or cash paid and $219,124 in stock awards.

60.     The 2023 Proxy Statement stated the following about Defendant Morgan:

*Michael C. Morgan*. Mr. Morgan has served as a member of our Board since the closing of the Merger in April 2021, and he served as the Chairman of the board of directors of STPK from August 2020 until the Merger. In 2008, Mr. Morgan co-founded Triangle Peak Partners, LP, a multi-strategy asset management firm focused on venture capital and growth equity, and he currently serves as its Chairman. Since 2004, Mr. Morgan has also served as President and Chief Executive Officer of Portcullis Partners, LP, a private investment partnership and limited partner of Triangle Peak Partners. Mr. Morgan has served as the lead independent director of Kinder Morgan, Inc. (NYSE: KMI), one of the largest energy infrastructure companies in North America, since 2011, and has served on the board of KMI and

its predecessors since 2003. Mr. Morgan joined Kinder Morgan in 1997 and headed Kinder Morgan's corporate development efforts until 2001. He then served as President of KMI until 2004. Mr. Morgan has been a director of Sunnova Energy International, Inc. (NYSE: NOVA) since its initial public offering in June 2019, and served on the board of its predecessor (Sunnova Energy Corporation) from October 2015 until NOVA's initial public offering. Mr. Morgan was Chairman, and a member of the audit and compensation committees, of the board of directors of Star Peak Corp. II (NYSE: STPC) from January 2021 until its merger with Benson Hill in September 2021. Mr. Morgan is a frequent volunteer at Stanford University, and currently serves as co-chair of the Precourt Energy Institute Advisory Council and on several other advisory committees. Mr. Morgan earned his B.A. in Economics and M.A. in Sociology from Stanford University and his M.B.A. from Harvard Business School.

Mr. Morgan is qualified to serve as a director due to his extensive experience in the energy infrastructure and clean energy sectors, corporate finance, capital markets and M&A, and corporate development and strategy, as well as his extensive experience as a director on other public company boards.

**Defendant Daley**

61.     Defendant Daley has served as a Company director since the IPO. He also serves as a member of the Audit Committee. According to the 2023 Proxy Statement, as of March 3, 2023, Defendant Daley beneficially owned 275,800 shares of Company common stock. Given that the price per share of the Company's common stock was $8.79 when markets closed on March 3, 2023, Defendant Daley beneficially owned approximately $2.4 million worth of Stem stock.

62.     For the fiscal year ended December 31, 2021, Defendant Daley received $220,548 in total compensation from the Company, including $19,585 in fees earned or cash paid, and $200,963 in stock awards. For the fiscal year ended December 31, 2022, Defendant Daley received $277,124 in total compensation from the Company, including $58,000 in fees earned or cash paid and $219,124 in stock awards.

63.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Daley made the following sales of Company stock:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
| --- | --- | --- | --- |

| 8/11/2022 | 75,000 | $15.05 | $1,128,675.00 |
| 8/10/2022 | 75,000 | $14.79 | $1,109,475.00 |
| 12/2/2021 | 100,000 | $19.82 | $1,981,800.00 |
| 12/1/2021 | 100,000 | $21.14 | $2,113,500.00 |

Thus, in total, before the fraud was exposed, he sold 350,000 shares of Company common stock on inside information, for which he received approximately $6.3 million in proceeds. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

64.     The 2023 Proxy Statement stated the following about Defendant Daley:

**Adam E. Daley**. Mr. Daley has served as a member of our Board since the closing of the Merger in April 2021, and was a member of the STPK board of directors from 2020 until the Merger. He is a Partner at Magnetar Capital LLC, Co-Head of Magnetar's Energy & Infrastructure Group and a member of Magnetar Capital's Management Committee and Investment Committee. Since joining Magnetar Capital at its inception in 2005, Mr. Daley has been focused primarily on the sourcing, execution and management of various investments in the energy, energy infrastructure and renewables sectors. Prior to joining Magnetar Capital, Mr. Daley was an investment banker at Citigroup's Global Corporate and Investment Bank from 1999 to 2005. Mr. Daley has served as a member of the board of directors of Lightstar Renewables LL since 2023, PosiGen, Inc. since December 2021, Double Eagle Energy III, LLC since January 2018, Vesper Energy Development LLC since November 2020 and DoublePoint Energy, LLC since June 2018. Mr. Daley previously served as a director of Star Peak Corp. II (NYSE: STPC) from January 2021 to September 2021. Mr. Daley earned his B.S. in Finance with High Honors from the University of Illinois.

Mr. Daley is qualified to serve as a director due to his broad transactional experience in the energy, energy infrastructure and renewables sectors, his strong strategic focus and his financial expertise, all of which enable him to make valuable contributions to Stem's financial and strategic planning and industry competitiveness.

**Defendant Litowitz**

65.     Defendant Litowitz served as a director of the Company from the time of its IPO until the close of the Merger in April 2021.

66.     According to the Merger Proxy, like Defendants Scheyer and Morgan, Defendant

Litowitz beneficially owned 9,509,626 Founder Shares, comprised of shares of Class Common B stock of the Company as of February 16, 2021, through his ownership interest and control over the Sponsor, representing 10.2% of the Company's shares as of that date.

67.    The Merger Statement stated the following about Defendant Litowitz:

**Alec Litowitz** serves on our board of directors and has served on our board of directors since the IPO. Mr. Litowitz is the Founder, Chief Executive Officer and Chairman of the Management Committee and co-head of the Investment Committee of Magnetar. Prior to founding Magnetar in 2005, Mr. Litowitz was a Principal at Citadel Investment Group and served as Global Head of Equities and a member of the Management and Investment Committees. Mr. Litowitz created and continues to be extensively involved with the Magnetar Capital UChicago Financial Education Initiative, an innovative high school-based financial education initiative, which has helped more than 22,000 students increase their financial literacy. Mr. Litowitz graduated from MIT with a B.S. in mathematics and anthropology and received a J.D. and M.B.A. from the University of Chicago.

### Defendant Rogers

68.    Defendant Rogers served as a director of the Company from the time of its IPO until the close of the Merger in April 2021. According to the Merger Proxy, Defendant Rogers beneficially owned 40,000 Founder Shares comprised of shares of Class Common B stock of the Company as of February 16, 2021.

69.    The Merger Statement stated the following about Defendant Rogers:

**Desirée Rogers** serves on our board of directors and has served on our board of directors since the IPO. Ms. Rogers has been serving as the Chief Executive Officer and Co-Owner of Black Opal Beauty, LLC, a masstige makeup and skincare company for women of color sold in Walmart, CVS and Rite Aid as well as internationally since 2019. From 2013 to 2019, she served as the Chairman of Choose Chicago, the tourism agency for the city of Chicago with $1 billion in revenue and over 57 million visitors annually. Ms. Rogers was the first White House Social Secretary and Special Assistant to President Obama. Prior to this post, Ms. Rogers served as the President of Peoples Gas and North Shore Gas. Ms. Rogers is currently a member of the board of directors of Inspired Entertainment (INSE) and MDC Partners (MDC) as well as chairs the compensation committee of MDC. Ms. Rogers also serves on the board of non-for-profit, DonorsChoose, a group funding platform that grants over $120 million to public school teachers each year. She received a B.A. in Political Science from Wellesley College and an M.B.A. from Harvard Business School.

**Defendant Shaper**

70.     Defendant Shaper served as a director of the Company from the time of its IPO until the close of the Merger in April 2021. According to the Merger Proxy, Defendant Shaper beneficially owned 40,000 Founder Shares comprised of shares of Class Common B stock of the Company as of February 16, 2021.

71.     The Merger Proxy stated the following about Defendant Shaper:

**C. Park Shaper** serves on our board of directors and has served on our board of directors since the IPO. Mr. Shaper served in various management roles for the Kinder Morgan companies from 2000 until March 2013, when he retired as President of Kinder Morgan, Inc. (NYSE: KMI), Kinder Morgan Energy Partners, L.P., Kinder Morgan Management, LLC and as director and President of the general partner of El Paso Pipeline Partners, L.P. Since 2007, Mr. Shaper has served on the board of directors of Kinder Morgan, Inc., and he previously served on the boards of directors of Kinder Morgan G.P., Inc. (the general partner of Kinder Morgan Energy Partners, L.P.) and Kinder Morgan Management, LLC from 2003 to 2013. Mr. Shaper also serves on the board of directors of Sunnova (NYSE: NOVA) and as a trust manager of Weingarten Realty Investors (NYSE: WRI). Mr. Shaper received an MBA from the J.L. Kellogg Graduate School of Management at Northwestern University and a B.S. in Industrial Engineering and a BA in Quantitative Economics from Stanford University.

**Defendant Buzby**

72.     Defendant Buzby has served as a Company director since the Merger closed in April 2021. He also serves as a member of the Compensation Committee. Prior to the Merger, he served as a director of Legacy Stem from April 2010. According to the 2023 Proxy Statement, as of March 3, 2023, Defendant Buzby beneficially owned 558,711 shares of Company common stock. Given that the price per share of the Company's common stock was $8.79 when markets closed on March 3, 2023, Defendant Buzby beneficially owned approximately $4.1 million worth of Stem stock.

73.     For the fiscal year ended December 31, 2021, Defendant Buzby received $238,003 in total compensation from the Company, including $37,040 in fees earned or cash paid, and $200,963 in stock awards. For the fiscal year ended December 31, 2022, Defendant Buzby

received $318,124 in total compensation from the Company, including $99,000 in fees earned or cash paid and $219,124 in stock awards.

74.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Buzby made the following sales of Company stock:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| 9/9/2022 | 50,000 | $16.21 | $810,399.00 |
| 3/8/2022 | 86,121 | $9.01 | $775,950.00 |

Thus, in total, before the fraud was exposed, he sold 136,121 shares of Company common stock on inside information, for which he received approximately $1.5 million in proceeds. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

75.     The 2023 Proxy Statement stated the following about Defendant Buzby:

**David Buzby**. Mr. Buzby has served as member of our Board since the closing of the Merger in April 2021, and served on the Legacy Stem board of directors from April 2010 until the Merger. In April 2021 he was appointed Chairman of our Board. Mr. Buzby has been on the board of directors of Spring Valley Acquisition Corp. II (Nasdaq: SVIIU) since its initial public offering in October 2022 and Climate Transition Capital Acquisition (AEX: CTCA1) since 2021. He served on the board of directors of Leading Edge Equipment Technologies from 2017 until 2023. Mr. Buzby served as a member of the Investment Committee at the PRIME Coalition from 2016 to 2022, and as Founder and Chief Executive Officer of Bright Plain Renewable Energy from 2011 to 2016. He previously served as a member of the board of directors of Cambrian Innovation Inc. from 2016 to 2020. He was a founding investor and former director of SunRun Inc. (Nasdaq: RUN) from 2008 to 2012, SunEdison, Inc. from 2004 to 2009, Valueclick, Inc. from 1998 to 2014, Prevalent Power, Inc. from 2003 to 2005, Resource Holdings from 1991 to 1998 and Best Internet from 1995 to 1999. Mr. Buzby also served as the Chief Executive Officer of SunEdison and Resource Holdings and Chief Financial Officer of Best Internet. Mr. Buzby earned his B.A. from Middlebury College and his M.B.A. from Harvard Business School.

Mr. Buzby is qualified to serve as a director due to his extensive experience in the climate transition sector and as a director on the boards of other public companies.

**Defendant Tammineedi**

76.     Defendant Tammineedi has served as a Company director since the Merger closed in April 2021. He also serves as a member of the Audit Committee and Nominating Committee. Prior to the Merger, he served as a director of Legacy Stem from 2019 and was a principal affiliate in one of Legacy Stem's investors, Angeleno Investors III, L.P. ("Angeleno") before the Merger. According to the 2023 Proxy Statement, as of March 3, 2023, Defendant Tammineedi beneficially owned 4,295,373 shares of Company common stock through his affiliation with Angeleno. Given that the price per share of the Company's common stock was $8.79 when markets closed on March 3, 2023, Defendant Tammineedi beneficially owned approximately $37.7 million worth of Stem stock.

77.     For the fiscal year ended December 31, 2021, Defendant Tammineedi received $222,251 in total compensation from the Company, including $21,288 in fees earned or cash paid, and $200,963 in stock awards. For the fiscal year ended December 31, 2022, Defendant Tammineedi received $281,124 in total compensation from the Company, including $62,000 in fees earned or cash paid and $219,124 in stock awards.

78.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Tammineedi made the following sales of Company stock:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| 8/18/2022 | 50,000 | $16.11 | $805,450.00 |
| 8/18/2022 | 50,000 | $16.11 | $805,450.00 |
| 8/15/2022 | 50,000 | $16.37 | $818,600.00 |
| 8/12/2022 | 50,000 | $15.37 | $768,450.00 |
| 8/10/2022 | 50,000 | $15.00 | $750,000.00 |
| 3/16/2022 | 150,000 | $8.30 | $1,245,450.00 |

| 3/11/2022 | 100,000 | $8.23 | $823,000.00 |

Thus, in total, before the fraud was exposed, he sold 500,000 shares of Company common stock on inside information, for which he received approximately $6 million in proceeds. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

79.     The 2023 Proxy Statement stated the following about Defendant Tammineedi:

*Anil Tammineedi*. Mr. Tammineedi has served as a member of our Board since the closing of the Merger in April 2021, and was a member of the Legacy Stem Board of Directors from 2019 until the Merger. He is a Partner at the Angeleno Group, LLC, a leading global investment firm focused on high-growth clean energy and climate solutions companies, where he has been leading investments across a number of sectors, including sustainable mobility, energy storage, resource efficiency and smart infrastructure since 2008. Prior to joining the Angeleno Group, Mr. Tammineedi served in various product development and management roles related to semiconductors targeting communications, mobile and power management applications at Broadcom Inc., a semiconductor company, from 1999 to 2006. Mr. Tammineedi has served as a member of the board of directors of Locana since 2016, and served as a director of Patriot Environmental Services, Inc. from 2016 until its acquisition in 2022. He also serves as a board observer at mPrest, Inc. Mr. Tammineedi has a M.S. from Iowa State University and an M.B.A. from the UCLA Anderson School of Management, where he serves as a Senior Faculty Advisor to the Business Creation Program and lectures on Impact Investing and Entrepreneurship. Mr. Tammineedi is also a Kauffman Fellow.

Mr. Tammineedi is qualified to serve as a director due to his extensive experience in the technology sector and with high-growth and clean energy companies, and as a director on the boards of other companies.

**Defendant Troe**

80.     Defendant Troe served as a Company director from April 2021 until she resigned in June 2023. She also served as Chair of the Audit Committee. According to the 2023 Proxy Statement, as of March 3, 2023, Defendant Troe beneficially owned 5,524 shares of Company common stock. Given that the price per share of the Company's common stock was $8.79 when markets closed on March 3, 2023, Defendant Troe beneficially owned approximately $48,555 worth of Stem stock.

81.     For the fiscal year ended December 31, 2021, Defendant Troe received $224,803 in total compensation from the Company, including $23,840 in fees earned or cash paid, and $200,963 in stock awards. For the fiscal year ended December 31, 2022, Defendant Troe received $287,124 in total compensation from the Company, including $68,000 in fees earned or cash paid and $219,124 in stock awards.

82.     The 2023 Proxy Statement stated the following about Defendant Troe:

**Lisa L. Troe**. Ms. Troe has served as a member of our Board since the closing of the Merger in April 2021. She was a Senior Managing Director of Athena Advisors LLC, from January 2014 to June 2021, a firm she co-founded to provide services in securities litigation, public company accounting, financial reporting and disclosure, compliance systems, enterprise risk management and other business needs and strategies. From 2005 to 2013, Ms. Troe was a Senior Managing Director at FTI Consulting, Inc. (NYSE: FCN), a global business advisory firm. From 1995 to 2005, Ms. Troe served on the Staff of the Division of Enforcement of the U.S. Securities and Exchange Commission's Pacific regional office, including seven years as a Branch Chief and six years as the Regional Chief Enforcement Accountant. Prior to joining the SEC, Ms. Troe was an auditor at a Big Four public accounting firm and held corporate accounting and financial positions in the oil and gas industry.

Ms. Troe serves as a director and a member or chair of the audit committee of (i) Magnite, Inc. (Nasdaq: MGNI), an independent platform that facilitates the purchase and sale of digital advertising, since February 2014; (ii) HireRight Holdings Corp (NYSE: HRT), which provides employers with global background screening and other workforce solutions, since March 2021; and (iii) Expro Group Holdings N.V. (NYSE: XPRO), an international oilfield services company that facilitates safer development of new energy and extends the longevity of resources production, since October 2021. She served as a director on private company boards in multiple industries and as an independent member of a public company board special committee. Ms. Troe is a member of the National Association of Corporate Directors and holds a CERT certification in cybersecurity from the Software Engineering Institute of Carnegie Mellon University. Ms. Troe earned her B.S. in Business Administration with Honors from the University of Colorado and is a Certified Public Accountant.

Ms. Troe is qualified to serve as a director due to her expertise in public company accounting, financial reporting and disclosure; public company governance and oversight; and enterprise risk management, as well as for the depth of her government and business experience, and her extensive public company board and audit committee experience. Ms. Troe also has diverse experience in a wide range of industries, allowing her to bring additional valuable perspectives to our Board.

**Defendant Tyson**

31

83.     Defendant Tyson has served as a Company director since the Merger closed in April 2021. She also serves as Chair of the Nominating Committee. According to the 2023 Proxy Statement, as of March 3, 2023, Defendant Tyson beneficially owned 5,524 shares of Company common stock. Given that the price per share of the Company's common stock was $8.79 when markets closed on March 3, 2023, Defendant Tyson beneficially owned approximately $48,555 worth of Stem stock.

84.     For the fiscal year ended December 31, 2021, Defendant Tyson received $219,696 in total compensation from the Company, including $18,733 in fees earned or cash paid, and $200,963 in stock awards. For the fiscal year ended December 31, 2022, Defendant Tyson received $276,124 in total compensation from the Company, including $57,000 in fees earned or cash paid and $219,124 in stock awards.

85.     The 2023 Proxy Statement stated the following about Defendant Tyson:

**Laura D'Andrea Tyson**. Dr. Tyson has been a member of our Board since the closing of the Merger in April 2021. She is a Distinguished Professor of the Graduate School and Professor Emeritus at the Haas School of Business at the University of California, Berkeley, and has served in this capacity since 2016. She has also been Chair of the Board of Trustees and Steering Committee Member of the Blum Center for Developing Economies since 2007, and is the Faculty Director of the Berkeley Haas Blockchain Initiative and the co-Faculty Director of the Sustainable and Impact Finance Initiative at the Haas School of Business since 2019. Dr. Tyson has also held a series of other positions at the University of California, Berkeley, including Professor of Business Administration and Economics at the Haas School of Business from 2007 to 2016, the Founder, Faculty Director and Interim Director of the Institute of Business and Social Impact from 2013 to 2020, Interim Dean of UC Berkeley's Haas School of Business from July 1, 2018 to December 31, 2018 and Dean of the Haas School from 1998 through 2001. She was also Dean of London Business School, University of London from 2001 through 2006.

Dr. Tyson has been a director of Lexmark International Inc. since 2017 and Apex Swiss Holdings, SARL since 2017. Dr. Tyson previously served on the board of directors of CBRE Group, Inc. (NYSE: CBRE) from 2010 to April 2022, AT&T Inc. (NYSE: T) from 1999 to 2020, Morgan Stanley (NYSE: MS) from 1997 to 2016 and Silver Springs Networks, Inc. (NYSE: SSNI) from 2009 to 2018. Dr. Tyson has been a board member of the Haas School of Business since 2020, the Blum Center of Developing Economics since 2016, SeriousFun Children's Network since 2020, the Opportunity Institute since 2018, and the Sustainability Accounting Standards Board Foundation between 2017 and 2022.

Dr. Tyson has numerous advisory roles, such as Senior Advisor to the Rock Creek Group since 2009 and to the APAX Global Partners Fund since 2021. She is an Economic Advisor to the McKinsey Global Institute and a Global Economy Fellow for the MasterCard Center for Inclusive Growth since 2019, having acted as special advisor since 2016. Dr. Tyson was a member of the *Commission d'experts sur les grands défis économiques* for French President Emmanuel Macron since 2020. She has served as an advisory board member for APAX Global Impact since 2021 and Angeleno Group since 2018. She has served on the executive board of the Major League Baseball Professional Development League since 2022. She is the co-chair of the California Governor's Council of Economic Advisors. Other government roles include membership on the US President's Council of Advisors on Science and Technology (Working Group Member on Semiconductors) from 2016 to 2017, Secretary of State Foreign Affairs Policy Board and Council on Jobs and Competitiveness for the President of the U.S. from 2011 to 2013, Economic Recovery Advisory Board to the President of the U.S. from 2009 to 2011. She is a regular opinion columnist for Project Syndicate, an international media group that publishes pieces on its website and on numerous print publications around the world. Dr. Tyson was a member of President Clinton's cabinet from 1993 to 1996 and was the first woman to serve in the positions of Chair of the President's Council of Economic Advisors, from 1993 to 1995, and Director of the White House National Economic Council, from 1995 to 1996. Dr. Tyson received her B.A. from Smith College and holds a Ph.D. in Economics from the Massachusetts Institute of Technology.

Dr. Tyson is qualified to serve as a director due to her extensive public company board and governance experience, deep experience in the technology and energy industries, expertise in economics and public policy, her experience as an advisor in various business and political arenas, and her accomplishment at the highest levels of government service.

**Defendant Woodward**

86.     Defendant Woodward has served as a Company director since the Merger closed in April 2021. She also serves as a member of the Compensation Committee and Nominating Committee. According to the 2023 Proxy Statement, as of March 3, 2023, Defendant Woodward beneficially owned 5,524 shares of Company common stock. Given that the price per share of the Company's common stock was $8.79 when markets closed on March 3, 2023, Defendant Woodward beneficially owned approximately $48,555 worth of Stem stock.

87.     For the fiscal year ended December 31, 2021, Defendant Woodward received $220,548 in total compensation from the Company, including $19,585 in fees earned or cash paid,

and $200,963 in stock awards. For the fiscal year ended December 31, 2022, Defendant Woodward received $277,124 in total compensation from the Company, including $58,000 in fees earned or cash paid and $219,124 in stock awards.

88.     The 2023 Proxy Statement stated the following about Defendant Woodward:

***Jane Woodward***. Ms. Woodward has served as a member of our Board since the closing of the Merger in April 2021. She is a Founding Partner of MAP Energy, LLC, a firm that focuses on energy investing and manages one of the largest private mineral portfolios in the U.S. She is a Managing Partner of WovenEarth Ventures, a boutique fund of funds focused on early-stage venture and niche project development. Ms. Woodward is also a member of the boards of directors of Fervo Energy, a geothermal project developer where she has served since 2021, Project Canary, an ESG data provider where she has served since 2021, and Ambient Fuels, a green hydrogen project developer where she has served since 2022. Ms. Woodward has also served as an adjunct professor of civil and environmental engineering at Stanford University since 1991 and has more than 30 years of experience developing and teaching energy classes. Ms. Woodward also serves on the Precourt Institute for Energy Advisory Council at Stanford University. Prior to founding MAP and teaching at Stanford, Ms. Woodward worked as an exploration geologist with ARCO Exploration Company and later as a petroleum engineering consultant to Stanford University's endowment. Ms. Woodward earned her B.A. in Geological Sciences from the University of California, Santa Barbara and her M.S. in Applied Earth Science and her M.B.A. from Stanford University.

Ms. Woodward is qualified to serve as a director due to her extensive private sector experience in numerous areas within the energy and renewables industries, as well as three decades of energy-related teaching experience.

**Defendant Johnson**

89.     Defendant Johnson has served as the Company's CTO since the Merger closed in April 2021. Previously, he served as the CTO of Legacy Stem from January 2016 until the Merger.

90.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Johnson made the following sales of Company stock:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| 11/16/2021 | 15,000 | $24.55 | $368,305.50 |

| 5/10/2022 | 1,269 | $7.32 | $9,289.08 |
| 8/12/2022 | 30,000 | $15.44 | $463,290.00 |
| 8/15/2022 | 20,000 | $16.38 | $327,640.00 |
| 8/16/2022 | 10,000 | $16.09 | $160,851.00 |
| 11/14/2022 | 12,500 | $13.46 | $168,250.00 |
| 11/15/2022 | 12,500 | $14.42 | $180,228.75 |
| 3/1/2023 | 6,877 | $8.10 | $55,723.64 |

Thus, in total, before the fraud was exposed, he sold 108,146 shares of Company common stock on inside information, for which he received approximately $1.7 million in proceeds. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

91.     The 2023 Proxy Statement stated the following about Defendant Johnson:

> **_Larsh Johnson_**. Mr. Johnson has served as our Chief Technology Officer since the closing of the Merger in April 2021, and served as the Chief Technology Officer of Legacy Stem from January 2016 until the Merger. Mr. Johnson is responsible for leading hardware and software engineering to meet the unique needs of the Company's commercial, industrial, utility and energy market customers. Prior to joining the Company, Mr. Johnson served as Chief Technology Officer of Siemens Digital Grid from 2015 to 2016. Mr. Johnson joined Siemens via its 2012 acquisition of eMeter Corporation, a Bay Area software company of which he was co-founder and responsible for innovation and development of meter data management, analytics and advanced smart grid applications as Chief Technology Officer from 1999 to 2015. Prior to eMeter, Mr. Johnson co-founded CellNet Data Systems, Inc., a pioneer in wireless networks for smart metering and distribution automation, and served as Chief Technology Officer from 1985 to 1999. Mr. Johnson was a founding member of the Department of Energy's Gridwise Architecture Council and remains a member emeritus. Mr. Johnson earned his B.S. and an M.S. in Mechanical Engineering from Stanford University.

**Defendant Patel**

92.     Defendant Patel has served as the Company's CSO since 2020.

93.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Patel made the following sales of Company stock:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| 11/10/2021 | 90,000 | $25.25 | $2,272,185.00 |
| 11/11/2021 | 25,000 | $25.26 | $631,522.50 |
| 11/11/2021 | 5,000 | $27.02 | $135,075.00 |
| 5/10/2022 | 1,269 | $7.32 | $9,289.08 |
| 3/1/2023 | 6,888 | $8.10 | $55,812.78 |

Thus, in total, before the fraud was exposed, he sold 128,157 shares of Company common stock on inside information, for which he received approximately $3.1 million in proceeds. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

94.     The 2023 Proxy Statement stated the following about Defendant Patel:

*Prakesh Patel*. Mr. Patel has served as our Chief Strategy Officer since the closing of the Merger in April 2021, and served as the Chief Strategy Officer of Legacy Stem from July 2020 until the Merger. Previously, Mr. Patel served as our Vice President of Capital Markets and Strategy from 2013 to July 2020. Mr. Patel has spent his career financing technology and energy ventures at the cross section of multiple industries. Before joining the Company, from 2010 to 2013, he served on the investment team at Angeleno Group, LLC, an energy and natural resources-focused private equity firm, during which time he led their investment in the Company. Previously, Mr. Patel built and managed a portfolio of private equity investments at New Bridge Investments, an investment company, from 2008 to 2010, and Deutsche Bank AG, from 2005 to 2008. Mr. Patel earned his B.A. from the University of California, Berkeley and his M.B.A. from Yale University.

**Defendant Russo**

95.     Defendant Russo has served as the Company's CRO since 2019.

96.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Russo made the following sales of Company stock:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| 11/2/2021 | 8,500 | $25.01 | $212,570.55 |
| 5/10/2022 | 1,564 | $7.32 | $11,448.48 |
| 8/9/2022 | 46,641 | $14.70 | $685,622.70 |
| 8/9/2022 | 113,569 | $14.70 | $1,669,464.30 |
| 8/10/2022 | 13,427 | $6.50 | $87,275.50 |
| 3/1/2023 | 6,022 | $8.10 | $48,795.66 |

Thus, in total, before the fraud was exposed, he sold 189,723 shares of Company common stock on inside information, for which he received approximately $2.7 million in proceeds. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

97.     The 2023 Proxy Statement stated the following about Defendant Russo:

*Alan Russo*. Mr. Russo has served as our Chief Revenue Officer since the closing of the Merger in April 2021, and served as the Chief Revenue Officer of Legacy Stem from February 2019 until the Merger. Mr. Russo is responsible for leading the expansion of the Company's markets, including in the U.S., Canada, Europe and Asia. Previously, Mr. Russo served as our Senior Vice President of Global Sales and Marketing from April 2018 to February 2019. Mr. Russo was Senior Vice President of Sales and Marketing at REC Solar Holdings AS, a wholly owned subsidiary of Duke Energy, from 2015 to April 2018, and served in various leadership roles at Bloom Energy Corporation, a green energy company, from 2006 to 2015, including most recently as Vice President of Strategic Accounts. From 1999 to 2005, Mr. Russo led Asia commercial operations for American Power Conversion, a Schneider Electric company. Mr. Russo earned his B.S. in Aerospace Engineering from Boston University.

**Defendant Ho**

98.     Defendant Ho has served as the Company's Senior Director of Product Management since March 2022.

### The Sponsor

99.     The Sponsor, Longview Investors LLC, a Delaware limited liability company, served as the sponsor of Longview leading up to the Merger and is affiliated with several of the Individual Defendants. The Sponsor and its affiliates collectively owned over 20% of the Company's common stock and were conflicted in the Merger given their investments in Longview would have been rendered worthless had Longview failed to timely complete a qualifying business combination.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

100.    By reason of their positions as officers, directors, and/or fiduciaries of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally.

101.    Each director and/or officer of the Company owes to Stem and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

102.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein or aided and abetted the same.

103.    To discharge their duties, the officers and/or directors of the Company were

required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

104.    Each Individual Defendant at STPK leading up to the Merger, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of those Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by certain of the Individual Defendants who collectively comprised the Company's Board at all relevant times.

105.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants at STPK, and later Stem, had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the

Company remained in compliance with all applicable laws.

106.     To discharge their duties, the officers and/or directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and/or directors of the Company were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Stem's own Corporate Governance Guidelines and/or Code of Business Conduct and Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of the Company and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that the Company's operations would comply with all applicable laws and the Company's financial statements and regulatory filings filed with the SEC

and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

107.    Each of the Individual Defendants further owed to the Company and the shareholders the duty of loyalty requiring that each favor the Company's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

108.    At all times relevant hereto, the Individual Defendants at STPK, and later Stem, were the agents of each other and of the Company and were at all times acting within the course and scope of such agency.

109.    Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

110.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

111.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

112.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

113.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of STPK's board of directors and Legacy Stem's board of directors, each of the Individual Defendants who was an officer and/or director of STPK or Legacy Stem, and later, a director/officer of the post-Merger Company, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

114.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the

commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his overall contribution to and furtherance of the wrongdoing.

115.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and/or of the Company or Legacy Stem and was at all times acting within the course and scope of such agency.

## THE COMPANY'S CODE OF CONDUCT AND CORPORATE GOVERNANCE

### Stem's Code of Conduct

116.    Under Stem's Code of Conduct, which applies to "each director, officer and employee" of the Company, all individuals associated are expected to "conduct themselves with the highest degree of honesty and integrity at all times."

117.    The Code of Conduct provides that "[a]ny director, officer or employee who obtains information about a Code violation or illegal act has the responsibility to report the matter immediately" in the manner specified in the Code of Conduct.

118.    Under the sub-heading titled "Conflicts of Interest" the Code of Conduct maintains that:

> Directors, officers, and employees should avoid activities that create or give the appearance of a conflict of interest between their personal interests and the Company's interests. A conflict of interest exists when a personal interest or activity of a director officer or employee could influence or interfere with that person's performance of duties, responsibilities, or commitments to the Company. A conflict of interest also exists when a director, officer or employee (or member of his or her family) receives an improper personal benefit as a result of his or her position at the Company.

119.    Under the sub-heading titled "Inside Information," the Code of Conduct provides:

While at the Company, you may also come into contact with another form of information that requires special handling and discretion. Inside information is material, nonpublic information about the Company or another company that, if made public, would be reasonably expected to affect the price of a company's securities or investment decisions regarding the purchase or sale of such securities. Employees must never use inside information to obtain any type of personal advantage, and should not disclose inside information to any third parties without the prior approval of senior management. For further discussion on our policy with respect to inside information, please review our Insider Trading Policy and Guidelines for Public Disclosures and Communications with the Investment Community, which are incorporated herein by reference.

120.    Under the heading titled "Company Disclosure Obligations," the Code of Conduct maintains that:

When disclosing information to the public, it is our policy to provide consistent and accurate information. To maintain consistency and accuracy, specific company spokespersons are designated to respond to questions from the public. Only these individuals are authorized to release information to the public at appropriate times. All inquiries from the media or investors should be forwarded immediately to the CLO or Chief Executive Officer ("CEO"). The CLO or the CEO must approve all press releases, speeches, publications, or other official Company disclosures in advance. Our internal control procedures are further regulated by the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act"). The Sarbanes-Oxley Act was a U.S. legislative response to events at public companies involving pervasive breakdowns in corporate ethics and internal controls over financial reporting. It was designed to rebuild confidence in the capital markets by ensuring that public companies are operated in a transparent and honest manner. Ensuring proper and effective internal controls is among the Company's highest priorities. We take seriously the reliance our investors place on us to provide accurate and timely information about our business. In support of our disclosure obligations, it is our policy to always:

- comply with generally accepted accounting principles;

- maintain a system of internal accounting and disclosure controls and procedures that provides management with reasonable assurances that transactions are properly recorded and that material information is made known to management;

- maintain books and records that accurately and fairly reflect transactions; and

- prohibit establishment of material undisclosed or unrecorded funds or assets.

121.    Under the heading "Compliance with Laws, Rules and Regulations," the SRAC Code provides:

Compliance with both the letter and spirit of all laws, rules and regulations applicable to the Company, including any securities exchange or other organization or body that regulates the Company, is critical to our reputation and continued success. All employees, officers and directors must respect and obey the laws of the cities, states and countries in which the Company operates and avoid even the appearance of impropriety.

***Audit Committee Charter***

122.    The Company's Audit Committee Charter provides that "[e]ach member of the Committee must be able to read and understand fundamental financial statements, including the Company's balance sheet, income statement and statement of cash flows [.]"

123.    The purpose of the Audit Committee, as stated in the charter, is to, "at minimum":

- represent and act on behalf of the Board in discharging its oversight responsibility relating to: (a) the accounting and financial reporting processes of the Company, including the audits of the Company's financial statements and the integrity of the financial statements; (b) the Company's compliance with ethical, legal and regulatory requirements; (c) the outside auditor's qualifications and independence and (d) the performance of the Company's internal audit function and outside auditor; and

- oversee the preparation of the report of the Committee required by SEC Rules to be included in the Company's annual proxy statement.

124.    The Audit Committee Charter further provides that committee members must, among other responsibilities:

Receive reports from management regarding, and review and discuss the adequacy and effectiveness of, the Company's disclosure controls and procedures.

***

Review and discuss with management, the Company's earnings press releases and corporate practices with respect to earnings press releases and financial information, as well as earnings guidance provided to analysts and ratings agencies.

Review and discuss the Company's practices and policies with respect to risk assessment and risk management, including with respect to the Company's accounting and financial reporting processes, and also including any major financial risk exposures and steps taken by management to monitor and mitigate such exposures.

*** 

Oversee the Company's compliance program with respect to legal and regulatory requirements, including the Company's code(s) of conduct and policies and procedures for monitoring compliance; and, at least annually, meet to review the implementation and effectiveness of the Company's compliance program with the Chief Legal Officer, who shall have the authority to communicate directly to the Committee, promptly, about actual and alleged violations of law or the Company's code(s) of conduct, including any matters involving criminal or potential criminal conduct.

### *Corporate Governance Guidelines of the Board of Directors*

125.   The Company also maintains governance guidelines for its Board (the "Governance Guidelines"), which detail the Board's oversight function and responsibilities. Among the core responsibilities of the Board, are "reviewing the Company's major financial objectives, critical strategies and long-term plans, including major allocations of capital, significant proposed business acquisitions and divestures, operating performance, sustainability and stockholder returns;" "overseeing the assessment of major risks facing the Company," "overseeing the integrity of the Company's financial statements and the Company's financial reporting processes;" and "monitoring the effectiveness of the Company's corporate governance practices and making changes as necessary or appropriate for the Company."

126.   Under the heading titled "Long Range Plan and Annual Operating Plan; Strategic Planning" the Governance Guidelines state:

The objectives of the Long Range Plan ("LRP") and Annual Operating Plan ("AOP") are to highlight the growth plans and financial targets for the business, as well as key issues and risks to achieving these goals; determine the pace, magnitude and allocation of the Company's projected capital spending; and update the Company's anticipated operating expenses. The LRP and the AOP shall be presented, at a minimum, annually to the Board for review, input and, with respect to the AOP, approval. The Board shall monitor implementation of the LRP and AOP throughout the year.

127.   Under the heading titled "Conflicts of Interest," the Governance Guidelines state

that:

> Each director is expected to be familiar with and follow the Company's Code of Conduct. If an actual or potential conflict of interest develops, or a situation arises that might give the appearance of such a conflict, the director should immediately report the matter to the Secretary and to the Chairman of the Nominating Committee. If a director has a personal, business or professional interest in a matter before the Board or any of its committees, the director shall disclose the interest to the Board or such committee, excuse himself or herself from discussions on the matter, and not vote on the matter.

128.    In violation of the Code of Conduct, Audit Committee Charter, and Stem's Governance Guidelines, the Individual Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to, breaches of fiduciary duty, by engaging in, effectuating, or aiding and abetting in the Overpayment Misconduct, and violations of Section 14(a) of the Exchange Act. Defendants further failed to maintain the accuracy of Stem's public reports and other documents filed with the SEC, comply with laws and regulations, conduct business in an honest and ethical manner, and oversee the integrity of financial information provided to shareholders, the public, and any stock exchange.

129.    The Individual Defendants who were at the Company before the Merger conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to breaches of fiduciary duty and violations of Section 14(a) of the Exchange Act. These Defendants were also subject to similar ethical duties and responsibilities under STPK's guidelines and Code of Ethics. Nonetheless, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, including, for some, by engaging in improper insider trading, and failed to oversee the integrity of the Company's financial statements, and maintain internal controls.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### *Background of STPK*

130.    STPK was incorporated in Delaware on October 29, 2018 as a special purpose acquisition company (i.e., a SPAC) formed for the purpose of effecting a merger, capital stock exchange, or similar business combination with one or more businesses. STPK represented to investors that it was specifically seeking a private company in the energy and infrastructure sector to take public. The Company's Sponsor was Star Peak Sponsor LLC, a Delaware limited liability company, and its CEO was Defendant Scheyer, who also served as a director.

131.    The managing members of the Sponsor were Star Peak 19, LLC, Star Peak L LLC and Star Peak M LLC. Defendant Scheyer was the sole member of and controlled Star Peak 19, LLC, Defendant Litowitz was the sole member of and controlled Star Peak L LLC, and Defendant Morgan was the sole member of and controlled Star Peak M LLC. Thus, Defendants Scheyer, Litowitz, and Morgan, which represented a majority of STPK's Board, were significantly interested in effectuating any business combination by dint of their ownership and control of the Sponsor.

132.    On November 8, 2018, the Sponsor purchased 2,875,000 Founder Shares of Class B common stock for $25,000. On July 13, 2020, a stock split resulted in the Sponsor holding 10,062,500 Founder Shares. The Founder Shares would automatically convert into Class A common stock upon the consummation of a business combination. On July 29, 2020, the Sponsor transferred 40,000 Founder Shares to Defendants Rogers and Shaper, who were considered the independent directors on the STPK Board at the time.

133.    STPK undertook its initial public offering on August 20, 2020, offering 35,000,000 units at $10.00 per unit for gross proceeds of $350 million, excluding costs. That day, the net

proceeds of the $350 million sale of units and concurrent private placements were placed in the Trust. On August 26, 2020, STPK undertook an additional sale of 3,358,504 units at $10.00 per unit, generating $33.6 million in further proceeds, excluding costs. In conjunction with the offering, STPK also engaged in a private placement with the Sponsor, whereby the Sponsor obtained 7,181,234 Private Placement Warrants at $1.50 each, generating gross proceeds of $10.1 million and $0.7 million.

134.    The $350 million in proceeds from the IPO was placed into the Trust on August 26, 2020, which required that the shares be redeemed in the first instance, contributed to a merger, or returned to shareholders in the event of liquidation. In other words, the Trust was established to safeguard two key rights held by STPK shareholders under STPK's Certificate of Incorporation: (1) the right to redeem their shares at $10.00 per share price instead of investing in the Merger; and (2) in the event STPK was unable to timely complete a business combination, the right to receive a return of all IPO proceeds.

135.    However, as certain of the Individual Defendants had either a direct or indirect economic interest in the Founder Shares and Private Placement Warrants, their financial interests were misaligned with those of STPK shareholders. These conflicts of interest only worsened once STPK determined it would complete a business combination with Legacy Stem. Pursuant to STPK's Certificate of Incorporation, STPK had only 24 months from the date of the IPO, or until August 20, 2022, to complete a business combination. This meant that, in the event STPK failed to complete a business combination by that time, STPK would have had to: (1) cease all its operations, except those made for the purposes of winding up the Company's affairs and liquidating; (2) redeem public shares; and (3) dissolve and liquidate the funds held in the Trust to return to STPK's investors. Because each of STPK's officers and directors agreed to waive their

rights to liquidating distributions from the Trust, the $350 million worth of Founder Shares and Private Placement Warrants would have been rendered worthless to them in the event STPK failed to timely complete a business combination.

136.    Throughout the Relevant Period, the Individual Defendants associated with STPK represented themselves to the investing public as having substantial experience in identifying targets and acquiring businesses. In particular, the Individual Defendants touted their experience with investments and SPAC IPOs.

### *Background of Legacy Stem*

137.    Legacy Stem was a private business founded in 2009 in California that designed solutions in the energy industry aimed at reducing costs and maximizing function. Specifically, Legacy Stem depicted itself as a "global leader in artificial intelligence (AI)-driven clean energy solutions and services." To do this, Legacy Stem sold hardware (batteries) along with its proprietary software platform, Athena, which purportedly provided the company with an edge over other energy storage providers who operated only with hardware. Before and during the Merger, Legacy Stem only catered to the BTM market.

138.    Additionally, Legacy Stem did not manufacture its own batteries, but instead sourced its batteries from large makers such as Tesla, Samsung, LG Chem, and Panasonic. Legacy Stem then re-sold the batteries to its customers, which included commercial and industrial (C&I) enterprises as well as independent power producers, renewable project developers, and grid operators with energy storage systems.

139.    Legacy Stem represented that its Athena software platform was a "fully automated" AI-driven software that could give customers "energy forecasts" and "real-time optimization and automated controls." The Company further told investors that Athena incessantly "learns" and

achieves "deep insights to better inform the improvement of [its] algorithms in predicting economically optimal charge and discharge intervals of energy storage systems." Stem also maintained that Athena was autonomous, representing that: "what Athena does is it's analyzing these large data sets and making real-time decisions that automatically respond to changing conditions in the energy market." Athena's ability to work autonomously is integral to its stated capabilities and attractiveness to both BTM and FTM customers.

140.    Athena's ability to work autonomously is integral because the software was intended to aid energy grid operators' reliance on conventional energy sources, which would strengthen the electrical grid, and in result, reduce carbon emissions through the increased use of renewable energy sources. Athena was also billed to automate energy system discharges across several geographically separated utilities, which would immediately improve grid support when problems arise.

141.    As stated above, Legacy Stem's business was focused on BTM projects for C&I customers. However, to win over investors for the Merger, Stem claimed it was transforming into a high-margin software company that, powered by the Athena software platform, could sneak into the much more lucrative FTM market, which was 10x larger than the BTM market. The transition from hardware sales to software sales was highly important to Stem's business model, both present and future, since the Company could only markup prices on hardware (batteries) between 10 and 20 percent. As a result, hardware sales had low gross margins. However, on the other hand, software sales carried extremely high markups and could support gross margins higher than 80 percent.

142.    Indeed, Stem emphasized in the December 4, 2020 press release announcing the Merger that Legacy Stem was "a global leader in artificial intelligence (AI)-driven clean energy

storage systems" and that the Merger would spawn $608 million in gross proceeds and "position[] Stem to capitalize on significant growth opportunities, expand globally and continue to advance its Athena™ software platform."

143.    Further, the Individual Defendants asserted that the Merger would help Stem fully fund its business, with the Merger being a "transaction [that] is transformative for us and we expect it to significantly accelerate our growth." The Individual Defendants also stressed that the $600 million-plus in gross proceeds from Stem's Merger and IPO "positions Stem to capitalize on significant growth opportunities, expand globally and continue to advance its Athena™ software platform." The Individual Defendants also told investors that the combined "[b]alance sheet supports significant market expansion – strong balance sheet with approximately $525 million of cash to fully finance all U.S. and international forecasted growth." The forecasted growth indicated a projected profit by the conclusion of Fiscal Year 2022, with gross margins of 12% for Fiscal Year 2020 that would eventually double by the conclusion of Fiscal Year 2022 to 28%, all purportedly powered by software sales. The Individual Defendants further hyped up the Merger to investors by stating that Legacy Stem had a "[c]apital light business model" and that the "Athena™ AI-driven software leads to strong operating leverage with low expected capital intensity."

144.    The Individual Defendants published extraordinarily high growth forecasts for Stem in connection with the Merger as well. For instance, the Individual Defendants forecasted that Stem's revenue would grow from $33 million in 2022 to $147 million in 2021 to $315 million in 2022 and $526 million in 2023. The Individual Defendants represented that non-GAAP gross margins would similarly balloon over the same time period, with gross margins of 12% in 2020, 16% in 2021, 26% in 2022, and 32% in 2023.

**The Merger and Overpayment Misconduct**

145.    On August 21, 2020, after a representative from Goldman Sachs, STPK's agent, reached out to Defendant Carrington about Legacy Stem, Defendants Scheyer and Morgan met with an STPK representative to discuss Legacy Stem's business and the SPAC process. Between August 24, 2020 and August 28, 2020, representatives from both companies continued to engage with each other and discuss a possible transaction. Defendants Morgan, Scheyer, and Daley were involved in these discussions.

146.    On September 11, 2020, Defendant Morgan and Carrington discussed STPK's intent to present a term sheet for a proposed business combination following initial due diligence.

147.    On September 20, 2020, STPK sent initial terms to Legacy Stem, which included STPK's proposed consideration package of $650 million. Legacy Stem agreed on September 25, 2020, and STPK sent a preliminary term sheet. The same day, the STPK Board met and discussed the transaction and authorized the preliminary term sheet.

148.    Between September 26, 2020, and September 28, 2020, the parties fine-tuned the terms of the preliminary term sheet, including by adding a minimum cash condition of $300 million, as Legacy Stem requested, and executed the document on September 28, 2020.

149.    Thereafter, STPK conducted some confirmatory business due diligence and engaged in numerous discussions with Legacy Stem's representatives.

150.    The Legacy Stem Board also met and discussed the proposed transaction between September 25, 2020, and December 2, 2020. Defendant Carrington also regularly communicated with the rest of the Legacy Stem Board to update them on the status of the business combination and discussions between STPK and Legacy Stem. On December 1, 2020, and December 3, 2020, specifically, Legacy Stem's Board met and discussed the terms of the Merger and the Merger, including STPK's valuation, the benefits and risks associated with the transaction, and the

fiduciary duties of Legacy Stem's Board and management under Delaware law. On December 3, 2020, the Legacy Stem Board determined that it would be in Legacy Stem's best interest to effectuate the Merger. In reaching such conclusion, the Legacy Stem Board considered "its knowledge of Stem's business, operations, financial condition, earnings and prospects, and its knowledge of the financial and capital markets and the risks associated with pursing an IPO of Stem."

151.    The Company announced its definitive agreement to merge with Legacy Stem on December 4, 2020. Supposedly, the combined entity would be worth approximately $1.35 billion. However, the officers and directors of STPK and Legacy Stem had interests in the Merger that departed from the interests of other shareholders—particularly STPK shareholders. For example, in addition to the interests of STPK's officers and directors in cashing out on their Founder Shares:

> Stem's executive officers hold stock options to acquire Existing Stem Common Stock under the 2009 Plan. In addition, Stem's executive officers received grants of stock options under the 2009 Plan to acquire the following numbers of shares in recognition of their ongoing services in connection with the merger: Mr. Carrington — 950,000;    Mr. Triplett — 185,000;    Mr. Russo — 147,500; Mr. Bush — 462,500; Mr. Johnson — 420,000; and Mr. Patel — 462,500. These stock options are fully vested as of the date of this proxy statement/consent solicitation statement/prospectus. In addition, each of Messrs. Carrington, Bush and Triplett also received additional grants of stock options under the 2009 Plan to acquire 3,634,841 shares, 1,587,868 shares and 19,840 shares, respectively. These stock options are scheduled to vest in annual installments of 25% over a four-year period, subject to the executive's continued employment. In connection with the merger, such stock options will be converted into stock options to acquire New Stem Common Stock.

152.    Shortly after announcing the anticipated Merger, on December 17, 2020, the Company filed the Registration Statement, which was declared effective on March 29, 2021. The following day, the Merger Proxy was filed. As admitted in the Merger Proxy, which was solicited by both STPK's Board and the Board of Legacy Stem, STPK's Board determined not to obtain a fairness opinion given their "substantial experience in evaluating the operating and financial merits of companies from a wide range of industries [.]"

153.    The Offering Documents were materially false and misleading, as discussed below, and created a false impression of Legacy Stem's business, prospects, and financial standing and resultingly, of the post-Merger Company. In truth, Legacy Stem suffered from serious internal control deficiencies over its financial reporting, its revenues from its software business were not nearly as strong as presented, and its platform, Athena, as well as its touted partnerships were overstated.

154.    On April 28, 2021, STPK effectuated the Merger, with Merger Sub, a wholly owned subsidiary of the Company, merging into Legacy Stem. The surviving entity was Legacy Stem, which became a wholly owned subsidiary of the Company as of that date. In connection with the Merger, the Company changed its name to Stem, Inc. and undertook the business operations of Legacy Stem. The next day, Stem's shares and warrants started trading on the NYSE under the ticker symbols "STEM" and "STEM. WS" respectively. The transaction was comprised of $383 million in cash from the Trust and $225 million in cash from private investment in public equity, excluding transaction costs. Legacy Stem's former shareholders "rolled 100% of their equity holdings into the new public company."

### *Legacy Stem's BTM Sales Suffered Before the Merger*

155.    Leading up to the Merger, the Individual Defendants crafted a story to investors that Stem would quickly transition from a business centered on BTM to a business focused on FTM deals. Unbeknownst to investors, this marketing strategy was effectuated largely because Legacy Stem's BTM business was suffering and could not come anywhere close to supporting the kind of growth the Individual Defendants were forecasting for investors.

156.    The Securities Class Action interviewed four separate employees of Legacy Stem, all of whom corroborated these circumstances. Two of the former employees interviewed worked

for Legacy Stem well before the consummation of the Merger. For example, CW-2, who held multiple positions at the Company from early 2020 until August 2023, including as an analyst, stated that Stem's BTM business's growth started to wither before the Merger, spurring the Individual Defendants to set their sights on the FTM market.

157.    Similarly, CW-4, who worked at Legacy Stem prior to the Relevant Period until August 2021 and who oversaw legislation and regulatory affairs, including lobbying on the Company's behalf, stated that Stem was initially successful at selling batteries in California because of California's favorable SGIP (Self-Generation Incentive Program) which provided rebates to BTM customers who installed qualified distributed energy systems. However, CW-4 noted the SGIP ran out of funds sometime in 2020. To accomplish its expansion into the FTM space, Legacy Stem first announced, on July 9, 2019, its first FTM project intended to furnish AI-driven storage solutions via Athena at five grid sites in Massachusetts.

158.    However, Legacy Stem's Athena platform was not fully automated and was not equipped to handle FTM projects, as FTM projects are significantly bigger and more complicated than BTM projects. For instance, for the Massachusetts projects, a Legacy Stem employee utilized an Excel Spreadsheet to manually input software functions Athena allegedly autonomously offered.

### Contrary to Individual Defendants' Representations, Athena is not Autonomous and Not Equipped to Handle FTM Projects

159.    At the time of Legacy Stem's Massachusetts FTM project in 2019, the Athena software platform did not work for FTM projects. CW-1, who worked on FTM projects at Stem from before the Relevant Period until February 2022, stated that Stem sold Athena for FTM projects despite Athena not being viable for FTM projects. CW-1 further explained that Stem never had a viable, functioning product that could handle FTM projects since the Company began in

2009. CW-1 maintained that FTM customers depicted Stem as an empty suit with respect to software for FTM projects because the Company did not have the software capabilities it claimed it had. CW-1 clarified that Athena worked for BTM projects but did not operate well for larger FTM projects. CW-1 further explained that Athena was just a rudimentary prototype akin to an Excel Spreadsheet and was therefore not used for FTM projects because the Company could not supply customers with Athena's basic functions for FTM projects. This was vital to FTM customers, however, since FTM projects are much more sophisticated than BTM projects, as FTM project systems use technology and data analysis to balance supply and demand, manage outages, and maintain the stability and reliability of the grid rather than just working to minimize energy costs as BTMs do.

160.    Despite this reality, CW-1 maintained that Stem decided to continue selling Athena to FTM customers because FTM deals made much more money than BTM deals. CW-3, who worked as Stem's Director, Technical Sales Training from March 2021 until June 2023, corroborated CW-1's account that Athena was not functional for FTM projects, noting that he could not even remember once seeing a FTM case study that was ever installed. Additionally, CW-3 would often ask for instances of Athena's successful use in an FTM project but never received any information from Stem. CW-2, who also worked in sales, had a similar experience, stating that Athena was not ready for FTM projects and noting that Stem was attempting to ***develop the software and sell it at the same time***.

161.    According to CW-1, Stem's strategy was to first build a pipeline of FTM project deals, then assemble a software team, and finally design the software for the FTM projects. Accordingly, CW-1 stated it was false and misleading for Stem to represent to investors that Athena was automated and functional for FTM projects. CW-2 corroborated this assessment,

stating that Stem planned to sign up customers for FTM projects and then hire more personnel, such as a software team, to develop the Athena platform for FTM use at a later time.

162.    Making matters worse, the Athena platform was not automated but instead required a Company employee to manually input allegedly automated activities. CW-1 compared Athena to a vending machine. Vending machines are autonomous machines that perform functions after a customer prompts the machine with a coin or a swipe of a credit card. Similarly, Athena was thought to be a software that worked autonomously—without the assistance of human input. However, Athena was in fact not autonomous but instead required a Stem employee to manually complete tasks via an Excel Spreadsheet. Considering this reality, CW-1 maintained that it was misleading for Stem to represent that Athena was viable for FTM projects.

163.    For example, Stem's largest FTM project, the Massachusetts project that began in 2019, was still not completed by the time CW-1 left Stem in early 2022. CW-1 stated that since Athena could not work as advertised, Stem employees had to personally manage Excel Spreadsheets by inputting numerous changes that Athena was said to be capable of doing automatically but could not. CW-2 corroborated CW-1's knowledge, stating that they were aware of an employee who was manually handling work that was supposed to be automatically handled by Athena. Further, CW-2 noted that they heard of a Stem employee who complained to a Company sales representative that they were annoyed at the number of manual tasks they had to complete.

**_Contrary to Individual Defendants' Representations, Stem Was Not Equipped to Train Employees and Customers on How to Use Athena for FTM Projects Since Athena Was Not Functional_**

164.    Since Athena did not work for FTM projects, Stem was unable to train its employees and customers on how to utilize the Athena platform. For instance, CW-1 noted that

they had asked a Stem product marketing manager in the marketing department for a video explaining how the Athena platform operated in a FTM project, but that the marketing department could not provide a video since Athena did not work for FTM projects. CW-3 corroborated CW-1's experience, noting that they found it hard to give content to the Company's partners for training purposes and further revealing that it was always difficult to give enough information to the product team for FTM projects. CW-3 maintained, based upon their experience at other companies, that this type of information should have been communicated by various departments, including product, marketing, training, and operations. Yet, CW-3 found themselves alone to provide information on Athena training to the Company's partners for FTM project sales.

165.    Specifically, CW-3 explained that at some point in the end of 2021 or beginning of 2022, Stem employees were confused about how to handle Athena, as several employees, including the Senior Product Manager who was responsible for overseeing Athena's development, abruptly departed Stem. The product team that replaced them, per CW-3, did provide CW-3's sales team with Athena product materials for FTM projects so that CW-3's team could draft training materials. However, when CW-3's team made training materials based on the product materials given to them, CW-3's team was then told that some of the training materials could not be used since some of Athena's FTM software was only in development and was therefore not actually functional. Two of the software products not to be included for FTM projects due to their non-functionality were Athena Bidder and Athena Supervisor.[5] CW-3 further noted that the team was told that any products still in development could not be used in official training materials for partners but could be used in materials for marketing purposes, such as for trade shows and for

---

[5] In February 2022, Defendant Carrington, when announcing the Available Power FTM deal, referred to Athena Bidder as a "market-leading" software.

marketing to possible customers and partners. CW-2 corroborated CW-3's assessment, stating that it was always difficult to obtain a video demonstrating Athena operating, and further noting that this type of material was never given to customers.

### The Individual Defendants Inflated Stem's Product Pipeline

166.    Before the Merger and in connection with the Merger, Legacy Stem represented that the product pipeline was the total value of uncontracted, potential hardware and software revenue from opportunities currently in process by Stem salespeople and channel partners, which have a reasonable likelihood of contract execution within 12 months. The Individual Defendants also referred to the pipeline as a "12-Month Pipeline" frequently throughout the Relevant Period.

167.    The Company defines bookings as the total value of executed customer agreements, as measured during a given period. The booking amount includes hardware revenue (typically recognized at delivery of product system to customer) and software revenue (total nominal software contract value recognized pro rata over the contract period). Stem defines "backlog" as the total value of bookings in dollars on a specific date. Therefore, pursuant to this structure, as new contracts are signed, backlog will grow, and as product systems are delivered, backlog will drop.

168.    Before, during, and after the Merger, the Individual Defendants boasted about Legacy Stem's (and, following the Merger, the Company's) pipeline, indicating that the pipeline was a "key metric" that Stem would report quarterly. For example, on April 12, 2021, Defendant Carrington told investors that Stem's pipeline was worth more than $1 billion. Just after the Merger, on May 17, 2021, Stem stated that the 12-Month pipeline was worth $1.43 billion. CW-1, who worked on developing the pipeline, stated that items included in the pipeline were not real deals, agreements, or commitments, but instead were just ideas that possibly had a chance of

getting an Athena platform deal, but that certainly had no guarantees of any deals.

169.    Additionally, CW-1 maintained that the pipeline also had phantom deals. Specifically, CW-1 stated that Stem even included in its financial figures deals that were just a chance to send a proposal and further stated that numerous big projects in the pipeline were just requests for proposals. Yet, Stem included these requests in the pipeline because it was remotely possible a Company proposal could be chosen for the project. Moreover, CW-1 maintained that Stem included requests for proposals in both Salesforce and the pipeline even if there was no realistic chance of Stem receiving the project, even if the Company was not the lowest bidder, or even if the Company did not have the experience the requests for proposal required. CW-1 further stated that Defendant Russo (Chief Revenue Officer) and Mary Adams (Director of Sales) did not seriously count these deals since they knew Stem could not obtain these deals.

170.    Compounding this issue was the reality that Stem's repeat customers received lower prices as the volume of deals increased, akin to a pyramid scheme. CW-2 corroborated CW-1's perspectives, stating that Stem's pipeline was artificially inflated, and the Company wanted employees to build the pipeline even with phantom deals that just featured numbers but no solid information. CW-2 was aware that some employees put everything into the pipeline, regardless of the deal's merit, and that certain managers told their employees to add deals to the pipeline that did not have supporting information. CW-2 also maintained that at the end of each quarter, some of these deals would be marked as having a high chance of closing despite employees knowing this was not true.

171.    CW-3 further stated that the sales team faced significant pressure to sell FTM products and that possible deals were always included in the pipeline despite producing no positive outcomes after multiple quarters of non-activity. CW-2 stated this could be seen by the low closing

rate of the deals. CW-1 confirmed these assessments of the situation, stating that phantom deals would languish in Salesforce and even be included in the Company's projections and public filings intended for investors and that the reporting dashboards in Salesforce include phantom deals, not imminent or realistic ones. CW-2 also stated that even in light of this pipeline inflation, the Company's sales team's bonus incentives were "built on pipeline."

172.    In addition to inflating the pipeline, Stem inflated the bookings too. CW-2 stated that bookings were not real deals but were only letters of intent with no product purchase requirements. To this end, the Company would try to boost bookings near the end of quarters so that the Company could report potential deals despite not actually possessing any purchase orders.

173.    For example, Stem's huge $500 million Available Power FTM deal was a phantom deal. Per CW-2, the Company initially stated it had a booking with Available Power (a non-binding letter of intent that stated Available Power was supposed to provide purchase orders to the Company within two months of the issuing of the letter of intent). Nevertheless, Available Power never sent Stem any purchase orders. And, since Stem needed purchase orders to buy the hardware for the deal, Stem could not properly record the Available Power deal as a sale. Despite this, Stem broke company policy and ordered the hardware for the deal anyway—solely based upon the letter of intent. CW-2 stated that Defendant Bush and Defendant Carrington would have authorized this activity by signature. CW-2 became aware of the phantom nature of the Available Power transaction in the third quarter of 2022 when CW-2's manager, Randy Parole, told CW-2 that Stem possessed hardware that needed to be sold.

174.    Moreover, according to CW-2, Stem intended to recognize hardware revenue from the Available Power deal before the end of Fiscal Year 2022 despite not actually selling the hardware to Available Power. To this end, Stem somehow found other buyers for the hardware,

REX Storage Holdings, LLC, a joint venture of Regis Energy Partners LP, and Excelsior Energy Capital. However, there was a catch. According to CW-2, the hardware contract had a parent guarantee that permitted both companies to return the hardware to Stem if they could not sell the hardware themselves. In particular, the two companies could keep the hardware until October 2023. After that time, Stem would be responsible for selling it.

175.     Thus, the Individual Defendants inflated the Company's pipeline, and by doing so, issued false and misleading statements to investors that were vital to STPK shareholders in approving the Merger and causing the Company and STPK shareholders to overpay for Legacy Stem.

### Legacy Stem Needed Capital from the Merger to Continue As A Going Concern

176.     Before the Merger, Legacy Stem stared down a financial crisis that posed significant risks to Legacy Stem's ability to function as a going concern should the business not receive cash funding. As of December 31, 2020, Legacy Stem had $6.9 million in cash equivalents, an accumulated deficit of $407.8 million, and net current liabilities of $141.2 million, with $116.2 million of debt financing due in the coming year. Stem also incurred a net loss of $156.1 million and had negative cash flows from operating activities of $33.7 million for Fiscal Year 2020.

177.     Given Stem's dismal financial position, the Company's accountant, Deloitte & Touche LLP ("Deloitte"), decided that the Company was a going concern (facing the inability to meet its financial obligations within a year). Deloitte stated that Stem's viability was concerning because of the Company's "recurring losses from operations and cash outflows from operating activities and . . . debt coming due."

178.     Indeed, the Merger Proxy had stated that "*there is substantial doubt about the Company's ability to continue as a going concern within one year after the date that the*

*financial statements are available to be issued.*"

179.    Stem's poor condition was largely due to its business model of selling low-margin batteries (hardware) made by other companies such as Tesla and Sungrow to its BTM customers, and the Company's massive struggle to successfully sell products to FTM customers. CW-1 noted that Stem's hardware markup was often as low as 5%, and in some cases, was even less. Stem tolerated these low prices because the Company wanted as many customers as possible, even though it was selling hardware at almost the same cost it was purchasing it for.

180.    CW-1 further noted that Stem was, at its core, a hardware company that was pretending to be a software company. In other words, if a customer wanted to sign a development agreement to purchase hardware at a lower price, the customer would be required to sign a software purchase agreement as well. Stem tried to push software since it had much higher margins than hardware and offered more return for a longer period. However, since Stem's Athena software was still under development and it did not function for FTM projects, the Company's software sales struggled significantly.

181.    Additionally, Stem needed the capital infusion from the Merger to finance the development of the Athena platform itself. For these reasons, the Individual Defendants depended upon the Merger closing to secure the cash necessary to keep Stem afloat.

***The Individual Defendants Cause Stem to Acquire AlsoEnergy to Remedy Stem's Athena Software Problems***

182.    On December 16, 2021, about seven months after the Merger, Stem announced its $695 million acquisition of AlsoEnergy, a company that purportedly provides customers with solar asset performance monitoring and control software. Stem later depicted AlsoEnergy as "a global leader in solar asset management software" with "60% gross margin across its software" and other services. The deal closed on February 1, 2022.

183.    During a December 17, 2021 interview on CNBC's MadMoney with Jim Cramer, Defendant Carrington stated that the AlsoEnergy acquisition helped Stem reach its goals of "strong recurring revenues," "a strong gross margin accretive to our gross margin," and "accelerat[ing] our software roadmap." However, the AlsoEnergy acquisition would not save Stem and unfortunately contributed to the further need for additional capital down the road.

### The Individual Defendants Cause Stem to Need More Capital

184.    By March 2023, Stem was suffering from low profit margins and reeling from the cancellation of the major Available Power deal.  As a result, Stem needed to quickly raise more capital. On March 29, 2023, Stem announced it would conduct a $175 million Green Convertible Senior Notes Offering (which it would increase to $200 million the following day) in a private offering to institutional buyers, which would become due in 2030. In the announcement, the Individual Defendants stated that Stem intended to use the proceeds from the sale to purchase and surrender for cancellation a part of Stem's 2028 Convertible Senior Notes, to pay the cost of entering into capped call transactions, and for other general business purposes.

185.    Most of the Individual Defendants, by virtue of their positions as officers and/or directors of STPK or Legacy Stem at the time, were in a position to know the true state of Legacy Stem prior to the Merger in the course of conducting due diligence, and despite knowing of the prospects and competitive standing of Legacy Stem, they agreed to the Merger on terms that were unreasonable given the true, yet undisclosed, state of affairs.

186.    In breach of their fiduciary duties to the Company, the Defendants at STPK engaged in the Overpayment Misconduct by causing STPK to acquire Legacy Stem on unfavorable terms to STPK's shareholders. Moreover, the Individual Defendants at STPK placed their own self-interest over the interest of the Company and the pre-Merger Company's shareholders, and

agreed to the Merger on less favorable terms than were reasonable, given the poor state of Legacy Stem, which would only later become publicly known. Those at Legacy Stem, who later perpetuated the fraud as long as possible after the Merger, aided and abetted in this misconduct, which has damaged the Company.

187.    During the Relevant Period, the Individual Defendants caused the Company to make to the investing public a series of materially false and misleading statements regarding the business, operations, and prospects of the Company. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company was engaged in the Overpayment Misconduct; (2) Legacy Stem's business and competitive standing were overstated, particularly concerning its strategic partnerships and revenues tied to its software; (3) Stem's Athena software platform was not fully automated, was not a "robust AI platform," and did not produce strong gross margins for the Company; (4) the Company's pipeline of contract deals, especially FTM deals, was exaggerated and contained fraudulent entries to inflate the appearance of Stem's business prospects; (5) Legacy Stem needed the capital infusion from the Merger to continue as a going concern; (6) the Company overstated its gross margins and exaggerated its business and financial prospects; (7) the Company's deal with Available Power was illusory; (8) the Company's software revenue did not account for 100%  of its  services revenue; and (9) Legacy Stem's and Stem's internal controls over financial reporting were wholly inadequate. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**False and Misleading Statements**

***December 4, 2020 Press Release & Conference Call***

188.     On December 4, 2020, the Company issued a press release regarding the agreement to merge with Legacy Stem. The press release stated the following about Athena's capabilities and the Company's ability to generate revenue:

> The Company generates revenue by providing customers with integrated energy storage systems, long-term recurring software services and energy market participation through its ***proprietary software platform, called Athena™, which enables AI-automated system operations***.

189.     On December 4, 2020, the Company held a conference call with analysts and investors concerning the agreement to merge with Legacy Stem. Defendant Carrington, Legacy Stem's CEO at the time, stated during the call that Legacy Stem's business was ultimately "about the software," and that the "Athena software creates the super intelligence that drives these large lithium-ion batteries." Defendant Carrington further stated the following about Athena's capabilities:

> I would now like to share a day in the life of Athena.
>
> Throughout the day, Athena optimizes the value for individual customers as individual sites are consuming power based on their own business needs. Later in the day, typically at about three o'clock in the case of California, Athena, in response to utility requests and market price signals, begidns to orchestrate hundreds of sites coordinated as virtual power plants to deliver energy to the grid. ***Athena automates system discharges across multiple different utility territories, collaborating with the utilities to provide instant grid support when and where it is needed.***
>
> In the early evening when grid demand has dropped, the systems resume normal operation. And when power prices drop at night ***Athena automates their recharging***, using low cost power to restore energy so they can begin operation in a similar pattern for the following day.

190.     In response to an analyst question about it meant to "be the first public pure play smart energy storage company" Defendant Carrington stated that: "Yeah. So, we provide clean energy battery solutions that allow our customers to reduce energy costs, reduce carbon emissions,

and provide greater reliability for the grid. All of that is operated by our proprietary AI-driven software platform we call Athena."

191.    Later in the call, Defendant Bush stated the following regarding the Company's ability to integrate hardware and software, and the Company's gross margins:

> Turning to our financials. Our business has three primary sources of revenue – Hardware, Software, and Market Participation – all enabled by Athena. On the Hardware side, we integrate with best-in-class energy storage systems from Tesla, LG and Samsung to provide turnkey, integrated hardware solutions to our customers, ***which carry gross margins in the 10 to 30% range***, reflecting the premium services that we provide our customers. Our Software revenue has contract terms in the 10 to 20-year range, carrying gross margins in excess of 80%. Our software revenue is a combination of recurring software and system management fees, which have a 100% attach rate to our integrated hardware solution.

***December 4, 2020 Slideshow Investor Presentation***

192.    On December 4, 2020, the Company published a presentation slideshow to be used in connection with the Merger as exhibit 99.2 to a Form 8-K filed with the SEC the same day. The slideshow contained the following statements about Athena's capabilities:



*The Registration Statement*

193.     On December 17, 2020, the Company filed the Registration Statement with the SEC on Form S-4. The Registration Statement was signed by Defendants Scheyer, Wilds, Morgan, Daley, Litowitz, Shaper, and Rogers. The Registration Statement contained numerous false and misleading statements regarding Legacy Stem's business and value as a target for the Company to merge with. Among other things, the Registration Statement maintained that Legacy Stem provided customers with storage solutions that it obtained from leading OEMs and entered into long-term arrangements with partners for "software-enabled services to operate the energy storage systems . . . utilizing the Athena platform [.]" Specifically, the Registration Statement stated in relevant part:

> Stem (i) provides its customers, which include commercial and industrial enterprises as well as independent power producers, renewable project developers, utilities and grid operators, with an energy storage system, sourced from leading, global battery original equipment manufacturers, that it delivers through its partners, including solar project developers and engineering, procurement and construction firms and (ii) Stem provides its customers, through its Athena artificial intelligence platform ("Athena"), ***with ongoing software-enabled services to operate the energy storage systems for 10 to 20 years***. In addition, in all the markets where Stem operates its customers' systems, Stem has agreements to manage the energy storage systems utilizing the Athena platform to participate in energy markets and to share the revenue from such market participation.

(Emphases added.)

194.     In explaining why STPK was choosing Legacy Stem, the Registration Statement further provided that, based on the Company's "due diligence" investigations, that it was ideally situated to reap extensive benefits from merging with Legacy Stem, including from "increasing global initiatives to improve the efficiency of our energy ecosystems and reduce emissions" from a "digitally connected intelligent energy storage network":

Based on its due diligence investigations of Stem and the industry in which it operates, including the financial and other information provided by Stem in the course of their negotiations in connection with the merger agreement, [the Company] believes that Stem aligns well with the objectives laid out in its investment thesis which focused on identifying a business that is a market leader in, and/or benefitting from the increasing global initiatives to improve the efficiency of our energy ecosystems and reduce emissions. Consistent with [the Company's] objectives, Stem's mission to provide a critical component of the global transition to renewable energy by means of its digitally connected intelligent energy storage network for its customers. As a result, [the Company] believes that a merger with Stem will provide [the Company's] stockholders with an opportunity to participate in the ownership of a publicly-listed company with significant growth potential at an attractive valuation.

195.    The Registration Statement maintained that Legacy Stem had "numerous partnerships with a diverse set of industry leaders to reduce execution risk and increase speed to the market in certain geographies" and had international partnerships "with leading regional industrial equipment and energy firms . . . each focused on leveraging the partner's local market knowledge and reputation with leading corporates, utilities and grid operators."

196.    As far as the Company's future plans, the Registration Statement stated that the Company "intend[ed] to leverage our competitive strengths, technology leadership and market share position to build out the largest, digitally connected, AI-powered energy storage network, through" numerous strategies, including a "Continued Focus on Software Innovations," "Front-of-the-Meter Expansion," "International Market Growth," "More Favorable Supply Chain and Financing Terms," and "Additional Service Offerings."

197.    Moreover, the Registration Statement stated that "[w]e have significant in-house expertise in large utility scale projects and have developed a strategy to expand our team and technical capabilities for larger FTM [Front-of-the-Meter] opportunities"; that "[w]e have a history of innovation in the energy storage market through our development of an AI-powered storage technology and zero-money down financing"; that Legacy Stem "ha[s] built a sizeable leadership

position"; and that "[w]e have additional end-market opportunities in other applications for storage such as electric vehicle charging ('EV') integration and power solutions."

198.    Regarding the Company's competitive position, the Registration Statement distinguished Legacy Stem from its peers, stating that: "industry transformation has created an opportunity for an increased role for energy storage solutions like ours"; "[w]e believe as one of the largest in this industry we have a significant head start against our competition in this rapidly evolving environment []"; and "industry peers are typically focused on the development and marketing of single-purpose built solutions with captive hardware offerings, while our AI-powered platform is capable of delivering a multitude of software enabled services operating an extensive and diverse network of energy storage systems across multiple geographies, utility and grid operator service areas."

199.    Additionally, the Registration Statement further highlighted Legacy Stem's Athena platform, among other things, stating that the Company was well-positioned for success:

> We believe that one of the key advantages driving sustainable differentiation for our company includes the focus and capabilities built in our pioneering history in the BTM [Behind-the-Meter] segment of the energy storage industry. This experience required an emphasis on AI-driven co-optimization of energy storage operations and the build out of significant operational infrastructure to execute economic considerations for enterprise customers, utilities and grid operators. We believe that the distributed asset management capability from this experience positions us well to compete in the evolving FTM segment of the energy storage industry as recent regulatory actions include the liberalization and formalization of rules for compensation of market participation for distributed energy resources. We believe the legacy single-purpose market for FTM solutions will be driven by greater demand for flexible solutions that can access multiple market opportunities. Our solutions have been designed to mitigate the challenges of today's enterprise customers, independent power producers, utilities, renewable asset owners and the modern electrical grid at scale with continuous improvements to artificial intelligence optimization strategies informed by operational data from one of the industry's largest network of digitally-connected energy storage systems. We believe we are well-positioned to compete successfully in the market for energy storage hardware and software-enabled services. Despite our limited operating history, we are among the leaders in global distributed energy storage under

management, supported by our Athena platform, compelling customer services, strategic partnerships and seasoned leadership team with a proven track record of success.

200.    The statements in the Registration Statement created a false image of Legacy Stem and the post-Merger Company's access to long-term agreements for AI-run services that suggested stable, substantial and continual revenues, considerable growth, and an edge compared to other market competitors in light of Legacy Stem's use of AI for its storage solutions. In truth, the actual and potential value of Legacy Stem's AI platform was exaggerated.

### January 5, 2021 Press Release

201.    On January 5, 2021, the Company issued a press release, which qualifies as a prospectus under SEC rules, that stated the following about Stem's capabilities:

About Stem, Inc.

Stem provides solutions that address the challenges of today's dynamic energy market. By combining advanced energy storage solutions with Athena™, a world-class AI-powered analytics platform, ***Stem enables customers and partners to optimize energy use by automatically switching between battery power, onsite generation and grid power.*** Stem's solutions help enterprise customers benefit from a clean, adaptive energy infrastructure and achieve a wide variety of goals, including expense reduction, resilience, sustainability, environmental and corporate responsibility and innovation. Stem also offers full support for solar partners interested in adding storage to standalone, community or commercial solar projects – both behind and in front of the meter.

### January 13, 2021 Press Release

202.    Approximately one week later, on January 13, 2021, the Company issued another press release, which qualifies as a prospectus under SEC rules, that contained the same statement in the January 5, 2021 press release about Stem's capabilities:

About Stem, Inc.

Stem provides solutions that address the challenges of today's dynamic energy market. By combining advanced energy storage solutions with Athena™, a world-class AI-powered analytics platform, ***Stem enables customers and partners to optimize energy use by automatically switching between battery power, onsite***

***generation and grid power.*** Stem's solutions help enterprise customers benefit from a clean, adaptive energy infrastructure and achieve a wide variety of goals, including expense reduction, resilience, sustainability, environmental and corporate responsibility and innovation. Stem also offers full support for solar partners interested in adding storage to standalone, community or commercial solar projects – both behind and in front of the meter.

***January 25, 2021 Analyst Day Slideshow Presentation***

203.    On January 25, 2021, the Company published a presentation slideshow to be used in connection with the Merger. The slideshow contained the following statements about Athena's capabilities:

> Our market leading Athena software uses advanced artificial intelligence and machine learning to optimize the operation of these batteries ***by automatically switching between battery power, onsite generation and grid power.***
>
> \* \* \*
>
> . . . ***Athena absorbs massive volumes of real-time data to provide continuous monitoring, forecasting, optimization, and automated controls to deliver its many value-added services.***
>
> \* \* \*
>
> . . . ***Athena then automatically evaluates each customer's exposure to dynamic energy and demand prices and adapts to store and release energy when the customer will achieve the most savings.***
>
> . . . It integrates in real time with energy market operators and utilities to provide essential system visibility to grid operators ***while automating market transactions. And Athena and smart battery storage maximize wholesale market revenues with automated market participation across the project's entire lifecycle.***

204.    The slideshow presentation also represented that the Company's hardware gross margins would be between 10 to 30%:



205.    The slideshow presentation, on page 15, defined Stem's "12-Month Pipeline" as the "***Total value of uncontracted, potential hardware and software revenue from opportunities*** currently in process by Stem direct salesforce and channel partners ***which have a reasonable likelihood of contract execution*** within 12 months."

206.    On May 27, 2021, the Company included the same slide in ¶ 192 in the Leader in AI-Driven Storage Solutions Slideshow presentation.

***February 11, 2021 Press Release***

207.    On February 11, 2021, the Company issued another press release, which qualifies as a prospectus under SEC rules, that contained the same statement in the January 5, 2021 and January 13, 2021 press releases about Stem's capabilities:

> About Stem, Inc.
>
> Stem provides solutions that address the challenges of today's dynamic energy market. By combining advanced energy storage solutions with Athena™, a world-class AI-powered analytics platform, ***Stem enables customers and partners to***

*optimize energy use by automatically switching between battery power, onsite generation and grid power.* Stem's solutions help enterprise customers benefit from a clean, adaptive energy infrastructure and achieve a wide variety of goals, including expense reduction, resilience, sustainability, environmental and corporate responsibility and innovation. Stem also offers full support for solar partners interested in adding storage to standalone, community or commercial solar projects – both behind and in front of the meter.

### February 18, 2021 Press Release

208.   On February 18, 2021, the Company issued another press release, which qualifies

as a prospectus under SEC rules, that contained the same statement in the January 5, 2021, January

13, 2021, and February 11, 2021 press releases about Stem's capabilities:

> About Stem, Inc.
>
> Stem provides solutions that address the challenges of today's dynamic energy market. By combining advanced energy storage solutions with Athena™, a world-class AI-powered analytics platform, *Stem enables customers and partners to optimize energy use by automatically switching between battery power, onsite generation and grid power.* Stem's solutions help enterprise customers benefit from a clean, adaptive energy infrastructure and achieve a wide variety of goals, including expense reduction, resilience, sustainability, environmental and corporate responsibility and innovation. Stem also offers full support for solar partners interested in adding storage to standalone, community or commercial solar projects – both behind and in front of the meter.

### March 2, 2021 Press Release

209.   On March 2, 2021, the Company issued another press release, which qualifies as a

prospectus under SEC rules, that contained the same statement in the January 5, 2021, January 13,

2021, February 11, 2021, and February 18, 2021 press releases about Stem's capabilities:

> About Stem, Inc.
>
> Stem provides solutions that address the challenges of today's dynamic energy market. By combining advanced energy storage solutions with Athena™, a world-class AI-powered analytics platform, *Stem enables customers and partners to optimize energy use by automatically switching between battery power, onsite generation and grid power.* Stem's solutions help enterprise customers benefit from a clean, adaptive energy infrastructure and achieve a wide variety of goals, including expense reduction, resilience, sustainability, environmental and corporate

responsibility and innovation. Stem also offers full support for solar partners interested in adding storage to standalone, community or commercial solar projects – both behind and in front of the meter.

### March 18, 2021 Press Release

210.    On March 18, 2021, the Company issued another press release, which qualifies as

a prospectus under SEC rules, that contained the same statement in the January 5, 2021, January

13, 2021, February 11, 2021, February 18, 2021, and March 2, 2021 press releases about Stem's

capabilities:

> About Stem, Inc.
>
> Stem provides solutions that address the challenges of today's dynamic energy market. By combining advanced energy storage solutions with Athena™, a world-class AI-powered analytics platform, ***Stem enables customers and partners to optimize energy use by automatically switching between battery power, onsite generation and grid power.*** Stem's solutions help enterprise customers benefit from a clean, adaptive energy infrastructure and achieve a wide variety of goals, including expense reduction, resilience, sustainability, environmental and corporate responsibility and innovation. Stem also offers full support for solar partners interested in adding storage to standalone, community or commercial solar projects – both behind and in front of the meter.

### March 30, 2021 Press Release

211.    On March 30, 2021, the Company issued another press release, which qualifies as

a prospectus under SEC rules, that contained the same statement in the January 5, 2021, January

13, 2021, February 11, 2021, February 18, 2021, and March 2, 2021 press releases about Stem's

capabilities:

> About Stem, Inc.
>
> Stem provides solutions that address the challenges of today's dynamic energy market. By combining advanced energy storage solutions with Athena™, a world-class AI-powered analytics platform, ***Stem enables customers and partners to optimize energy use by automatically switching between battery power, onsite generation and grid power.*** Stem's solutions help enterprise customers benefit from a clean, adaptive energy infrastructure and achieve a wide variety of goals, including expense reduction, resilience, sustainability, environmental and corporate

responsibility and innovation. Stem also offers full support for solar partners interested in adding storage to standalone, community or commercial solar projects – both behind and in front of the meter.

***March 4, 2021 10-K***

212.    On March 4, 2021, the Company filed its annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2020 (the "2020 10-K"). The 2020 10-K was signed by Defendants Morgan, Scheyer, Wilds, Daley, Litowitz, Rogers, and Shaper and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the 2020 10-K's accuracy, which were signed by Defendants Scheyer and Wilds. Regarding the upcoming Merger, the 2020 10-K provided a general overview of the anticipated transaction and referred investors "to the preliminary proxy statement/consent solicitation statement/prospectus, as filed in Form S-4 with the [SEC] on January 22, 2021 for additional information." The 2020 10-K disclosed the following with respect to internal weaknesses in Legacy Stem's internal control over financial reporting:

> Based on its assessment as of December 31, 2019, management has identified material weaknesses in its internal controls over financial reporting that we are currently working to remediate, which relate to (i) ineffective internal controls over accounting for complex and significant transactions, (ii) accounting for energy storage systems, (iii) ineffective internal controls over review of the Company's consolidated financial statements and related disclosures and (iv) a lack of formality in our internal control activities, especially related to management review-type controls. With respect to accounting for complex and significant transactions, deficiencies exist in our process for ensuring the completeness of information utilized in various technical accounting analyses and in certain instances, the proper application of the relevant accounting literature, including the determination of the appropriate valuation methodology. These deficiencies could result in material adjustments for certain transactions, including interest capitalization and accounting for convertible notes, accounting and valuation of embedded derivatives and warrant liabilities. With respect to energy storage systems, we did not properly track inflows and outflows, including the valuation of energy storage systems, due in part to the systems that the Company used to track and value energy storage systems. With respect to a lack of formality in our control activities, we did not sufficiently establish formal policies and procedures to design effective controls, establish responsibilities to execute these policies and procedures and hold individuals accountable for performance of these responsibilities.

We had multiple control deficiencies aggregating to a material weakness over ineffective control activities.

213.    However, the statements in the 2020 10-K were materially false and misleading because, *inter alia*, they failed to account for supplementary material weaknesses in Legacy Stem's financial reporting of its accounts for deferred cost of goods sold, inventory, revenue calculations, and calculations related to its internal-use of its software.

214.    The Individual Defendants caused the statements in ¶¶ 188-199 and 201-212 to be materially false and misleading. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company was engaged in the Overpayment Misconduct; (2) Legacy Stem's business and competitive standing were overstated, particularly concerning its strategic partnerships and revenues tied to its software; (3) Stem's Athena software platform was not fully automated, was not a "robust AI platform," and did not produce strong gross margins for the Company; (4) the Company's pipeline of contract deals, especially FTM deals, was exaggerated and contained fraudulent entries to inflate the appearance of Stem's business prospects; (5) Legacy Stem needed the capital infusion from the Merger to continue as a going concern; (6) the Company overstated its gross margins and exaggerated its business and financial prospects; (7) the Company's deal with Available Power was illusory; (8) the Company's software revenue did not account for 100% of its services revenue; and (9) Legacy Stem's and Stem's internal controls over financial reporting were wholly inadequate. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Starts to Emerge While False and Misleading Statements Continue**

*March 15, 2021 Amendment to Registration Statement*

215.     On March 15, 2021, the Company filed a third amendment to its Registration Statement on Form S-4/A with the SEC, disclosing for the first-time additional material weaknesses in Legacy Stem's internal control over financial reporting. The amendment specifically stated in relevant part:

> Based on its assessment as of December 31, 2020, management has identified material weaknesses in its internal controls over financial reporting that we are currently working to remediate, which relate to [*inter alia*] . . . (ii) accounting for . . . deferred cost of goods sold and inventory . . . (v) ineffective internal controls over the review of certain revenue recognition calculations, and (vi) ineffective internal controls over the review of internal-use capitalized software calculations . . . . With respect to . . . inventory and deferred cost of goods sold, we did not properly track inflows and outflows, including the valuation of energy storage systems, due in part to the systems that the Company used to track and value energy storage systems and inventory . . . . [W]e did not sufficiently establish formal policies and procedures to design effective controls, . . . including over review over revenue recognition and internal-use capitalized software calculations.

216.     On this news, the Company's stock fell 3.36%, or $1.19 per share, from a close of $35.43 per share on March 12, 2021, to close at $34.24 per share on March 15, 2021. Still, investors and the public remained in the dark about the true value and prospects of Legacy Stem and the post-Merger Company. Despite the aforementioned disclosure, Defendants continued to make false and misleading statements leading up to the Merger and thereafter about the Company's prospects, financial positioning, and anticipated benefits tied to partnership agreements.

### *Merger Proxy*

217.     On March 30, 2021, the Company filed the Merger Proxy with the SEC, which served as a proxy statement, consent solicitation statement, and prospectus. The Individual Defendants serving on the Legacy Stem Board and the Board of STPK solicited the Merger Proxy filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions and failed to correct prior misstatements.

218.     The Merger Proxy called for shareholders to: (i) consider and vote to approve the

proposed business combination with Legacy Stem; (ii) consider and vote on certain charter proposals to amend the Company's certificate of incorporation and increase number of authorized shares from 400 million to 500 million and up to 1 million of new stem preferred stock, eliminate Class B common stock classification in favor of single class structure, provide for increasing number of authorized shares with a majority vote, provide for removal of directors for cause and by affirmative vote of 66 2/3 of voting power outstanding, provide for amendments to waiver of corporate opportunities, and provide for vote of 66 2/3 to adopt/amend/repeal certain provisions in bylaws or certificate of incorporation; (iii) consider and vote on proposal to approve issuance of shares on NYSE following the closing of the Merger and pursuant to agreements related to the Merger; (iv) approve an incentive plan proposal that would, *inter alia*, include a ceiling of $600,000 for director compensation and provide for incentive awards for employees and non-employee directors, including certain awards provided to officers on the close of the Merger (the "Incentive Plan"); and (v) consider and vote upon a proposal to adjourn STPK's special meeting regarding the Merger and related proposals to a later date if needed to permit further solicitation of proxies if there further support for the Merger is needed or the other proposals by the time of the special meeting.

219.    The Incentive Plan would be administered by the Board or a designated Board committee and provided for initial one-time awards of restricted stock units ("RSUs") for Defendants Carrington and Bush of 1,370,000 shares as part of the Merger. Under a pre-existing incentive plan, certain of Legacy Stem's former executives also would have the right to cash out on prior awards of stock.

220.    Notably, the Incentive Plan proposal, charter proposals, and NYSE proposals were all conditioned on shareholder approval of the Merger.

221.    The Merger Proxy noted that shareholders of the Company would have the opportunity to redeem their shares in the $383.7 million Trust at a redemption price of about $10.13.

222.    The Merger Proxy represented that the "distributed generation industry is an emerging market and our distributed generation offerings may not receive widespread market acceptance" and that Athena did not have defects, but rather "could have undetected defects,":

> The implementation and use of distributed generation at scale is still relatively nascent, and we cannot be sure that potential customers will accept such solutions broadly, or our hardware and software-enabled services more specifically. Enterprises may be unwilling to adopt our offerings over traditional or competing power sources for any number of reasons, ***including the perception that our technology is unproven***, lack of confidence in our business model, unavailability of back-up service providers to operate and maintain the energy storage systems, and lack of awareness of our related hardware and software-enabled services. Because this is an emerging industry, ***broad acceptance of our hardware and software-enabled services is subject to a high level of uncertainty and risk***. If the market develops more slowly than we anticipate, our business may be adversely affected.

> **Risk Factors Summary**

> . . . Risks Relating to Stem's Business and Industry

> . . . ***If Stem is unsuccessful in developing and maintaining its proprietary technology, including the Athena platform, Stem's ability to attract and retain partners could be impaired, Stem's competitive position could be adversely affected and Stem's revenue could be reduced.***

> . . . ***Stem's technology, including the Athena platform, could have undetected defects, errors or bugs in hardware or software which could reduce market adoption, damage Stem's reputation with current or prospective customers and/or expose Stem to product liability and other claims that could materially and adversely affect Stem's business.***

223.    The Merger Proxy further stated that certain risks could result in loss of customers and delayed market acceptance of the Company's hardware and software:

> *If our estimates of useful life for our energy storage systems and related hardware*

*and software-enabled services are inaccurate or if our OEM suppliers do not meet service and performance warranties and guarantees, our business and financial results could be adversely affected.*

[…] Further, ***the occurrence of any defects, errors, disruptions in service, or other performance problems***, interruptions, or delays ***with*** our energy storage systems or ***the Athena platform, whether in connection with day-to-day operations or otherwise, could result in:***

***-loss of customers;***

***-loss or delayed market acceptance and sales of our hardware and software-enabled services;***

[…] The costs incurred in correcting any material defects or errors in our hardware and software or other performance problems may be substantial and could adversely affect our business, financial condition and results of operations.

224.    The Merger Proxy stated that Athena "provides real-time energy optimization and automated controls…":

The transition to renewable energy and a distributed energy infrastructure has resulted in an increase in the complexity and variability of end-customer electricity demand influenced by onsite generation and flexible sources of load. Accordingly, ***it has become nearly impossible to efficiently manage and operate businesses and the grid using a schedule based, human operated approach. Instead, the utilization of intelligent, responsive energy storage throughout the grid is required to provide the real-time balance necessary to support more distributed renewable assets, and we believe that Athena fulfills this vital need of a modern energy infrastructure. Athena unlocks the value of battery storage by providing*** energy forecasting, ***real-time energy optimization and automated controls for our customers*** leveraging over 10 years of operational data and experience. By dispatching electricity to our C&I customers through our energy storage network during periods of peak power demand, we are able to reduce our customers' electricity expenses, improve the value of their energy usage and diminish their environmental impact. In addition, our energy storage network enables grid operators to decrease their reliance on conventional generation sources, thereby improving the resiliency of the electrical grid and enabling lower carbon emissions through the increased adoption of renewable generation sources.

225.    The Merger Proxy stated the following about the capabilities of the Athena platform:

Our Athena Platform

***Athena unlocks the value of battery storage by providing energy forecasting, real-time energy optimization and automated controls for our customers leveraging over 10 years of operational data and experience.*** By dispatching electricity to our C&I customers through our energy storage network during periods of peak power demand, we are able to decrease our customers' electricity expenses, improve the value of their energy usage and diminish their environmental impact. Our Athena AI-powered platform supports customers by managing large-scale energy storage projects, addressing intermittency issues and safeguarding project value against fluctuating market conditions and on-going policy changes. In addition, our energy storage network enables grid operators to decrease their reliance on conventional generation sources thereby improving the resiliency of the electrical grid and enabling lower carbon emissions through the increased adoption of renewable generation sources.

Athena utilizes highly localized weather, energy price and market data to understand the impact on customer electricity usage and formulate optimal economic strategies for charge and discharge of the energy storage systems. Athena-operated systems are under real-time control and currently over 700,000 data points per second are streamed into the platform, informing the strategy developed for each individual asset and site. As of October 2020, Athena's cloud infrastructure is performing automated data engineering, supporting our AI processes that currently model over 24 million scenarios per day, delivering optimal storage operating strategies for each individual customer site. ***This autonomous operation delivers value to enterprise customers, renewable generation partners, utilities, grid operators and financing counterparties.*** The most difficult part of AI and machine learning is data collection and data integrity, and our automated data engineering platform enables our data science team to rapidly develop and deploy new algorithms. These algorithms embed the physics of storage, renewable generation and the grid and include fit-to-purpose deep learning models that evolve so that Athena can react to changing conditions. Our team has automated AI model selection and training, evaluating them against our extensive energy storage operations database encompassing over 20 million runtime hours, or the equivalent of 2,200 years of operations.

226.    The Merger Proxy stated the following about the Athena platform's Gateway

service capabilities:

Athena Gateway: Gateway services provide real-time integration endpoints that tie into utility and market control systems. ***This feature enables our customers to participate in markets and grid programs with automated dispatching leveraging the near-instantaneous response of the Athena platform.***

227.    The Merger Proxy stated the following about the Company's "AI-powered

platform":

> Our key competitors include energy storage system OEMs, hardware integration providers, renewable project developers and engineering, procurement and construction firms. Our industry peers are typically focused on the development and marketing of single-purpose built solutions with captive hardware offerings, *while our AI-powered platform is capable of delivering a multitude of software-enabled services operating an extensive and diverse network of energy storage systems across multiple geographies, utility and grid operator service areas.*

228.    The Merger Proxy contained the same statement from the January 5, 2021, January 13, 2021, February 11, 2021, February 18, 2021, and March 2, 2021 press releases about Stem's capabilities:

> About Stem
>
> Stem provides solutions that address the challenges of today's dynamic energy market. By combining advanced energy storage solutions with Athena™, a world-class AI-powered analytics platform, *Stem enables customers and partners to optimize energy use by automatically switching between battery power, onsite generation and grid power.* Stem's solutions help enterprise customers benefit from a clean, adaptive energy infrastructure and achieve a wide variety of goals, including expense reduction, resilience, sustainability, environmental and corporate responsibility and innovation. Stem also offers full support for solar partners interested in adding storage to standalone, community or commercial solar projects – both behind and in front of the meter.

229.    The Merger Proxy stated the following about Stem's strength in operating in the FTM and BTM markets:

> We operate in two key markets within the energy storage landscape: Behind-the-Meter ("BTM") and Front-of-the-Meter ("FTM"). BTM systems installed at C&I customer locations generate energy that can be used on-site without interacting with the electric grid and passing through an electric meter. Our BTM systems reduce C&I customer energy bills and help facilitate their corporate environmental, social and governance ("ESG") objectives. FTM, grid-connected systems deliver power into the grid which is often sold to off-site customers and transported by the grid prior to reaching an end-user. FTM systems decrease risk for solar and renewable project developers, asset owners, independent power producers and investors by adapting to dynamic energy market conditions and improving the combined value of the solar renewable resource and energy storage over the course of their FTM system's useful life. As an early participant in the BTM market, *we developed operational focus and technical capabilities that position us to have multiple*

*product offerings and services in the evolving market for FTM energy storage services. We believe that Athena's ability to optimize operations in both the BTM and FTM markets is unique in the industry and provides us with a competitive advantage.*

230.   The Merger Proxy further stated, regarding FTM expansion, that "***We have significant in-house expertise in large utility scale projects and have developed a strategy to expand our team and technical capabilities for larger FTM opportunities***."

231.   The Merger Proxy also stated that the Company was well positioned to compete in the FTM market:

> We believe that one of the key advantages driving sustainable differentiation for our company includes the focus and capabilities built in our pioneering history in the BTM segment of the energy storage industry. This experience required an emphasis on AI-driven cooptimization of energy storage operations and the build out of significant operational infrastructure to execute economic considerations for enterprise customers, utilities and grid operators. ***We believe that the distributed asset management capability from this experience positions us well to compete in the evolving FTM segment of the energy storage industry*** as recent regulatory actions include the liberalization and formalization of rules for compensation of market participation for distributed energy resources. We believe the legacy single purpose market for FTM solutions will be driven by greater demand for flexible solutions that can access multiple market opportunities. Our solutions have been designed to mitigate the challenges of today's enterprise customers, independent power producers, utilities, renewable asset owners and the modern electrical grid at scale with continuous improvements to artificial intelligence optimization strategies informed by operational data from one of the industry's largest network of digitally-connected energy storage systems.

232.   The Merger Proxy went on to state that Athena could optimize both the BTM and FTM markets:

> ***We believe that Athena's ability to optimize the operations in both the BTM and FTM markets is unique in the industry and provides competitive differentiation.*** As an early participant in the BTM market, we developed operational focus and technical capabilities that position us to have multiple product offerings and services in the evolving market for FTM energy storage services. In particular, many industry analysts believe recent regulatory actions by the FERC and by global utilities and grid operators will enable distributed energy storage systems to participate in energy markets and receive equivalent compensation and market access to the same extent as conventional generation assets. Such regulatory actions

are expected to provide new economic opportunities for software-enabled services offerings in the energy storage and broader distributed energy resource markets.

233.   The Merger Proxy repeated the same statements made in the Registration Statement regarding Legacy Stem's unique and attractive position as a target with which to merge, its competitive standing and software offerings, the experience of its leadership and its global reach, and accordingly, the prospects of the post-Merger Company.

234.   For example, the Merger Proxy stated that Legacy Stem had "numerous partnerships with a diverse set of industry leaders to reduce execution risk and increase speed to market in certain geographies"; and "[i]nternationally, . . . ha[s] partnered with leading regional industrial equipment and energy firms . . . each focused on leveraging the partner's local market knowledge and reputation with leading corporates, utilities and grid operators."

235.   The Merger Proxy also maintained that "[w]e intend to leverage our competitive strengths, technology leadership and market share position to build out the largest, digitally connected, AI-powered energy storage network, through" several strategies, including a "Continued Focus on Software Innovations", "Front-of-the-Meter Expansion", "International Market Growth", "More Favorable Supply Chain and Financing Terms", and "Additional Service Offerings".

236.   Like the Registration Statement, the Merger Proxy assured that "[w]e have significant in-house expertise in large utility scale projects and have developed a strategy to expand our team and technical capabilities for larger FTM [Front-of-the-Meter] opportunities"; that "[w]e have a history of innovation in the energy storage market through our development of an AI-powered storage technology and zero-money down financing"; that Legacy Stem "ha[s] built a sizeable leadership position"; and that "[w]e have additional end-market opportunities in other

applications for storage such as electric vehicle charging ('EV') integration and power solutions."

237.    Regarding competition, the Merger Proxy maintained that Legacy Stem's peers in the industry were "typically focused on the development and marketing of single-purpose built solutions with captive hardware offerings, while our AI-powered platform is capable of delivering a multitude of software-enabled services operating an extensive and diverse network of energy storage systems

across multiple geographies, utility and grid operator service areas."

238.    Further highlighting the purported appeal of Legacy Stem and the prospects of the post-Merger Company, the Merger Proxy stated:

> We believe that one of the key advantages driving sustainable differentiation for our company includes the focus and capabilities built in our pioneering history in the BTM [Behind-the-Meter] segment of the energy storage industry. This experience required an emphasis on AI-driven co-optimization of energy storage operations and the build out of significant operational infrastructure to execute economic considerations for enterprise customers, utilities and grid operators. We believe that the distributed asset management capability from this experience positions us well to compete in the evolving FTM segment of the energy storage industry as recent regulatory actions include the liberalization and formalization of rules for compensation of market participation for distributed energy resources. We believe the legacy single-purpose market for FTM solutions will be driven by greater demand for flexible solutions that can access multiple market opportunities. Our solutions have been designed to mitigate the challenges of today's enterprise customers, independent power producers, utilities, renewable asset owners and the modern electrical grid at scale with continuous improvements to artificial intelligence optimization strategies informed by operational data from one of the industry's largest network of digitally-connected energy storage systems.
>
> We believe we are well-positioned to compete successfully in the market for energy storage hardware and software-enabled services. Despite our limited operating history, we are among the leaders in global distributed energy storage under management, supported by our Athena platform, compelling customer services, strategic partnerships and seasoned leadership team with a proven track record of success.

239.    The Individual Defendants caused the Merger Proxy to be materially false and misleading because it created a false impression of Legacy Stem's business, operations, and

prospects and, relatedly, the value of the Company's investment and future post-Merger. The Merger Proxy failed to disclose, *inter alia*: (1) Legacy Stem's business and competitive standing were overstated, particularly concerning its strategic partnerships and revenues tied to its software; (2) the post-Merger Company's business and financial prospects were also exaggerated.

240.     The Merger Proxy explicitly maintained that the STPK Board unanimously supported the Merger as "fair to and in the best interests of STPK and its stockholders" based on, admittedly, their own assessment and experience, despite acknowledging their self-interests in the Merger, without the aid of a third-party valuation or fairness opinion.

241.     The Merger Proxy also disclosed the unanimous support and recommendation of the Board of Legacy Stem, who also solicited shareholder approval for the Merger and related proposals in the Merger Proxy. Under a section titled "Management of Stem After the Merger" the Merger Proxy maintained that the current executive officers and directors of Legacy Stem would become the executive officers and directors of the Company.

242.     As a result of the material misstatements and omissions contained in the Merger Proxy, Company shareholders voted to, among other things: (1) approve the Merger; and (2) approve the Incentive Plan, materially benefitting the Individual Defendants, who joined the post-Merger Company.

243.     Indeed, the Merger Proxy described certain benefits set aside for certain of the Individual Defendants upon the Merger's approval as follows:

> each named executive officer will receive a "Closing Grant" of time-based restricted stock units under the Incentive Plan with Messrs. Carrington, Bush and Johnson eligible to receive one million restricted stock units, 65,000 restricted stock units and 65,000 restricted stock units, respectively. In addition, Mr. Carrington will be eligible to receive a number of restricted stock units with a grant date fair value equal to approximately $2 million in each of 2021, 2022 and 2023. Messrs. Bush and Johnson will be eligible to receive a number of restricted stock units in 2021 with a grant date fair value equal to approximately

$800,000, in the case of Mr. Bush, and $700,000, in the case of Mr. Johnson.

244.     Given the lack of appropriate and accurate disclosures in the Merger Proxy, STPK shareholders were unable to evaluate what they would receive in connection with any investment in the post-Merger Company. As many would come to know, those that failed to redeem their shares were duped into investing in a Company that was far less valuable than Defendants presented.

***March 22, 2021 Simmons Energy Conference Presentation***

245.     On March 22, 2021, the Company gave a presentation at the Simmons Energy Conference. The presentation utilized the same slide representing that the Company's Hardware gross margins were between 10 to 30%:



***April 6, 2021 Press Release***

246.     On April 6, 2021, the Company issued another press release, which qualifies as a prospectus under SEC rules, that contained the same statement from the January 5, 2021, January

13, 2021, February 11, 2021, February 18, 2021, March 2, 2021, March 30, 2021 press releases, and the Merger Proxy about Stem's capabilities:

> About Stem, Inc.
>
> Stem provides solutions that address the challenges of today's dynamic energy market. By combining advanced energy storage solutions with Athena™, a world-class AI-powered analytics platform, ***Stem enables customers and partners to optimize energy use by automatically switching between battery power, onsite generation and grid power.*** Stem's solutions help enterprise customers benefit from a clean, adaptive energy infrastructure and achieve a wide variety of goals, including expense reduction, resilience, sustainability, environmental and corporate responsibility and innovation. Stem also offers full support for solar partners interested in adding storage to standalone, community or commercial solar projects – both behind and in front of the meter.

### *April 12, 2021 Press Release*

247.    Less than a week later, on April 12, 2021, the Company issued another press release, which qualifies as a prospectus under SEC rules, that contained the same statement from the January 5, 2021, January 13, 2021, February 11, 2021, February 18, 2021, March 2, 2021, March 30, 2021, and April 6, 2021 press releases, and the Merger Proxy about Stem's capabilities:

> About Stem
>
> Stem provides solutions that address the challenges of today's dynamic energy market. By combining advanced energy storage solutions with Athena™, a world-class artificial intelligence (AI)-powered analytics platform, ***Stem enables customers and partners to optimize energy use by automatically switching between battery power, onsite generation and grid power.*** Stem's solutions help enterprise customers benefit from a clean, adaptive energy infrastructure and achieve a wide variety of goals, including expense reduction, resilience, sustainability, environmental and corporate responsibility and innovation. Stem also offers full support for solar partners interested in adding storage to standalone, community or commercial solar projects – both behind and in front of the meter.

### *April 12, 2021 IPO Edge Fireside Chat*

248. That same day, on April 12, 2021, Defendant Carrington spoke during the IPO Edge Fireside Chat to bolster investor confidence ahead of the Merger. During the Fireside Chat, Defendant Carrington responded to an analyst question about Athena by stating the following:

> *And what Athena does is analyze these large data sets and making real-time decisions that automatically respond to changing conditions in the energy market.* It's not immaterial, we've been at this for a long time, and our data set is very important. So to give you a little bit more color around that, Athena is ingesting over 700,000 data points per second from customer-sited energy storage systems.
>
> . . . So it's a pretty intense amount of AI that's going on and is true AI. It does get better with more use cases, and we believe it creates a significant competitive moat with all that adjusted data. We have over 20 million run time hours, John. That's the equivalent of 2,000 years of experience, actually, which is remarkable. We've had many battery suppliers come to us and try to acquire, want to acquire, our data set, because it is super compelling and very insightful on a variety of different segments.

249. The slideshow presentation that accompanied the IPO Edge Fireside chat represented that the Company's hardware gross margins were between 10 to 30%:



250.     During the Fireside Chat, Defendant Carrington stated that "[o]ur deployments are very significant and growing as is our pipeline. The 12-month pipeline, one of our key metrics that we'll be reporting quarterly, is $1.6 billion."

251.     Defendant Carrington also assured investors that the Company had robust gross margins and high upside:

> So what we do is we attach our software to all of our customers. It's a hundred percent attach rate for our software services. We have a subscription model that ranges from 10 to 20 years. And that provides us with significant and predictable contracted revenue. And there's a final piece to this that you see on the slide around this market participation. And that's when we aggregate customer installations and monetize that capacity in the energy market. ***And what's compelling as you can see very strong, gross margins across each of these values as we go through the process. And the software revenue, the recurring piece of that, continues to grow in the out years. And you can see this movement to much more of a software led company.***

252.     During the Q&A portion of the Fireside Chat, an analyst asked Defendant Carrington about Stem's growth forecast:

> Great. John, a question about your growth forecast. Something that jumped out at me and I thought it was very, very interesting about this transaction when I spoke to you guys when we did that article, was that there's a lot behind those numbers. It's not like you're doing top down analysis and saying, " That's what we're hoping for." Can you just, if you would, just talk a little bit more about how you got to those projections and why investors can have confidence in them?

253.     Defendant Carrington responded by emphasizing Stem's growing pipeline and painting a rosy picture for growth into 2022:

> Yeah. Well, I think first and foremost, it's a little bit about what Mike said, which is through the third quarter of last year, our bookings represented about 90% of our 2021 revenue goal. So we've updated that. We've affirmed our revenue goal for 2021. So I think that should give a lot of confidence for shareholders. ***We also have a significant growing pipeline. That gives us visibility to 2022, and that's starting to evolve more and more each day. And so we feel good about, as we look at those numbers going forward.*** But from the perspective of how we built the model, I think it was a very collaborative effort by Star Peak. And they were very thoughtful across a variety of diligence.

*April 14, 2021 Press Release*

254.    On April 14, 2021, the Company issued another press release, which qualifies as a prospectus under SEC rules, that contained the same statement from the January 5, 2021, January 13, 2021, February 11, 2021, February 18, 2021, March 2, 2021, March 30, 2021, April 14, 2021 press releases, and the Merger Proxy about Stem's capabilities:

> About Stem, Inc.
>
> Stem provides solutions that address the challenges of today's dynamic energy market. By combining advanced energy storage solutions with Athena™, a world-class AI-powered analytics platform, ***Stem enables customers and partners to optimize energy use by automatically switching between battery power, onsite generation and grid power.*** Stem's solutions help enterprise customers benefit from a clean, adaptive energy infrastructure and achieve a wide variety of goals, including expense reduction, resilience, sustainability, environmental and corporate responsibility and innovation. Stem also offers full support for solar partners interested in adding storage to standalone, community or commercial solar projects – both behind and in front of the meter.

255.    The Company issued another announcement on April 21, 2021, one week before the Merger, which contained the same statement as above in ¶ 192.

*May 17, 2021 Press Release*

256.    On May 17, 2021, the Company issued another press release, which qualifies as a prospectus under SEC rules, that contained the same statement from the January 5, 2021, January 13, 2021, February 11, 2021, February 18, 2021, March 2, 2021, March 30, 2021, April 14, 2021 press releases, and the Merger Proxy about Stem's capabilities:

> Stem, Inc. (NYSE: STEM) provides solutions that address the challenges of today's dynamic energy market. By combining advanced energy storage solutions with Athena™, a world-class AI-powered analytics platform, ***Stem enables customers and partners to optimize energy use by automatically switching between battery power, onsite generation and grid power***. Stem's solutions help enterprise customers benefit from a clean, adaptive energy infrastructure and achieve a wide variety of goals, including expense reduction, resilience, sustainability, environmental and corporate responsibility and innovation. Stem also offers full support for solar partners interested in adding storage to standalone, community or

commercial solar projects – both behind and in front of the meter. For more information, visit www.stem.com.

***May 31, 2021 FGain YouTube Interview with Defendant Carrington***

257.    On May 31, 2021, Defendant Carrington was interviewed by FGain in a YouTube video. During the interview, Defendant Carrington discussed Athena's AI capabilities:

 Sure, yeah. So our artificial, you know, intelligence or AI software, which I mentioned is called Athena, is really built to optimize energy storage assets for different value streams. And each market has different value streams. The good news is we see 13 that could be identified with energy storage. So you've got this massive land and expand opportunity that I alluded to earlier that's just not out there with a solar or wind technology. ***And what Athena does is it's analyzing these large data sets and making real time decisions that automatically respond to changing conditions in the energy market.*** It's not immaterial. We've been at this for a long time and our dataset is very important. So to kind of give you a little bit more color around that, Athena's ingesting over 700,000 data points per second from customer site and energy storage systems.

It requires very specific and localized information. As I mentioned, it changes in different markets, but typically we're looking at weather, energy prices, grid dynamics, and obviously the customer usage pattern and then their energy usage. And then what we do is we pair all of that with real-time data in our machine learning algorithm, which predicts future conditions. And that allows, and that runs over 24 million scenarios to optimize battery value for our customers. The grid, whether it's the grid, the customer, the utility. So it's a, it's a pretty intense amount of AI that's going on. ***It is true AI***, it does get better with more use cases, and we believe it creates a significant competitive moat with all that ingested data. We have over 20 million runtime hours, John, that's the equivalent of 2000 years of experience actually, which is remarkable. We've had many battery suppliers come to us and try to acquire or want to acquire our data set because it is super compelling and very insightful on a variety of different segments. So, you know, bottom line is battery storage needs smart software to make it work and optimize all these use cases. And by far we believe Athena is the best in class around that objective.

***June 9, 2021 Cowen Sustainability & Energy Transition Summit***

258.    On June 9, 2021, Stem attended the Cowen Sustainability & Energy Transition Summit, during which Defendant Carrington gave a presentation and answered questions regarding Stem. During the Summit, Defendant Carrington stated the following about Stem's growth and overall position in the energy market:

And when you think about a grid operator or utility, we are very material on that front. Here in California alone, we had over 20,000 calls last year when they were having wildfires and rolling blackouts. Now on the developer side and what we kind of think of as front of the meter or asset owner, we help them lever up their returns by anyway from 10% to 30%. From a market standpoint, super compelling time right now. We really think of it as an inflection point. And it's driven by the dramatic decrease in cost for both renewable, energy generation and a reduction in battery hardware. The other part about this that's really compelling is the fact that the storage market, according to BNEF, is going to grow at 25x over the next 10 years. And that turns into a $1.2 trillion TAM. So we're one of the market leaders in a worldwide storage development with a 1.1 gigawatt hours under management. So tremendous market, tremendous tailwind really globally.

And then finally, **the key to our growth and success is really this Athena software platform I mentioned.**

259.     Also, during the Summit, Defendant Carrington stated that he and his team at Stem developed a "best-in-class" "AI machine":

. . . I mean I joined in 2013, we had 5 systems. We now have over 950. So the growth rate has been exceptional. But what's also important is all that data we've ingested is also -- and that's 20 million runtime hours, by the way, **has really helped us refine our algorithms and created this AI machine** that we believe is best-in-class and really creates a higher competitive moat for the company.

260.     Defendant Carrington also told investors during the Summit that "**we are looking at our supply chain weekly in our operations call. And It's obviously very important because we are going to only recognize revenue when the hardware is delivered to our customer**."

**August 11, 2021 Form 10-Q**

261.     On August 11, 2021, the Company filed its quarterly report on Form 10-Q with the SEC for the quarter ended June 30, 2021 (the "2Q 2021 10-Q"). The 2Q 2021 10-Q was signed by Defendant Bush and contained SOX certifications signed by Defendant Carrington and Bush attesting to the 2Q 2021 10-Q's accuracy.

262.     The 2Q 2021 10-Q stated the following about Stem's business and likelihood of the Company experiencing poor revenues and overall performance:

The Company's business prospects are subject to risks, expenses, and uncertainties frequently encountered by companies in the early stages of commercial operations. Prior to the Merger, the Company had been funded primarily by equity financings, convertible promissory notes and borrowings from affiliates. The attainment of profitable operations is dependent upon future events, including obtaining adequate financing to complete the Company's development activities, securing adequate supplier relationships, building its customer base, successfully executing its business and marketing strategy, and hiring and retaining appropriate personnel. ***Failure to generate sufficient revenues, achieve planned gross margins and operating profitability, control operating costs, or secure additional funding may require the Company to modify, delay or abandon some of its planned future expansion or development, or to otherwise enact operating cost reductions available to management, which could have a material adverse effect on the Company's business, operating results and financial condition.***

***August 11, 2021 Press Release & Conference Call***

263.    On August 11, 2021, the Company issued another press release, which qualifies as a prospectus under SEC rules, that contained the same statement from the January 5, 2021, January 13, 2021, February 11, 2021, February 18, 2021, March 2, 2021, March 30, 2021, April 14, 2021, May 17, 2021 press releases, and the Merger Proxy about Stem's capabilities:

Stem, Inc. (NYSE: STEM) provides solutions that address the challenges of today's dynamic energy market. By combining advanced energy storage solutions with Athena™, a world-class AI-powered analytics platform, ***Stem enables customers and partners to optimize energy use by automatically switching between battery power, onsite generation and grid power***. Stem's solutions help enterprise customers benefit from a clean, adaptive energy infrastructure and achieve a wide variety of goals, including expense reduction, resilience, sustainability, environmental and corporate responsibility and innovation. Stem also offers full support for solar partners interested in adding storage to standalone, community or commercial solar projects – both behind and in front of the meter. For more information, visit www.stem.com.

264.    The press release also stated the following about Stem's pipeline and growth pertaining to FTM project opportunities:

***The Company's 12-month forward Pipeline was $1.7 billion as of June 30, 2021 representing significant year-over-year growth. The 21% increase in the 12-month pipeline from $1.4 billion at March 31 2021 is a result of increased FTM project opportunities*** and the seasonal nature of the pipeline.

265.    That same day, on August 11, 2021, the Company hosted a conference call with investors and analysts concerning Stem's second quarter financial results for the 2021 fiscal year. During the call, the Individual Defendants represented that "***Athena*** benefits from years of experience operating a large install base with over 20 million run time hours across a diverse set of markets, battery technologies, and multiple use cases, culminating in ***a significant competitive mode for the company***."

266.    The Individual Defendants also told investors and analysts that Athena was being used in Massachusetts as a fully automated system that could use real-time price forecasting algorithms:

> ***Athena is also executing in Massachusetts with its fully automated energy dispatch platform called Athena Bidder, where this past quarter Stem began AI automated bidding into the ISO New England energy and frequency regulation markets using real time price forecasting algorithms.***

> At the same time, Athena is optimizing for capacity obligations, long-term battery life, solar ITC compliance, and Massachusetts smart program compliance. Energy markets are only getting more complex, and Athena thrives on that complexity.

267.    During the call, Defendant Carrington emphasized that the Athena platform largely powered Stem's share of the FTM market:

> As we look to increase our sales in the fast growing Front of the Meter or FTM market, it is our partnered channel that will allow us to access those larger projects in markets. We have grown quickly in markets like Massachusetts. In fact, as of the end of June, Athena managed 52% of the energy storage assets active in the whole sale energy ancillary services and forward capacity settlement markets in Massachusetts.

> This capacity represents almost 20% of the continuous storage facilities in the six states comprising the ISO New England market as reported by that system operator. ***These strong results demonstrate our speed to market and effectiveness of our Athena platform, underscoring our confidence and continued momentum in growing share of the FTM market.***

268.    Defendant Carrington also discussed FTM impact in respect to the Massachusetts

project:

> I'd say that, one of the really exciting parts of what we're doing on the front of the
> meter side is if you look at Massachusetts, particularly it's a market we weren't
> even in 18 months ago. And as mentioned in the prepared remarks, we have 52%
> of the energy storage assets, active in the wholesale markets that Athena's
> managing. ***So we feel very good about our advanced, our efforts in the Front of
> the Meter side.***
>
> And again, when you think about the whole ISO New England market, it's 20%
> and that's a six states ecosystem, as you well know. I would also add that, we're
> continuing to look at a variety of things to accelerate that roadmap. And that could
> come in the form of, looking at opportunities from Athena roadmap standpoint and
> in organic type of plays, but we will certainly continue to invest in data science
> system in that software development team. But we do feel like it's a great spot for
> us. We are really feeling confident in our trajectory on that space. And we expect
> to see more and we'll continue to update everyone as the momentum continues.

269.    Defendant Bush also spoke during the call about Stem's pipeline growth because

of the Company's expanding its FTM presence:

> ***Turning to our operating metrics, our 12-month pipeline grew to $1.7 billion as
> of the end of June that's up 21% from the end of the first quarter 2021. We are
> seeing a lot of new opportunities in the FTM space, which contributed to two-
> thirds of the growth in the pipeline as our salesforce focuses on that market.*** We
> booked $45 million in projects in the quarter and have booked $96 million in the
> first half 2021 versus $58 million in the first half of 2020.

270.    During the Q&A portion of the call, an analyst asked about Stem's margins, asking

if Defendant Bush could discuss "how should we think about margins in the near-term" in light of

industry shipping costs and broader supply chain issues. Specifically, the analyst sought clarity on

Stem's margins for the latter half of 2021 and 2022. Defendant Bush replied:

> .. . we think the second quarter [of 2022], the margins there really reflected some
> of the – early entry FTM projects, which had a little bit lower margins then what
> we are seeing currently. ***Longer term, we think that the software does of course,
> drive the mix, and that's going to drive higher gross margins as we've talked
> about over a number of calls.***
>
> ***September 9, 2021 Leader in AI-Driven Solutions Slideshow Presentation***

271.    On September 9, 2021, Stem published a Leader in AI-Driven Solutions slideshow presentation. The presentation featured the following slide that represented Stem's hardware gross margins were between 10 to 30%:



*October 12, 2021 AI Driven Storage Conference*

272.    On October 12, 2021, Defendant Carrington was interviewed during the AI Driven Energy Storage Conference. During the interview, Defendant Carrington was asked, "What would you say to a skeptical investor or a potential investor looking at the competition? What did they get wrong about your company?" Defendant Carrington replied:

> You know, look, I mean, I think we've got a tremendous shareholder base. You can see who those names are. Obviously, the stock performance has been very good. I don't think people don't understand the company. ***I think it's a question of can, can the company execute? Can they make this shift to front of the meter from behind the meter? Yes, you are the leader, yes, you have this huge market share. And I would say to that highlight, Massachusetts, which is one of the biggest front of the meter markets, we have 52% share.*** I would also highlight the fact that we weren't there 18 months ago. ***So we have a very compelling product that is winning in a variety of markets.*** So, I don't, there's not been a silver bullet of, hey,

here's a concern we see. And when your customers continue to buy from you, you grow at 4x, year over year, you continue to meet your financial metrics that you've committed to the street. That's pretty powerful and I intend to continue to do that.

273.    The interviewer also asked Defendant Carrington about Stem's revenue and the growth of the Company's pipeline:

Yeah, maybe we can take a look at that 4x growth in that pipeline. Revenues, like you mentioned, the 339%, is great. You were quoted as saying revenue was at the high end of your guidance range, which coupled with gross margin and operating expense performance keeps you on track to meet your full year revenue and adjusted EBITDA targets. So was the higher hardware revenue from the front of meter partnership agreements, was that a one-time event or can investors expect to see that in the future? Maybe kind of unpack that pipeline in 4x expectation.

274.    Defendant Carrington responded by emphasizing Stem's pipeline growth in respect to FTM expansion:

Yeah, look, you know, *our pipeline continues to grow. It's a $1.7 billion pipeline as of the end of June. As I mentioned, that's up 21%, versus the end of the first quarter of 2021. So we could see growth there. And yes, a lot of that's in the front of the meter side.* We expect to continue.

**November 9, 2021 Conference Call and Press Release**

275.    On November 9, 2021, the Company hosted a conference call with analysts and investors concerning Stem's third quarter financial results for the 2021 fiscal year. During the call, in response to an analyst's question about whether Stem's service revenue line was 100% software related, Defendant Bush maintained "That is 100% software revenue."

276.    Defendant Carrington also boasted about Stem's "most robust artificial intelligence platform in the industry":

On today's call, I want to focus on 3 things that differentiate us in the market. Number one, our software; number two, our customer focus; and number three, our financial position. *First, starting with software. Let me be completely clear about our vision.* It is to expand our position as the leading energy intelligent software provider. *We have purposefully built our organization to drive the deepest, most robust artificial intelligence platform in the industry*. Larsh will discuss our software differentiation in more detail later in the call.

277.    Defendant Carrington also mentioned stated that "[t]*he Athena platform drove 8%*

*GAAP gross margin and 15% non-GAAP gross margin this quarter, and Athena will continue*

*to drive our margin expansion.*"

278.    Defendant Carrington also stressed that Stem's FTM market growth was

expanding, and the Company's project pipeline was growing in result:

> *In the front of meter, our FTM market segment, we continue to gain share, which contributed to the significant increase in our pipeline this quarter.* Additionally, our behind the meter, our BTM customers, continue to grow. And our repeat customer metrics are up quarter-over-quarter and year-over-year. In fact, nearly 50% of our bookings this quarter came from existing customers.
>
> * * *
>
> *Moving to some of our key metrics driven by our customer success. Our 12-month pipeline grew by 41% in only 90 days from $1.7 billion at the end of the second quarter to a record $2.4 billion at the end of September. We achieved this stellar growth across both FTM and BTM segments* and across multiple geographies.

279.    Also, during the call, Defendant Johnson emphasized the importance of Athena to

Stem's ability to successfully optimize FTM sites:

> Last month, we introduced new advanced applications for wholesale energy markets. Athena Supervisor, which provides customers and partners asset performance insights with real-time visibility into how Athena manages and monetizes energy assets to ensure the lowest total cost of ownership. And Athena Bidder, which incorporates an owner's asset strategy and continuously generates market bids to maximize wholesale market revenues. *We are fulfilling significant demand for these applications as we continue to expand our presence operating front-of-meter assets in wholesale energy markets.*
>
> *Let's focus on our co-optimization capability for a couple of these FTM sites that went live in Massachusetts this year. For the first time, Athena Bidder automated day-ahead and real-time energy market participation along with capacity and frequency regulation services of hybrid solar plus storage assets in ISO-New England. Athena continuously forecast solar generation, the battery state of charge, energy and frequency regulation prices, market options and incentive goals.*
> *With this information, Athena optimizes executing millions of scenarios per hour to determine the best operation for each site and then automatically generates bids for each market interval over the coming hours and days. Athena*

*continuously tracks real-time conditions and cleared bids to better inform this nonstop real-time trading activity.* I'm pleased to report that our first system is already performing 16% better than the initial forecast.

Lastly, we aggressively deployed these systems to maximize returns for our customers. This was no small feat and involved working with the ISO-New England to ensure these new hybrid systems were operating properly with the market. Our deep domain expertise is differentiating, and we will continue to work with grid operators on maximizing the benefits of energy intelligence.

280.     Defendant Bush also discussed Stem's operating metrics during the call, stating that the Company's "*12-month pipeline grew to $2.4 billion as of the end of September*. That's up 41% from the second quarter of 2021. *Our pipeline grew in multiple markets and both in FTM and BTM*.

281.     An analyst then asked Defendant Bush a follow-up question about Stem's pipeline; specifically, whether the Individual Defendants were seeing any software opportunities in the pipeline or whether the opportunities were solely hardware. Defendant Bush replied:

No. *We definitely see software-only opportunities as well, and that tends to be more on the larger side of the FTM projects.* And I think as we've said in the past, our customer base are really our partners, solar development partners tend to vary fairly significantly in terms of sophistication. And so the larger projects tend to be driven by much more sophisticated counterparties who, in some cases, actually have procurement departments themselves as it relates to batteries. And so in those cases, you more likely see a software-only.

282.     Later in the session, Maheep Madloi, an analyst for Credit Suisse, asked Defendant Carrington about the volume of BTM and FTM bookings and how it was divide between hardware and software:

And just one last one for me and then I'll just hop back in the queue here. If you could just talk about the split of, in the bookings, the share of behind the meter and front of the meter and how much is hardware versus software?

283.     Defendant Carrington replied by stating that Stem was experiencing "great progress" on expanding into new geographic areas:

Yes. From a booking standpoint, 80% of our bookings in the third quarter were front of the meter. And ***Texas was a large part of our pipeline expansion, particularly around front of the meter. The pipeline as we go forward looks to be about 75% front of meter. And so we feel like we're making great progress on that front and getting into new geographies.***

284. The same day, the Company issued a press release which qualifies as a prospectus under SEC rules, reaffirming its gross profit guidance for the full-year 2021, stating in relevant part that "[t]he Company reaffirms its guidance of full-year 2021 revenue of $147 million and full year 2021 Adjusted EBITDA of $(25) million. Consistent with prior guidance, the Company reaffirms that it expects to recognize 50-60% of total 2021 revenue in Q4. The Company expects to provide 2022 guidance in its fourth quarter/full year 2021 earnings call in mid-to-late February 2022."

285. The press release stated that Stem's pipeline was growing as a result of new FTM project opportunities:

> ***The Company's 12-month forward Pipeline was $2.4 billion as of September 30, 2021***, compared to $1.7 billion on June 30, 2021, ***representing 41% sequential growth. The increase in the 12-month pipeline is a result of increased FTM project opportunities***, including significant expansions into new markets, continued growth in Stem's partner channel, and the seasonal nature of the pipeline.

286. The press release also contained the same statement from the January 5, 2021, January 13, 2021, February 11, 2021, February 18, 2021, March 2, 2021, March 30, 2021, April 14, 2021, May 17, 2021, August 11, 2021 press releases, and the Merger Proxy about Stem's capabilities:

> Stem, Inc. (NYSE: STEM) provides solutions that address the challenges of today's dynamic energy market. By combining advanced energy storage solutions with Athena™, a world-class AI-powered analytics platform, ***Stem enables customers and partners to optimize energy use by automatically switching between battery power, onsite generation and grid power***. Stem's solutions help enterprise customers benefit from a clean, adaptive energy infrastructure and achieve a wide variety of goals, including expense reduction, resilience, sustainability, environmental and corporate responsibility and innovation. Stem also offers full

support for solar partners interested in adding storage to standalone, community or commercial solar projects – both behind and in front of the meter. For more information, visit www.stem.com.

### November 10, 2021 Form 10-Q

287.     The next day, on November 10, 2021, the Company filed its quarterly report on Form 10-Q with the SEC for the quarter ended September 30, 2021 (the "3Q 2021 10-Q"). The 3Q 2021 10-Q was signed by Defendant Bush and contained SOX certifications signed by Defendant Carrington and Bush attesting to the 3Q 2021 10-Q's accuracy.

288.     The 3Q 2021 10-Q stated the following about Stem's pipeline and the likelihood of the Company executing on the projects contained in the pipeline:

> *Pipeline represents the total value (excluding market participation revenue) of uncontracted, potential hardware and software contracts* that are currently being pursued by Stem direct salesforce and channel partners with developers and independent power producers seeking energy optimization services and transfer of energy storage systems *that have a reasonable likelihood of execution* within 12 months of the end of the relevant period based on project timelines published by such developers and independent power producers. We cannot guarantee that our pipeline will result in meaningful revenue or profitability.

289.     The 3Q 2021 10-Q stated the following about Stem's business and likelihood of the Company experiencing poor revenues and overall performance:

> The Company's business prospects are subject to risks, expenses, and uncertainties frequently encountered by companies in the early stages of commercial operations. Prior to the Merger, the Company had been funded primarily by equity financings, convertible promissory notes and borrowings from affiliates. The attainment of profitable operations is dependent upon future events, including obtaining adequate financing to complete the Company's development activities, securing adequate supplier relationships, building its customer base, successfully executing its business and marketing strategy, and hiring and retaining appropriate personnel. *Failure to generate sufficient revenues, achieve planned gross margins and operating profitability, control operating costs, or secure additional funding may require the Company to modify, delay or abandon some of its planned future expansion or development, or to otherwise enact operating cost reductions available to management, which could have a material adverse effect on the Company's business, operating results and financial condition.*

***December 1, 2021 Leader in AI-Driven Solutions Slideshow Presentation***

290.    On December 1, 2021, Stem published a Leader in AI-Driven Solutions slideshow presentation. The presentation featured the following slide that represented Stem's hardware gross margins were between 10 to 30%:



***January 6, 2022 Goldman Sachs Global Energy and Clean Technology Conference***

291.    On January 6, 2022, Stem used the same slide that represented Stem's hardware gross margins were between 10 to 30% as referenced in ¶ 271 during the Company's AI-Driven Solutions presentation. During the conference, Defendant Carrington emphasized Stem's FTM software deals:

> We said on the call [last quarter], and we built the original model a little over 2 years ago now. And at the time, we assumed a 70-30 hardware software split on revenues. And as we sign more and more contracts, we are seeing that mix shift much closer to a 60% hardware, 40% software. And I'd say ***in terms of drivers, again, back to our heavier-weighted FTM deals***, versus behind the meter in our backlog, ***we're just seeing much more software volume revenue dollars associated with that*** because of the scale of those projects.

*The mix shift is a very good thing long term* because if you look at the hardware side, *we earn anywhere from 10% to 30% gross margins on the hardware, but software is 80% plus.*

292.    Later in the conference, an analyst asked Defendant Carrington to explain how Stem's battery and software product is better, and differentiating, from the Company's competitors:

And you mentioned the customer feedback. So that's probably a good segue to talk a little bit about competition on the software side, where your value add really is. So when we talk to investors, there does seem to be, at times, a lack of knowledge or appreciation of the differences in the software space for energy storage. I know it's newer to the public markets, and that might be part of that why that's the case. But the question we get a lot is how do battery software players like yourself differentiate from competitors from a tech perspective? Why would a utility or C&I customer choose your platform versus another platform that might be out there?

293.    Defendant Carrington replied:

Sure. Look, *I'd say we have the most complete solution for both behind the meter and front of the meter energy storage deployments*. And why does that matter? Well, we have significant experience in achieving compelling project economics. So when a C&I customer thinks about the [say new] ratio, are we getting what's Tim told us we were going to say, the answer is yes. That's a very tight community of energy buyers actually. So they talk a lot about what other suppliers are doing, how they performed. And our repeat customer purchases is exceptional. Over 50% of our third quarter bookings were from repeat customers. So they are they're seeing what we said we were going to do. They're saving the money we said, and we're executing on the software solution we committed to.

We also help selecting the right hardware of a particular use case and importantly, the software to ensure the best outcome by optimizing the charge and discharge of the battery. So when you look at a corporate customer, reducing their electricity bill or we're deciding when to help trade in and out of a wholesale market for utility scale development. So all of that runtime hours and experience that we've accumulated, and there's 22 million run time hours. That data really drives better outcomes through our machine AI platform. And effectively, in the end, Brian, what we're doing is we could do more with a battery resource than any other competitor in our view, and that's the feedback we get from customers. And again, I think when you have over half of your bookings coming from repeat customers, *that's a pretty loud voice saying that, a, we're differentiated. We're executing on what we said we would do, and the software is either meeting or exceeding their expectations.*

294.    During the conference, another analyst asked Defendant Carrington about the

Stem's exposure in both the BTM and FTM markets and whether one market was more stable or

promising than the other:

> And I know you guys specifically have talked about your backlog having in not quite equal parts, C&I and utility scale. But as you think about your sort of balanced exposure between -- behind the meter, in front of the meter. Are you more bullish on one versus the other? Maybe if you can drill down into each of the specific end markets as to your views for the outlook here.

295.    Defendant Carrington replied by emphasizing Stem's success in FTM projects:

> Yes, sure. We're certainly seeing tremendous growth in utility scale or some call it front of meter. 80% of our bookings in the third quarter were for front of the meter, and *a full 75% of our pipeline in front of the meter. So Texas was a big part of that.* We see that as a larger growing market. And I'd expect a similar shift to more and more up front of the meter, but we're very bullish on behind the meter. I mean that's really where we got our start. It continues to be a solid contributor to our results, both on a revenue front as well as a gross margin standpoint. And if you look at the corporates, the C&I corporates, Fortune 500s, I mean, they're laser-focused on ESG initiatives. They want to put more solar in, they'd like to put more storage in. They want to be a better grid citizen of the things that we kind of hear from them. And in an aggregate, they all want to save money on their energy. So I think you're going to continue to see a very robust C&I market. I like the fact that we have front of the meter and behind the meter, quite frankly, because it gives you a little bit of flexibility as projects move around on the front of the meter, they're very lumpy, as you know. And so behind the meter, there's less permitting, less interconnection issues. So you're really -- having both in our portfolio, we think, is important.

**January 6, 2022 Leader in AI-Driven Solutions Slideshow Presentation**

296.    On January 6, 2022, Stem published a Leader in AI-Driven Solutions slideshow

presentation. The presentation represented that Stem's project pipeline included projects that had

a reasonable likelihood of execution:

> 12-Month Pipeline[:] *Total value (excluding market participation revenue) of uncontracted, potential hardware and software revenue from opportunities* that are currently being pursued by Stem direct salesforce and channel partners with developers and independent power producers seeking energy optimization services and transfer of energy storage systems, and *which have a reasonable likelihood of contract execution* within 12 months of the end of the relevant period. Pipeline is

based on project timelines published by such developers and independent power producers. We cannot guarantee that our pipeline will result in meaningful re venue or profitability.

*February 24, 2022 Press Releases, Conference Call, and 2021 Financial Results*

297.    On February 24, 2022, the Company issued a press release announcing that it had been selected by Available Power to provide smart energy storage solutions in Texas. Available Power was described as "a developer that designs, develops, and deploys distributed energy resources and microgrid systems for commercial and industrial real estate." The "strategic" partnership was touted as a significant victory for Stem. The press release further stated, in relevant part:

> ***This strategic partnership gives Stem exclusive rights to provide its proprietary Athena® smart energy storage software to energy storage systems at 100 front-of-the-meter (FTM) sites*** throughout the state of Texas. ***The project portfolio is expected to have a value of more than $500 million and will be completed in phases, beginning with deployment of the first 20 systems by early 2023***. Together, Stem and AP will be providing the state grid, operating under the Electric Reliability Council of Texas (ERCOT), with an additional one gigawatt (GW), or two gigawatt-hours (GWh), of flexible electric power for 20 years.
>
> ERCOT is responsible for delivering 90 percent of the state's electric power to more than 25 million people throughout Texas. The market for energy storage in ERCOT is expected to grow more than 10 GWh over the next five years as renewable energy adoption increases and the state prioritizes grid resilience.
>
> AP will be facilitating the entire scope of work on the projects, from development of the energy storage sites, to marketing and selling the assets as they reach operation. Stem will provide the battery storage hardware at each site, incorporate Athena Bidder™ to optimize the bidding and dispatch of the systems (based on real-time market dynamics), and organize the portfolio of energy storage sites into a single, integrated energy intelligence platform. The full scope of Stem's software and services also includes revenue modeling, battery hardware consulting, and development support to successfully complete these projects.

298.    In a last bid before the public learned about more negative news, the press release, quoting Defendant Carrington, also maintained that:

"This partnership with Available Power showcases Stem's ability to support developers across the project lifecycle and enable best-in-class management of large portfolios of energy storage projects. Our market-leading Athena® software, advanced Bidder™ application, system operating knowledge, and ability to rapidly deploy projects will help Available Power quickly go to market and generate exceptional value."

299.    The press release stated the following about Stem's 12-month pipeline growth:

**The Company's 12-month forward pipeline was $4.0 billion at the end of the fourth quarter** compared to $2.4 billion at the end of the third quarter, **representing 67% sequential growth. The increase in the 12-month pipeline is a result of increased FTM project opportunities, including significant expansions into new markets**, continued growth in Stem's partner channel, and the seasonal nature of the pipeline.

300.    The press release also contained the same statement from the January 5, 2021, January 13, 2021, February 11, 2021, February 18, 2021, March 2, 2021, March 30, 2021, April 14, 2021, May 17, 2021, August 11, 2021, November 9, 2021 press releases, and the Merger Proxy about Stem's capabilities:

Stem, Inc. (NYSE: STEM) provides solutions that address the challenges of today's dynamic energy market. By combining advanced energy storage solutions with Athena™, a world-class AI-powered analytics platform, **Stem enables customers and partners to optimize energy use by automatically switching between battery power, onsite generation and grid power**. Stem's solutions help enterprise customers benefit from a clean, adaptive energy infrastructure and achieve a wide variety of goals, including expense reduction, resilience, sustainability, environmental and corporate responsibility and innovation. Stem also offers full support for solar partners interested in adding storage to standalone, community or commercial solar projects – both behind and in front of the meter. For more information, visit www.stem.com.

301.    That same day, the Company hosted a conference call with investors and analysts to discuss Stem's fourth quarter of 2021 and 2021 fiscal year financial results. During the call, Defendant Carrington boasted about Stem's AI platform, telling investors, "I'm energized by the purpose-driven organization we have built and the **substantial competitive position**, with over 34 gigawatts of global assets and **an unrivaled data advantage in our best-in-class AI software platform**."

302.    Defendant Carrington also stated Stem would continue to grow in 2022, powered

by Athena:

> *Our significant momentum on bookings and Athena expansion will drive momentum in 2022 and expect continued strong growth*, as we saw in 2021. *We will maintain our focus of delivering high-value software and services to our customers, which will drive higher margins and higher mix of software revenues*.

303.    During the presentation, Defendant Carrington discussed Stem's contracts,

especially the Available Power deal in Texas:

> We have booked over $300 million in contracts during the second half of 2021. And based on our guidance, at the end of 2022, we expect to book over $1 billion in contracts in the course of 18 months. Based on our current mix of 60/40 hardware to software split, that represents over $400 million of long-dated, high-margin software contracts that will generate strong recurring revenues for years to come. We believe this high-margin multiyear SaaS revenue provides significant operating leverage to our business and positions the company for highly visible, profitable growth.
>
> * * *
>
> Moving to Slide 5. Today, we announced an exciting series of projects in Texas with Available Power, a renewable developer where we will have exclusive rights to provide storage hardware and software for a portfolio of up to 100 sites. In total, this could become a 1-gigawatt, 2-gigawatt hour portfolio, which more than doubles our assets under management from current levels on the storage side.
>
> We expect the value of this award to exceed $500 million. We expect the first 20 systems, or 180 megawatts of energy storage, to be commissioned in early 2023.
>
> Texas was a big driver of our bookings in the fourth quarter, and that momentum will continue *with the Available Power deal.* ERCOT now represents the largest market in our pipeline.
>
> *We are proving how Athena Bidder maximizes the value of our customers' storage assets in this compelling wholesale market.* ERCOT's market structure, with no capacity market, leads to big price swings by design. Storage is well suited to capture these price signals, and Athena enables our customers to participate both in energy and ancillary services markets.
>
> * * *
>
> *The Available announcement is another example of our continued momentum in large-scale, front-of-meter, or FTM, market and the success of our channel partner strategy.* Developers value our ability to procure fit-for-purpose hardware at competitive prices to integrate into their portfolio across multiple sites and to

110

deliver optimized wholesale market bidding and dispatch with our Athena Bidder application.

Our sales in ERCOT follow the same formula we've used in other markets for storage. We deliver hardware upfront and then sell a long-dated software contract that helps our customers optimize their assets for the life of the battery. We are not taking any merchant commodity exposure; just earning recurring software revenue over the contract period, which is typically 20 years for FTM.

***The Available Power win further demonstrates*** our commercial diversity, as our customers span multiple geographies, customer types and use cases, ***continuing to underscore the reach of our Athena platform.***

304.    The slideshow presentation used during the call stated the following about Stem's pipeline and that the projects included in the pipeline "have a reasonable likelihood of execution":

12-Month Pipeline[:] ***Pipeline represents the total value (excluding market participation revenue) of uncontracted, potential hardware and software contracts*** that are currently being pursued by Stem direct salesforce and channel partners with developers and independent power producers seeking energy optimization services and transfer of energy storage systems that have a reasonable likelihood of execution within 12 months of the end of the relevant period based on project timelines published by such developers and independent power producers. We cannot guarantee that our pipeline will result in meaningful revenue or profitability.

305.    Also, during the call, Defendant Johnson stated that Stem's "shared vision [with Also Energy] is to empower clean energy asset owners and operators to scale their businesses by leveraging ***AI-automated, data-driven operations enabled by Athena***."

306.    Defendant Bush represented in the call that "Athena automates everything":

Starting with the Stem energy storage business, our software drives exceptional economics for our customers. ***Athena automates everything***, including reducing costs, increasing revenues, complying with regulatory incentives and constraints and minimizing greenhouse gas emissions. Our broad market reach and scope allows us to co-optimize multiple value streams in real time and over time to maximize economic value for our customers.

307.    During the Q&A portion of the call, an analyst asked the following question regarding Stem's margins:

I wanted to ask a first question, I guess, on the margins here. Maybe if you could give us a bit more bridge. I think you said AlsoEnergy is doing 60% gross margin, overall. So at the midpoint of guidance, it implies they're about half your gross profit dollars for 2022, and that means core Stem is doing maybe about a 10% gross margin. I think you guys originally had a target to do, like, mid-20s in 2022, and you were also 10% to 20% throughout all of '21, before 4Q. Just I'm trying to reconcile the sharp drop-off here, and I know you mentioned a number of different moving parts, but can you maybe help bridge a bit and maybe quantify, if you can, kind of where we were targeting before for core Stem and kind of where we're ending up here with, if the math is right, an implied kind of 10% margin?

308.    Defendant Carrington replied:

Thanks, Brian. Good to have you on the call. Appreciate the question. I'd say, first, then I'll turn it over to Bill, we're really not providing separated guidance. It's all consolidated. And we don't want to break it out for each company's performance.

But Bill, if you want to address some of those points, we can maybe tackle a few of those items that Brian asked.

309.    Defendant Bush than expounded upon Defendant Carrington's reply:

Thanks, John. Brian, appreciate the question. So I think, as John said, I think in the future we won't be breaking out the 2 divisions of the company that way. But I mean, I think the basic math is pretty very correct.

***I think the issue that we're focused on is the continued bookings of the company, and the focus there is making sure that the software is what's driving the long-term value of the company***. So it's possible that we'll see lower margins in the near term, but ultimately – and that's why we rolled out the CARR metric. I mean, that's the – I think we've said pretty consistently in the past that we think backlog is a great short- to medium-term reflection of what the revenues will be. Well, CARR is going to be a great reflection of what software is going to be as we mature.

310.    An analyst then asked a follow-up question about Stem's "margin threshold" on the

"hardware side for new business." Defendant Bush replied:

***I think one of the things that's important to note is we are ever more leaning towards the FTM side of the house. I mean, we've talked about 80/20. That number is getting higher on the FTM side. And as you go back to the guidance of, gosh, almost 2 years ago now, we talked about margins in the 10% to 30% range, more closer to 10% on the FTM side, and that's kind of what we're seeing.***

So I think that though it's a long-dated plan, we're still kind of operating somewhat close to it, other than kind of the mix percentages that we talked about, that we're leaning more heavily towards FTM. I don't think we could have predicted way back

then that Texas would become the market that it has. But the good news is that we're there in force, and we're happy to be.

So I think on the BTM side, still growing, good margins, but definitely maybe more impacted by the pandemic because that tends to be more on the Fortune 500 side of the house.

311.  Later in the call, another analyst inquired about the disparity between Stem's

projected gross margins of 10 to 30% and the actual figures:

I know you guys have a mix shift story here medium to longer term. As more software Athena gets embedded at these higher margins, you're obviously going to see some margin expansion. But just in the near term, there's still going to be a relatively high hardware mix. And I think you guys had talked about a 10% to 30% hardware gross margin. I mean, if you're doing 10%, is there something here to suggest that maybe we should structurally be thinking about a lower hardware gross margin and, eventually, you see the mix shift help you get consolidated margins up, but you're not going to see the sort of 10% to 30% gross margins on hardware anymore? Just trying to figure out if this is a temporary supply chain logistics issue or if this is maybe more structural on the hardware side.

312.  Defendant Bush replied:

I guess I'm not sure I would use the word "structural." But I mean, I think we have consistently said that the larger FTM projects carry a lower gross margin. When you think about those larger developers versus, say, the "smaller ones," the primary difference is integration; and the integration being, does that company have a supply chain relationship or a procurement department? To the sense that they have that and you're doing deals that kind of come into the multi-hundred millions of dollars gigawatt size range, they tend to have relationships, which means that some of the value-added services that we would normally bring to, say, maybe a BTM project just isn't required. And so as a result of that, you're going to see lower gross margins on the hardware. That's just what it is.

However, the more important thing is you're still signing a software contract, which is that super high gross margin contract which is going to layer in over a long period of time.

And so I think irrespective of what the hardware margin is, I think one of the things that we really thought about and which, frankly, drove the decision to acquire AlsoEnergy was the gross margin profile on the software and services. And so that's really where we're focused long term. I mean, to the extent that the hardware suffers in the near term, well, then that's – we think that's a great trade-off for a 10- to 20-year contract with super low churn. So it even goes beyond that.

And so that's really kind of what (inaudible) always thought that way. We're starting to do more software-only deals as well, which is kind of along that same path.

*And so we think that the software continues to differentiate itself from other competitors in the marketplace*. And I think that's really in the end where we're going to be.

313.    The analyst answered Defendant Bush's reply by stating, "Got it. I suppose the good news is (inaudible) the increase in FTM mix, you're still getting the software business that has the same margins, whether it's FTM or BTM." Defendant Bush then followed up the analyst's comment:

Exactly. I mean, ultimately, I think as we've always said and I think most have agreed, *this is a software story*. It's not a sale of somebody else's hardware story. It's really what – *the differentiating component of Stem is the Athena platform. That's always been true, and I think that's going to continue to be true in the future*.

314.    The statements in ¶¶ 245-313 were materially false and misleading as they failed to disclose, *inter alia*, that: (1) the Company was engaged in the Overpayment Misconduct; (2) Legacy Stem's business and competitive standing were overstated, particularly concerning its strategic partnerships and revenues tied to its software; (3) Stem's Athena software platform was not fully automated, was not a "robust AI platform," and did not produce strong gross margins for the Company; (4) the Company's pipeline of contract deals, especially FTM deals, was exaggerated and contained fraudulent entries to inflate the appearance of Stem's business prospects; (5) Legacy Stem needed the capital infusion from the Merger to continue as a going concern; (6) the Company overstated its gross margins and exaggerated its business and financial prospects; (7) the Company's deal with Available Power was illusory; (8) the Company's software revenue did not account for 100% of its services revenue; and (9) Legacy Stem's and Stem's internal controls over financial reporting were wholly inadequate. As a result of the

foregoing, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Continues to Partially Emerge as False and Misleading Statements Continue

315.     The same day, after markets closed, the Company issued another press release revealing disappointing financial results for the fourth quarter and fiscal year ended December 31, 2021. The press release reported earnings per share of -$0.96 and revenue of $127.4 million, which missed consensus estimates by nearly $20 million. Stem also reported low guidance for fiscal year 2022, with gross margins of 15-20% and adjusted EBITDA of $60 to $20 million. For context, Stem told the market on January 25, 2021, just over a year earlier, that the Company would post gross margins of 26% and that the Company would turn a profit with adjusted EBITDA of $28 million. These weak results signaled to investors that Stem was not bringing in revenues from high-margin FTM software deals as the Individual Defendants had represented.  To soften the news, the press release highlighted the Company's purported strategic partnership with Available Power, misleadingly stating in relevant part that:

> On February 24, 2022, the Company announced that it had been exclusively selected to provide storage solutions to Available Power, a developer of distributed energy resources. The strategic partnership will develop up to 100 FTM sites in Texas with potential to provide one gigawatt (GW), or two GWh, of energy storage systems and Athena software. The portfolio will be completed in phases, with deployment of the first 20 systems by early 2023.

316.     The market responded swiftly to the poor news. On February 25, 2022, Morningstar reported that it had "lowered Stem's price target $8, from $18 to $10 per share as a "result of an increase in our discount rate and *a reduction in our long-term profitability outlook*." Morningstar analysts also stated that "[*t]he miss is largely driven by weaker-than-expected gross profit as the company appears to be selling hardware at near breakeven gross margins, below its prior guidance of 10%-30% margins*"; and "[w]e would like to see the company execute well against

its 2022 targets and ***demonstrate further ability to generate software-only sales*** prior to becoming more constructive on its valuation upside."

317.    That same day, Credit Suisse stated that "We reduce our TP by $8 to $28, due to ***lower hardware gross margins due to higher mix of low-margin FTM products*** and higher opex for expansion in new markets and products." Similarly, analysts at SIG noted "margin below expectations" with "***non-GAAP gross margins came in meaningfully below our forecast***." SIG further noted that "we are ***assuming a slower gross margin progression***."

318.    In the same vein, Wolfe Research declared that "Stem's update was a disappointment" and that "2021 misses; ***margin outlook much weaker***" and that ***"[d]riving the negative surprise was a materially weaker outlook for gross margins – guidance of 15-20% for 2022 vs our prior expectation of ~25%***." Wolfe therefore chopped its price target "largely on the lower margin outlook." Wolfe also discussed the fact that although Stem's acquisition of AlsoEnergy was intended to bolster Stem's margins, Stem's gross margins guidance for fiscal year 2022 was well below expectations:

> ***Wasn't the AE deal supposed to be margin accretive***? That was our expectation heading into the print, but ***AE's contribution is being masked by lower margins in STEM's battery segment. STEM previously pointed to a 10-30% GM, but given the backlog's heavy tilt toward FTM projects, the blended margin looks to be at the 10% level. With battery hardware still driving the majority of revenue in the coming years, this is driving materially lower margins/EBITDA in our forecast*** (details on pg 3).
>
> * * *
>
> ***Gross margins inflect lower for now.*** STEM's 15-20% guide for gross margins in 2022 was well below our expectation of ~25%. And our expectation was just for legacy STEM - ***AlsoEnergy was supposed to be accretive to that given that it is a ~60% gross margin business. However, AlsoEnergy's contribution is being masked by lower margins in STEM's battery segment. STEM previously pointed to a 10-30% gross margin, but given the backlog's heavy tilt toward FTM projects (90%+), the blended margin looks to be at the 10% level at least over the near term.***

319.   *Seeking Alpha* reported on the Company's "new 52 week low" and revenue miss the next day, on February 25, 2022, stating in relevant part:

> Stem Inc. (STEM -19%) sinks to a new 52-week low after reporting a larger than forecast Q4 loss and record-high quarterly revenues that tripled from a year ago but missed analyst expectations.
>
> Stem's Q4 net loss narrowed to $34.1M from last year's $100.9M loss but was still wider than the analyst consensus for an $11.6M loss.
>
> * * *
>
> "Supply chain, permitting and interconnection delays negatively impacted our fourth quarter revenues, but demand remains robust, and we expect these issues to resolve over time," [Defendant] Carrington said.
>
> * * *
>
> Stem shares have plunged 68% over the past year, including a 40% YTD decline.

320.   On this news, Stem's stock price declined by 21.62%, or $2.43 per share, from a close of $11.24 per share on February 24, 2022, to close at $8.81 per share on February 25, 2022.

### *February 28, 2022 10-K*

321.   On February 28, 2022, the Company filed its annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2021 (the "2021 10-K"). The 2021 10-K was signed by Defendant Bush and non-party Rahul Shukla and contained SOX certifications signed by Defendant Carrington and Bush attesting to the 2021 10-K's accuracy. The 2021 10-K reiterated substantially the same representations made in the Registration Statement regarding Stem's future prospects, its supposed competitive advantages and international leadership in the energy storage arena. The 2021 10-K further disclosed the following about Stem's revenue line:

> We generate service revenue and hardware revenue. Service revenue is generated through arrangements with host customers to provide energy optimization services using our proprietary cloud-based software platform coupled with a dedicated energy storage system owned and controlled by us throughout the term of the contract. Fees charged to customers for energy optimization services generally consist of recurring fixed monthly payments throughout the term of the contract and

in some arrangements, an installation and/or upfront fee component. We may also receive incentives from utility companies in relation to the sale of our services.

. . . . We separately generate services revenue through partnership arrangements by providing energy optimization services after the developer completes the installation of the project.

322.    Further, the 2021 10-K stated that, "[s]ervices revenue increased by $4.8 million primarily due to continued growth in host customer arrangements and partnership revenue related to services provided." Given that Defendant Bush had maintained that Stem's services revenue line was "100% software revenue [,]" these statements gave the false impression that Stem's purported increase in services revenue was solely a result of its software products and offerings.

323.    The 2021 10-K also represented that Athena enhances battery storage by providing energy forecasting, real-time energy optimization, and automated controls:

The transition to renewable energy and a distributed energy infrastructure has resulted in an increase in the complexity and variability of end-customer electricity demand influenced by onsite generation and flexible sources of load. Accordingly, it has become nearly impossible to efficiently manage and operate businesses and the grid using a schedule based, human operated approach. Instead, the utilization of intelligent, responsive energy storage throughout the grid is required to provide the real-time balance necessary to support more distributed renewable assets, and we believe that Athena fulfills this vital need of a modern energy infrastructure. ***Athena unlocks the value of battery storage by providing energy forecasting, real-time energy optimization and automated controls for our customers*** leveraging over 10 years of operational data and experience.

324.    The 2021 10-K also explained Stem's operations in both the BTM and FTM markets:

We operate in two key markets within the energy storage landscape: BTM and FTM. . . . For FTM customers, we provide software-enabled services to capture revenue from energy market participation, including the sale of capacity, energy and ancillary services into regional electricity markets helping these customers enhance renewable project returns while improving grid resiliency and reliability for utilities and grid operators. These services that we provide are all at the direction of our customers, and we do not independently participate in the wholesale electricity market.

We believe that Athena's ability to optimize the operations in both the BTM and FTM markets is unique in the industry and provides a competitive differentiation. ***As an early participant in the BTM market, we developed operational focus and technical capabilities that position us to have multiple product offerings and services in the evolving market for FTM energy storage services.***

325.    The 2021 10-K also included the Athena AI automated platform as one of Stem's competitive strengths:

Our competitive strengths include the following:

\* \* \*

• **Advanced Technology Platform**: We developed one of the first AI platforms for energy storage and virtual power plants, ***automating storage participation in electricity markets, performing monitoring and management of customer loads, solar generation and energy prices with real-time, complex decision-making algorithms.*** The platform is able to co-optimize multiple energy market revenue streams across a diverse fleet of hardware throughout multiple geographies and energy markets.

326.    The 2021 10-K stated the following about Stem's pipeline and that the projects included in the pipeline "have a reasonable likelihood of execution":

12-Month Pipeline[:] ***Pipeline represents the total value (excluding market participation revenue) of uncontracted, potential hardware and software contracts*** that are currently being pursued by Stem direct salesforce and channel partners with developers and independent power producers seeking energy optimization services and transfer of energy storage systems that have a reasonable likelihood of execution within 12 months of the end of the relevant period based on project timelines published by such developers and independent power producers. We cannot guarantee that our pipeline will result in meaningful revenue or profitability.

327.    The 2021 10-K stated the following about the risks Stem faced in its business:

***Risks Related to Our Business and Industry***

\* \* \*

***The distributed generation industry is emerging and our distributed generation offerings may not receive widespread market acceptance.***
The implementation and use of distributed generation at scale is still relatively nascent, and we cannot be sure that potential customers will accept such solutions broadly, or our hardware and software-enabled services more specifically.

Enterprises may be unwilling to adopt our offerings over traditional or competing power sources for any number of reasons, ***including the perception that our technology is unproven***, lack of confidence in our business model, unavailability of back-up service providers to operate and maintain the energy storage systems, and lack of awareness of our related hardware and software-enabled services. Because this is an emerging industry, ***broad acceptance of our hardware and software-enabled services is subject to a high level of uncertainty and risk***. If the market develops more slowly than we anticipate, our business may be adversely affected.

328.    The 2021 10-K further stated the following risks pertaining to the Athena platform:

***If our estimates of useful life for our energy storage systems and related hardware and software-enabled services are inaccurate or if our OEM suppliers do not meet service and performance warranties and guarantees, our business and financial results could be adversely affected.***

\* \* \*

Further, ***the occurrence of any defects, errors, disruptions in service, or other performance problems, interruptions, or delays with our energy storage systems or the Athena platform, whether in connection with day-to-day operations or otherwise, could result in:***

• ***loss of customers;***

• ***loss or delayed market acceptance and sales of our hardware and software-enabled services;***

\* \* \*

The costs incurred in correcting any material defects or errors in our hardware and software or other performance problems may be substantial and could adversely affect our business, financial condition and results of operations.

329.    The 2021 10-K also discussed general risk possibilities that could affect Stem's

business:

Our business prospects are subject to risks, expenses and uncertainties frequently encountered by companies in the early stages of commercial operations. The attainment of profitable operations is dependent upon future events, including obtaining adequate financing to complete our development activities, obtaining adequate supplier relationships, building our customer base, successfully executing our business and marketing strategy and hiring appropriate personnel. ***Failure to generate sufficient revenues, achieve planned gross margins and operating profitability, control operating costs, or secure additional funding may require us to modify, delay, or abandon some of our planned future expansion or development, or to otherwise enact operating cost reductions available to***

*management, which could have a material adverse effect on our business, operating results, financial condition.*

330.    The 2021 10-K stated the following about risks pertaining to Stem's intellectual property and technology:

***Risks Related to Our Intellectual Property and Technology***

***Our technology, including the Athena platform, could have undetected defects, errors or bugs in hardware or software which could reduce market adoption, damage our reputation with current or prospective customers and/or expose us to product liability and other claims that could materially and adversely affect our business.***

331.    The statements in the 2021 10-K identified in ¶¶ 321-330 were materially false and misleading and failed to disclose material information about Stem's business, compliance, and operations. Specifically, the 2021 10-K failed to disclose that: (1) the Company was engaged in the Overpayment Misconduct; (2) Legacy Stem's business and competitive standing were overstated, particularly concerning its strategic partnerships and revenues tied to its software; (3) Stem's Athena software platform was not fully automated, was not a "robust AI platform," and did not produce strong gross margins for the Company; (4) the Company's pipeline of contract deals, especially FTM deals, was exaggerated and contained fraudulent entries to inflate the appearance of Stem's business prospects; (5) Legacy Stem needed the capital infusion from the Merger to continue as a going concern; (6) the Company overstated its gross margins and exaggerated its business and financial prospects; (7) the Company's deal with Available Power was illusory; (8) the Company's software revenue did not account for 100% of its  services revenue; and (9) Legacy Stem's and Stem's internal controls over financial reporting were wholly inadequate. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

***March 15, 2022 Leader in AI-Driven Energy Solutions Slideshow Presentation***

332.    On March 15, 2021, Stem published a Leader in AI-Driven Solutions slideshow presentation. The presentation featured the following slide that represented Stem's hardware gross margins were between 10 to 30%:



333.    The slideshow presentation stated the following about Stem's pipeline and that the projects included in the pipeline "have a reasonable likelihood of execution":

> 12-Month Pipeline[:] ***Pipeline represents the total value (excluding market participation revenue) of uncontracted, potential hardware and software contracts*** that are currently being pursued by Stem direct salesforce and channel partners with developers and independent power producers seeking energy optimization services and transfer of energy storage systems ***that have a reasonable likelihood of execution*** within 12 months of the end of the relevant period based on project timelines published by such developers and independent power producers. We cannot guarantee that our pipeline will result in meaningful revenue or profitability.

***May 5, 2022 Press Release and Conference Call***

334.    On May 5, 2022, Stem issued a press release in connection with the Company's first quarter of 2022 financial results that stated the Company was "pleased with the increase in

CARR to $51.5 million, reflecting our long-term focus on high-margin software and services revenue." The press release also represented that the Company "believe[s] **Stem's differentiated software solutions, coupled with our customer-focused employees and strong balance sheet, will drive multi-year growth in high margin recurring software and services revenues**, as evidenced by our 16% non-GAAP gross margin this quarter."

335.    The press release also stated that Stem's pipeline was growing because of increased FTM projection opportunities:

> **The Company's 12-month forward pipeline was $5.2 billion at the end of the first quarter 2022** compared to $4.0 billion at the end of the fourth quarter 2021, **representing 30% sequential growth. The increase in the 12-month forward pipeline was driven by increased FTM project opportunities, including significant expansions into new markets** and continued growth in Stem's partner channels.

336.    The press release also contained the same statement from the January 5, 2021, January 13, 2021, February 11, 2021, February 18, 2021, March 2, 2021, March 30, 2021, April 14, 2021, May 17, 2021, August 11, 2021, November 9, 2021 press releases, February 24, 2022 and the Merger Proxy about Stem's capabilities:

> Stem, Inc. (NYSE: STEM) provides solutions that address the challenges of today's dynamic energy market. By combining advanced energy storage solutions with Athena™, a world-class AI-powered analytics platform, **Stem enables customers and partners to optimize energy use by automatically switching between battery power, onsite generation and grid power**. Stem's solutions help enterprise customers benefit from a clean, adaptive energy infrastructure and achieve a wide variety of goals, including expense reduction, resilience, sustainability, environmental and corporate responsibility and innovation. Stem also offers full support for solar partners interested in adding storage to standalone, community or commercial solar projects – both behind and in front of the meter. For more information, visit www.stem.com.

337.    That same day, the Company hosted a conference call with investors and analysts to discuss Stem's first quarter of 2022 financial results. During the call, Defendant Bush stated

that Stem was successfully transforming from a hardware company to a software company, as

evidenced by the CARR figures:

> Contracted Annual Recurring revenue or CARR ended the quarter at $51.5 million.
> This software metric showcases the importance of the Athena and PowerTrack
> network and services we offer our customers that drive long-term value. ***The
> growth in this metric underlies the transition from a predominantly hardware
> revenue model to one focused on low churn high margin differentiated software
> sales.***

338.    Also, during the call, Defendant Carrington stated that Stem was succeeding in the

FTM market:

> On the bookings front, we did $151 million, and again, that's nearly triple the same
> quarter of 2021. The mix is 90% FTM and 10% BTM. As you might recall, the
> fourth quarter was 95%, 5%. You know, ***from a pipeline standpoint, we're running
> about a little over 80% front of the meter with a 12-month pipeline of around $5.2
> billion. And that's a record, so we feel very strong about that. It's really indicative
> of a couple of markets like Texas and California that have continued to see
> acceleration.***

339.    The conference call also utilized a slideshow presentation that discussed Stem's

pipeline and that the projects included in the pipeline "have a reasonable likelihood of execution":

> 12-Month Pipeline[:] ***Pipeline represents the total value (excluding market
> participation revenue) of uncontracted, potential hardware and software
> contracts*** that are currently being pursued by Stem direct salesforce and channel
> partners with developers and independent power producers seeking energy
> optimization services and transfer of energy storage systems ***that have a reasonable
> likelihood of execution*** within 12 months of the end of the relevant period based
> on project timelines published by such developers and independent power
> producers. We cannot guarantee that our pipeline will result in meaningful revenue
> or profitability.

***May 6, 2022 Form 10-Q***

340.    The next day, on May 6, 2022, the Company filed its quarterly report on Form 10-

Q with the SEC for the quarter ended March 31, 2022 (the "1Q 2022 10-Q"). The 1Q 2022 10-Q

was signed by Defendant Bush and contained SOX certifications signed by Defendant Carrington

and Bush attesting to the 1Q 2022 10-Q's accuracy.

341.    The 1Q 2022 10-Q stated the following about Stem's pipeline and the likelihood of the Company executing on the projects contained in the pipeline:

*Pipeline represents the total value (excluding market participation revenue) of uncontracted, potential hardware and software contracts* that are currently being pursued by Stem direct salesforce and channel partners with developers and independent power producers seeking energy optimization services and transfer of energy storage systems *that have a reasonable likelihood of execution* within 12 months of the end of the relevant period based on project timelines published by such developers and independent power producers. We cannot guarantee that our pipeline will result in meaningful revenue or profitability.

342.    The 1Q 2022 10-Q stated the following about possible risks to Stem's business:

The Company's business prospects are subject to risks, expenses, and uncertainties frequently encountered by companies in the early stages of commercial operations. Prior to the Merger, the Company had been funded primarily by equity financings, convertible promissory notes and borrowings from affiliates. The attainment of profitable operations is dependent upon future events, including securing new customers and maintaining current ones, securing and maintaining adequate supplier relationships, building its customer base, successfully executing its business and marketing strategy, obtaining adequate financing to complete the Company's development activities, and hiring and retaining appropriate personnel. *Failure to generate sufficient revenues, achieve planned gross margins and operating profitability, control operating costs, or secure additional funding may require the Company to modify, delay or abandon some of its planned future expansion or development, or to otherwise enact operating cost reductions available to management, which could have a material adverse effect on the Company's business, operating results and financial condition.*

343.    The 1Q 2022 10-Q also stated that *"[t]here have been no material changes to the risk factors disclosed in Part 1, Item 1A, of our Annual Report on Form 10-K for the fiscal year ended December 31, 2021*, except as set forth below [regarding import tariffs].

*August 4, 2022 Press Release & Conference Call*

344.    On August 4, 2022, the Company issued a press release pertaining to Stem's second quarter of 2022 financial performance. The press release also contained the same statement from the January 5, 2021, January 13, 2021, February 11, 2021, February 18, 2021, March 2, 2021,

March 30, 2021, April 14, 2021, May 17, 2021, August 11, 2021, November 9, 2021 press releases,

February 24, 2022, May 5, 2022 and the Merger Proxy about Stem's capabilities:

> Stem, Inc. (NYSE: STEM) provides solutions that address the challenges of today's dynamic energy market. By combining advanced energy storage solutions with Athena™, a world-class AI-powered analytics platform, ***Stem enables customers and partners to optimize energy use by automatically switching between battery power, onsite generation and grid power***. Stem's solutions help enterprise customers benefit from a clean, adaptive energy infrastructure and achieve a wide variety of goals, including expense reduction, resilience, sustainability, environmental and corporate responsibility and innovation. Stem also offers full support for solar partners interested in adding storage to standalone, community or commercial solar projects – both behind and in front of the meter. For more information, visit www.stem.com.

345.    The press release also stated the following about Stem's pipeline and growth

pertaining to FTM project opportunities:

> ***The Company's 12-month Pipeline was $5.6 billion at the end of the second quarter of 2022*** compared to $5.2 billion at the end of the first quarter of 2022, ***representing 8% sequential growth. The increase in the 12-month pipeline was driven by increased FTM project opportunities, including significant expansions into new markets and continued growth in Stem's partner channels.***

346.    On August 4, 2022, the Company hosted a conference call with investors and

analysts to discuss Stem's second quarter of 2022 financial results. During the call, Defendant

Bush boasted of Stem's growth:

> Our revised bookings guidance now calls for us to more than double our bookings relative to 2021. . . . ***We have grown the business very rapidly in a short amount of time and without any changes in legislation. This is a testament to our differentiated software offering as well as our ability to help customers enter new markets profitably***.

347.    During the Q&A portion of the call, an analyst asked the following question

regarding Stem's revised guidance for bookings:

> First question I have is just on the revised guidance for bookings specifically. Can you talk a little bit on where you're seeing the increased momentum relative to initial expectations? Is it being driven primarily by FTM or anything available

power related? And then just related to that, what ISOs are you seeing the most success in?

348.   Defendant Bush responded by stating the FTM segment of Stem was growing very

rapidly:

> So I think much like we've talked about in prior quarters, ***the FTM segment of the business is growing very rapidly.*** And that's where we're seeing – we continue to see the most momentum there. Although we are starting to see some initial, say, on the BTM side, some initial opportunities, and on the AE side as we come out of the AC, any competitive, component with the government. So I think we're really seeing it across the business, but the biggest impact is clearly on the FTM side of the business.

349.   The Individual Defendants' presentation during the conference call featured a

slideshow presentation that stated the following about Stem's pipeline and the likelihood of the

Company executing on the projects contained in the pipeline:

> ***Pipeline represents the total value (excluding market participation revenue) of uncontracted, potential hardware and software contracts*** that are currently being pursued by Stem direct salesforce and channel partners with developers and independent power producers seeking energy optimization services and transfer of energy storage systems ***that have a reasonable likelihood of execution*** within 12 months of the end of the relevant period based on project timelines published by such developers and independent power producers. We cannot guarantee that our pipeline will result in meaningful revenue or profitability.

***August 5, 2022 Form 10-Q***

350.   The next day, on August 5, 2022, the Company filed its quarterly report on Form

10-Q with the SEC for the quarter ended June 30, 2022 (the "2Q 2022 10-Q"). The 2Q 2022 10-Q

was signed by Defendant Bush and contained SOX certifications signed by Defendant Carrington

and Bush attesting to the 2Q 2022 10-Q's accuracy.

351.   The 2Q 2022 10-Q stated the following about Stem's pipeline and the likelihood of

the Company executing on the projects contained in the pipeline:

> ***Pipeline represents the total value (excluding market participation revenue) of uncontracted, potential hardware and software contracts*** that are currently being

pursued by Stem direct salesforce and channel partners with developers and independent power producers seeking energy optimization services and transfer of energy storage systems *that have a reasonable likelihood of execution* within 12 months of the end of the relevant period based on project timelines published by such developers and independent power producers. We cannot guarantee that our pipeline will result in meaningful revenue or profitability.

352.    The 2Q 2022 10-Q stated the following about possible risk factors facing Stem's business:

> The Company's business prospects are subject to risks, expenses, and uncertainties frequently encountered by companies in the early stages of commercial operations. Prior to the Merger, the Company had been funded primarily by equity financings, convertible promissory notes and borrowings from affiliates. The attainment of profitable operations is dependent upon future events, including securing new customers and maintaining current ones, securing and maintaining adequate supplier relationships, building its customer base, successfully executing its business and marketing strategy, obtaining adequate financing to complete the Company's development activities, and hiring and retaining appropriate personnel. ***Failure to generate sufficient revenues, achieve planned gross margins and operating profitability, control operating costs, or secure additional funding may require the Company to modify, delay or abandon some of its planned future expansion or development, or to otherwise enact operating cost reductions available to management, which could have a material adverse effect on the Company's business, operating results and financial condition.***

353.    The 2Q 2022 10-Q also represented that no changes were made to Stem's risk factors:

> ***There have been no material changes to the risk factors disclosed in Part 1, Item 1A, of our Annual Report on Form 10-K for the fiscal year ended December 31, 2021 and in Part II, Item 1A. "Risk Factors" of our Quarterly Report on Form 10-Q for the quarter ended March 31, 2022***, except as set forth below [regarding hardware suppliers, long-term hardware supply agreements, power generation development projects, and small number of customers for a material portion of revenue].

***September 28, 2022 Stem Investor and Analyst Day***

354.    On September 28, 2022, Stem held an investor and analyst day to discuss Stem's growth, Athena's AI automated capabilities, and the Company's FTM projects. During the event,

Defendant Johnson stated the following about FTM, Athena, and the impact of Athena on Stem's project in Massachusetts:

> **So the question is, well, what does winning look like?** With this extensive suite of capabilities, there's a lot of different characteristics that I think are important here. The interesting thing that's going on with the passage of IRA is how to think about solar plus storage combination. So we're going to focus a little bit on winning with the hybrid systems where you have both solar and storage, in particular, potentially retrofitting storage to that 40,000 installed base that you heard about with AlsoEnergy PowerTrack system.
>
> **So we'll start with one of the sites that has solar and storage in Massachusetts. We've been operating this site, delivering a full suite of capabilities that automatically continuously co-optimize 7 different value streams**. We're bidding hybrid solar and storage into the ISO-New England market. PowerTrack is at the site providing a complete view of the asset, the solar asset and on-site weather conditions. And this combination of economic optimization and asset management has resulted in revenues exceeding the project pro forma by over 46%. This demonstrates the differentiated capability to operate and monetize these different value streams in grid services and wholesale market opportunities in front-of-the-meter site, operating with the combined services of the Athena platform and the AlsoEnergy PowerTrack application.
>
>        * * *
>
> So one of the other dynamics that's going to come in here is the merger and the co-optimization across what we're already doing today in multiple markets with front-of-the-meter projects moving into the behind-the-meter applications as well. So again, **bringing back the differentiation of Athena with this broader suite of capabilities across a broad market segments and being able to tie that back under a single platform into a unique value proposition**.
>
>        * * *
>
> And then full circle, of course, owners will have a trusted enterprise platform. **We offer a single pane of glass that covers both behind-the-meter and front-of-the-meter facilities**, with a mix of clean energy assets across multiple markets, use cases and OEMs and provides integrated economic optimization and asset performance management. And that's a mouthful, but that's what the platform promises, is to be able to provide that kind of capability with one stop with one company who can support that over time. And when compared to multiple point solutions, our unified platform and Athena offerings are differentiated in the industry, and the ability to sell solutions into this entire ecosystem will make smart energy simpler for all.

355.    Defendant Johnson went on to describe Athena in more detail:

So first, ***Athena automates dispatching with flexible energy systems***, right, to achieve that maximum economic value. How does that happen? The first step is we need to predict the future. We need to predict what's going to happen. You need to understand how much solar generation we're going to have available. These are at every particular site that we're operating. We need to predict that solar generation. We need to predict what the market prices will be. We need to predict a customer load if we're going to be offsetting the customer load and optimizing for behind-the-meter facility. And then we need to run that optimization which oftentimes takes millions of scenarios in order to achieve the best fit and look at the landscape of that particular site over a multi-day period, determining if the energy available is best to use today or best to save and use tomorrow when market prices may be higher or opportunities may be better. We do that over a multiple day scenario. And we're doing this continuously, literally running millions of scenarios every hour. And then finally, we have to dispatch the asset. So once we determine what the economic ideal operating plan is we need to actually create that -- realize that economic plan, either through bidding into a wholesale market and clearing in prices that will affect the operation of the system in the way we want or by directly dispatching that aspect for a particular customer opportunity. ***This automated, very scalable prediction optimizing dispatch process run continuously, nonstop 24/7, supporting the economic dispatch of these flexible assets.***

356.    Indeed, Defendant Johnson was unequivocal that Athena was fully automated and allowed Stem to continue growing as a company:

> ***This is a fully automated process lights out. There's no humans involved in this loop. Once we set it up, it just keeps running***. And then second, we're at the point of asset performance management. All the time we're doing this, we're continually getting streaming data from these sites. Data that can range from every second to every few minutes. It's coming in, in order to make sure that we have a complete situational awareness for all assets. And then Athena can determine if there's anything that needs to be acted on. Corrective actions such as remote automated solutions as well as corrective actions that may involve field work dispatch.
>
> ***So Athena automates this process, processing terabytes of data every day and determining where there are issues and then triggering the appropriate workflows to either automatically resolve an issue***, informing the proper people and then in some cases, being able to initiate a workflow that results in a truck roll in order to do some work at the site.
>
> Delivering both of these again on a unified platform, we think it's an entirely differentiated offer that increases yield, reduces risk and improves the operating efficiency of these clean energy assets. And this is just incredibly important to achieve our mission of accelerating the clean energy transition because the cost of these operations***, the economic value is what underwrites the ability to continue to grow this clean energy portfolio***.

I'm going to dig in one more level and talk a little bit about the automated AI operations. And it operates on several levels. So you'll hear us talk about one second data. We're also talking about one second and even sub-second control that has to happen. A lot of this is affected directly at the edge because of the latency that has to be low for some of these grid-related services.

And that's – *these kinds of cadences are effectively what lead us into the performance that we've been citing. 96% of perfect foresight in terms of the ISO New England market revenues* and overperforming in the greenhouse gas goals at C&I sites in California. So again, every second, these solutions are operating at the edge, they're acquiring site-specific data, combining that real-time asset condition, generation, local weather status and the making control decisions that can respond in milliseconds.

\* \* \*

And then on a daily basis, we're evaluating the key performance indicators, the KPIs that really determine how we're performing, either against greenhouse gas goal against an incentive goal against battery longevity and performance objectives for the battery and warranty and so forth and then determining what that ongoing operating plan should be in relation to those maybe longer-horizon metrics that are also part of the optimization process.

And then very interesting, quite important is on a monthly basis, *our automated AI operations* will evaluate the models that are used for each of these forecasts for each and every site. So every site may have multiple forecast streams that are being run. And every one of those may have a model that's selected specifically based on *model evaluation process that runs automatically every month* in order to adapt to longer changing conditions and that automated model selection, you can look at deep neural net, gradient boosted network, gradient boosted forecast, random forest approach. And all of those different approaches are evaluated in order to say what's the best one for this particular site and then that's selected for the next operating period.

So Athena is automatically doing this in the background, evaluating the best model approach, that set of hyper parameters that control that model and then being able to say this is how we should proceed and that *AI automation for that process is something we think is also a unique and differentiated value in terms of scaling and operating these systems, adapting to conditions without human intervention.*

357.    Defendant Carrington also participated in the event. Specifically, he told investors

that Stem was experiencing great success in the FTM market:

> *And then finally, on the front-of-the-meter side, this is a market, as I mentioned, that we really continue to have great success on.* I'd say that we have simplify the solution to help these customers achieve significant increases in their returns. You see the IRR increases of 10% to 40%. *We have the software platform that they*

*need.* We'll continue to grow this. We are becoming the de facto company for the space.

*And as I mentioned, really to go from 0 to leading market share in 18 months in New England ISO is very impressive. And it says a lot about the software.* It also says a lot about Athena that over 50% of our contracted volume last quarter was from repeat customers. So, we are executing the say-do ratio is there, and they're continuing to come back and purchase from Stem.

358.    Defendant Carrington also claimed that Stem successfully transitioned from a BTM company to a FTM company because of Athena:

. . . And people said, do you think you can really execute in front of the meter because you've done such a great job behind the meter. *While we went from 0 to over 50% market share in 18 months in the New England ISO.*

*So a real accomplishment that is very much attributable to our software platform because we could translate our behind-the-meter software deck to that front-of-the-meter need.* And I think that – that was a big milestone for the business to make that transition.

359.    The Stem Investor and Analyst Day also included a slideshow presentation that featured the following slide depicting Athena's operations, including the platform's "automated controls" and "automated algorithms":



360.    The Stem Investor and Analyst Day presentation also featured the following slide depicting Athena's operations, including the platform's ability to learn "automatically and continuously":



***November 4, 2022 Form 10-Q***

361.    On November 4, 2022, the Company filed its quarterly report on Form 10-Q with the SEC for the quarter ended September 30, 2022 (the "3Q 2022 10-Q"). The 3Q 2022 10-Q was signed by Defendant Bush and contained SOX certifications signed by Defendant Carrington and Bush attesting to the 3Q 2022 10-Q's accuracy.

362.    The 3Q 2022 10-Q stated the following about Stem's pipeline and the likelihood of the Company executing on the projects contained in the pipeline:

> ***Pipeline represents the total value (excluding market participation revenue) of uncontracted, potential hardware and software contracts*** that are currently being pursued by Stem direct salesforce and channel partners with developers and independent power producers seeking energy optimization services and transfer of energy storage systems ***that have a reasonable likelihood of execution*** within 12 months of the end of the relevant period based on project timelines published by such developers and independent power producers. We cannot guarantee that our pipeline will result in meaningful revenue or profitability.

363.    The 3Q 2022 10-Q stated the following about possible risks facing Stem's business:

The Company's business prospects are subject to risks, expenses, and uncertainties frequently encountered by companies in the early stages of commercial operations. Prior to the Merger, the Company had been funded primarily by equity financings, convertible promissory notes and borrowings from affiliates. The attainment of profitable operations is dependent upon future events, including securing new customers and maintaining current ones, securing and maintaining adequate supplier relationships, building its customer base, successfully executing its business and marketing strategy, obtaining adequate financing to complete the Company's development activities, and hiring and retaining appropriate personnel. ***Failure to generate sufficient revenues, achieve planned gross margins and operating profitability, control operating costs, or secure additional funding may require the Company to modify, delay or abandon some of its planned future expansion or development, or to otherwise enact operating cost reductions available to management, which could have a material adverse effect on the Company's business, operating results and financial condition.***

364.    The 3Q 2022 10-Q stated that no changes were made to any risk factors involving

Stem:

***There have been no material changes to the risk factors disclosed in Part 1, Item 1A, of our Annual Report on Form 10-K for the fiscal year ended December 31, 2021 and in Part II, Item 1A. "Risk Factors" of our Quarterly Report on Form 10-Q for the quarters ended March 31, 2022 and June 30, 2022.***

***December 8, 2022 Optimizing Your Large-Scale and Storage Portfolio Webinar***

365.    On December 8, 2022, Stem hosted the Optimizing Your Large-Scale and Storage

Portfolio Webinar. During the webinar, Defendant Ho emphasized Athena's automation:

Through all this variability, and again, the backdrop of variability in wholesale market pricing, uh, Athena's working 24/7 to generate, uh, solutions. And you'll see that, again, the general patterns and solutions are that system will charge during the day because of that ITC constraint and systems will discharge in the evening ramp because prices tend to be high there. But on top of that, there's the quantity and timing that which it charges and discharges is variable. ***And that's the power of automation, right? It's, it's there. You don't need a human operator to screen, you know, chained to the desk 24/7 to, uh, make this work. We've got Athena working on behalf of the asset owner every hour, every hour, every hour, um, optimizing this thing***. So how does it, you know, this is, we're looking at meter data here and the kind of effects of the Athena optimization. How does it actually sort of affect, you know, um, get that done? We'll take kind of a look under the hood a bit here, uh, with some custom views that you can create in supervisor. Supervisor can essentially access all of our time series data and therefore allow

users to layer on, uh, custom views. So we'll look at a view that was built to visualize real time, uh, energy bids and offers.

So as that retrieves the data, you know, for those you know, uh, who aren't familiar, um, you know, uh, Mary mentioned this concept about a PQ pair. So bids to buy energy and offers to sell energy into the wholesale market rely on essentially kind of this primary, uh, you know, set of parameters, which are pairs of prices and quantities at which a, um, you know, a market participant will, uh, tell the market that they will buy or sell energy at. So that might be, I will sell three megawatt hours of energy in a interval at a price of $50 a megawatt hour, right? Those, those two quantities are essentially coupled. ***Um, and that's, those are the sort of quantities that Athena produces automatically***. What we're looking at here on the top graph is historical, uh, pricing. So these are the actual material realized prices in the, you know, that are clear in the market and on the bottom are in the solid curves in orange, the prices that Athena sell for that it would need to bid at to buy energy.

The, you know, the patterns here again, um, are generally that we'll buy when solar is producing generally sell in the evening ramp hours, but there's a lot of variability day to day. ***And that again, is the power of automation, uh, in Athena, is that it will solve for that, um, ensure compliance with the constraints, the hour in, hour out, day in, day out***. So finally, and I'd kind of, um, you know, like to point out that, you know, we, we chose to show this example of an asset, you know, solar plus storage in Massachusetts because, you know, it's sort of on the, you know, uh, extreme edge of complexity. Um, there are markets in which, you know, solar and or storage, you know, are purely merchant. Um, and therefore the problem at hand is to solve for the optimal economic outcome based on the wholesale market products.

366.     The webinar also included a slideshow presentation that featured the following slide depicting Athena's operations, including the platform's "automated controls" and "automated algorithms":



367.    The Stem Investor and Analyst Day presentation also featured the following slide depicting Athena's operations, including the platform's ability to learn "automatically and continuously":



***January 5, 2023 Goldman Sachs Energy Conference***

368.    On January 5, 2023, Stem attended the Goldman Sachs Energy Conference. During the conference, an analyst asked the following question regarding SKUs and end markets through

2023: "From an end market standpoint, (technical difficulty) SKU versus BTM. How should we be thinking about kind of the SKU, the mix between end markets as you roll through '23?" Defendant Carrington replied:

> Yes, look, I mean, I'd say from the meter, it was a conscious effort of us to go after the front of the meter side. We – the business started behind the meter. We were the market leader in California. And we learned a lot about how to build out our software and, quite frankly, behind the meter is harder than front of the meter, although front of the meter is getting more complex, which is good for the Athena platform.
>
> But I would say you're going to – we're at 90-10 is the mix today, front of the meter to behind the meter. We are seeing more of a shift to behind the meter. So I think we'll see 75-25, we're seeing that in our pipeline. We're also seeing enhanced margins in our pipeline. So I think both of those are very positive. And I think a lot of it's IRA driven from the behind the meter side.
> So we feel like the mix is definitely going back to more behind the meter, which is – we feel good about both. But look, I mean, Wood Mack has got front of the meter growing at 10x to 20x that of behind the meter. ***So you kind of have to be in front of the meter, and we've got a great channel partner strategy that we think will continue to help us grow in that market. And so we're engaged in both.***

369.    Another analyst asked the following question about Stem's place in the FTM market: "You've also kind of parlayed that C&I success into the FTM markets if we look at the backlog growth in that particular end market. So anything new or different or a changing competitive landscape that allowed you to do that in FTM?" Defendant Carrington replied:

> I think a lot of what we learned in behind the meter helped us in front of the meter. ***As I said earlier, it's actually easier to do the front of meter***, but it's getting much more complicated, ***which is good for our platform***. There's just more use cases to exploit and drive value from.
>
> So not really any huge learnings as much as just making sure we have the right software and the right areas of the country. When we started, people said you won't be able to make this transition, you're behind the meter company. Well, 2 years ago, we weren't in Massachusetts. Recently, we were at 50% share, we're probably still in the 40s.

370.    Later during the conference, another analyst asked about Stem's prospects going into 2022 and where most of Stem's revenues would be made, either through software or hardware:

And so it really does sound like it's a timing; issue. We'll get an update on that as we move into the new year, but you did reach your target of exceeding $1 billion of backlog exiting the year. It's more than double what it was at the end of 2021. So how does that kind of translate, especially for folks who are newer to the business, what does $1 billion of backlog mean in terms of kind of the outlook for the next 12 months, 2023? And then maybe anything notable around mix, whether it's software, hardware, (inaudible)?

371.    Defendant Carrington replied:

Yes. So from a revenue standpoint, I think in terms of 60-40 hardware software. And it won't be over the next 12 months, typically. So it will be kind of 12, 18 months. And obviously, when we provide guidance, we'll have more clarity around that. But it is an indicator in our view of the strength of demand for our products and services.

And to that point, it's significant growth. **We're also seeing significant growth in the pipeline. It's over $7.2 billion as we reported in our third quarter. That was 29% quarter-over-quarter growth. So the demand continues to be exceptional in the business, and I think that bodes very well** (technical difficulty).

372.    The statements in ¶¶ 332-371 were false and misleading and failed to disclose, *inter alia*, that: (1) the Company was engaged in the Overpayment Misconduct; (2) Legacy Stem's business and competitive standing were overstated, particularly concerning its strategic partnerships and revenues tied to its software; (3) Stem's Athena software platform was not fully automated, was not a "robust AI platform," and did not produce strong gross margins for the Company; (4) the Company's pipeline of contract deals, especially FTM deals, was exaggerated and contained fraudulent entries to inflate the appearance of Stem's business prospects; (5) Legacy Stem needed the capital infusion from the Merger to continue as a going concern; (6) the Company overstated its gross margins and exaggerated its business and financial prospects; (7) the Company's deal with Available Power was illusory; (8) the Company's software revenue did not account for 100%  of its  services revenue; and (9) Legacy Stem's and Stem's internal controls over financial reporting were wholly inadequate. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Continues to Emerge as False and Misleading Statements Continue**

373.     On January 5, 2023, the truth continued to partially emerge. Before the market opened, Stem published the slideshow presentation that would be used later that day during the Goldman Sachs Global Energy and Clean Technology Conference. The slides revealed that the Company's fourth quarter of 2022 revenue and fiscal year 2022 gross margins were at and well below the low end of previous guidance, respectively, even though Stem reaffirmed the guidance just two months earlier on November 3, 2022.

374.     In particular, the slideshow presentation stated that the Company's FTM hardware gross margins were anticipated to be "~10%", as compared to 10-30% for Fiscal Year 2021. Stem's slideshow presentation also reported that Stem's Fisal Year 2022 non-GAAP gross margins were anticipated to be below the low end of previous guidance. The slideshow presentation further revealed that the Company had "lost" one of its larger FTM projects, which would later be revealed to be Available Power.

375.     The slideshow presentation also revealed that the Company's bookings pipeline for 2022 was lower because of "Stem initiated contract cancellation (~$130M) due to partner non-performance on [an] agreed timeline." It took Stem a full week to disclose, on January 12, 2023, that "we canceled a booking of approximately $135 million in the fourth quarter of 2022. This cancellation was attributable solely to DevCo projects with Available Power."

376.     Together, these disclosures signaled to investors that Stem's business model was quite risky, especially in light of Stem's inability to put out a fully automated Athena software platform for FTM customers.

377.     On this news, the Company's common stock price fell $0.75 per share, or 8.78%, from a closing price of $8.54 per share on January 4, 2023 to a closing price of $7.79 per share on January 5, 2023.

378.     In response to these disclosures, on January 9, 2023, Morningstar reduced its fair value estimate for the Company from $12 to $10 per share "after reviewing an updated slide deck the company released last week." Morningstar justified its decision in a report:

> ***Stem's software sales are largely derived from hardware sales today, and the company may be unsuccessful in generating stand-alone software sales.***
>
> Competition from well-financed battery manufacturers that can integrate software directly into hardware may prove difficult for Stem to compete with.
>
> Stem is relatively inexperienced in the front-of-the-meter market, which is a material contributor to long-term financial targets.
>
> *  *  *
>
> Given the company does not undertake material value-added activities or manufacture proprietary hardware components, it is difficult to justify a moat for its hardware sales. Further, given margin stacking (Stem sells hardware at a 10%-30% gross margin), we think its hardware is at a relatively disadvantaged cost structure versus competitors.
>
> Stem's long-term strategic focus is around its Athena artificial intelligence software. To date, the company's software has been sold attached to hardware sales for a bundled solution. We see this dynamic as favoring well capitalized battery hardware manufacturers that have increasingly looked to build out software management systems (i.e.: Tesla's Autobidder). ***We view the company's need to be involved in hardware as indicative that its software does not possess a competitive moat on its own.***

***January 11, 2023 Blue Orca Report***

379.     A few days later, on January 11, 2023, Blue Orca published a report disclosing further information about Stem's software revenues, including that they did not account for 100% of the Company's revenues. In fact, the report found the opposite; that software revenues provided "a tiny fraction of reported" revenues.

380.    The report further asserted that the Company had financed its agreement with Available Power, which is what led to the partnership to begin with (rather than Athena). The Blue Orca report further stated in relevant part:

> STEM's stock trades at a premium on its claim that its low-margin hardware sales are accompanied by high-margin software revenues from its Athena AI platform, which STEM claims has a growing pipeline of recurring future revenues . . . . STEM's management stated unequivocally that "100%" of this services revenue line was from "software revenue." **In our view, this is a lie.** Rather, almost all of this services revenue is not from software, but from a legacy business under which STEM leases hardware to customers in what it calls "host customer arrangements." These arrangements, which STEM are winding down, are akin to hardware leases with a small software and services component, yet STEM tries to claim that 100% of the revenues from these contracts are software . . . . By disguising these low-margin, no-growth contract leases as software revenues, we think STEM fools investors into believing that STEM has a meaningful software business in order to garner a substantially higher valuation multiple.
>
> * * *
>
> For example, on an earnings call, STEM's CFO confirmed that "100%" of the service revenue line was "software revenue."
>
> * * *
>
> Likewise in its investor presentations, STEM labels these revenues as "software revenue."
>
> * * *
>
> Without hardware-leasing revenues masquerading as software revenues, STEM would be viewed as a low margin battery storage integrator whose primary business is charging developers a small markup on batteries purchased from OEMs. We think that STEM misleads investors about the true nature of its software revenues to inflate its stock price.
>
> • **This Explains STEM's Shifting and Disappearing Disclosures**
>
> We think STEM knows that this is terminal to its valuation, which is why STEM has stopped disclosing both partnership services and host customer revenues in recent periods.
>
> Up until and including its Q3 2021 filing, STEM specifically broke out the portion of its "partnership service" revenue derived from services. We think that this is the best proxy for the revenue reasonably attributed to the supposedly unique and coveted "Athena AI" platform which STEM pitches to investors as the cornerstone of its burgeoning and coveted software business.

*Disaggregation of Revenue*

The following table provides information on the disaggregation of revenue as recorded in the consolidated statements of operations (in thousands):

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2021 | 2020 | 2021 | 2020 |
| Partnership hardware revenue | $ 34,886 | $ 5,523 | $ 59,609 | $ 6,950 |
| Partnership service revenue | 33 | — | 112 | — |
| Host customer service revenue | 4,914 | 3,649 | 14,870 | 10,711 |
| Total revenue | $ 39,833 | $ 9,172 | $ 74,591 | $ 17,661 |

*Source: STEM 10-Q Q3-2021*

\* \* \*

Then, in Q3 2022, STEM changed the labelling of its software segment from "service revenue" to **"services and *other* revenue."**

381.    Blue Orca further highlighted the Company's consolidated statements regarding "Disaggregation of Revenue" in 2021 and 2022, as well, noting that the Company's line-item report titled "Services and other revenue" for the three months and nine months ended September 30, 2022, stating:

> What counts as "other" in this segment? STEM does not say. Yet the timing of the label change is notable. In Q3-2022, STEM's purported organic "software" segment grew 24% QoQ [quarter-over-quarter] to $6.6 million, the first time this segment had shown meaningful growth in 18 months. We suspect that the growth was driven not by organic software sales, but by the inclusion of other non-software service revenue in the segment, hence the label change.

382.    The report also shed light on Stem's purported partnership with Available Power, stating in relevant part:

> **Undisclosed to Investors, STEM Finances Flagship Customer.** In February 2022, at the same time STEM announced a substantial earnings miss, it announced the signing of a flagship $500 million deal with Available Power, a new customer, for up to 1GW/2GWh of energy storage in Texas. Characterized by sell-side analysts as a "great win," the Available Power deal was so big that it was larger than STEM's total energy storage AUM at the time. The deal was supposedly an endorsement of STEM's software platform and evidence that STEM could compete for large utility-

scale front-of-the-meter projects. Yet undisclosed to investors, interviews with a former STEM executive and solar industry experts revealed that STEM I contributing development capital to Available Power to finance the deal. The deal is just beginning, so the accounting details are murky, but we question whether STEM will use this arrangement to recognize revenues, profits and cash flows effectively paid for by STEM. Yet the larger point is that investors would have thought much differently about the flagship deal if they had known STEM is surreptitiously funding purchases from STEM. Rather than evidence that STEM can compete for utility-scale projects, we think this shows clearly that STEM cannot win big deals it doesn't pay for.

383.    The next day, on January 12, 2023, the Company issued a statement in response to the report. Stem's statement maintained:

> **Software Revenues.** Our Host Customer agreements represented approximately $20 million of our total Services revenue in full-year 2021. These agreements represent ongoing software services where we optimize energy storage systems on behalf of our customers. These contracts are financed by third parties and are not classified as leases. Rather, these contracts are classified as services revenue in accordance with FASB ASU 2014-09 Topic 606, *Revenue from Contracts with Customers ("ASC 606")*.
>
> We generated $36 million of services revenue through third quarter 2022, a 141% increase versus the nine months ended September 30, 2021, and our services revenue in third quarter 2022 grew 9% sequentially versus the second quarter of 2022.
>
> We believe Contracted Annual Recurring Revenue (CARR) is a good proxy for the longterm value of the differentiated technology that we provide our customers. All additions to CARR represent contracted, high-margin software services. As previously disclosed, CARR was $61 million at the end of the third quarter 2022.

384.    Notably, Stem's response failed to directly acknowledge or address several of Blue Orca's findings including that the percentage of its software revenues was false and that it funded the Available Power partnership. Moreover, it clarified that Stem had "canceled . . . booking of approximately $135 million in the fourth quarter of 2022" which were "attributable solely to DevCo projects with Available Power. We have not recorded any revenue from any Available Power projects and there are no additional projects in the backlog with this former partner."

*February 16, 2023 Press Release & Conference Call*

385.    On February 16, 2023, the Company issued a press release that stated the following

about Stem's pipeline and announced that Stem would no longer report its 12-month pipeline:

> ***The Company's 12-month Pipeline was $7.1 billion at the end of the fourth
> quarter of 2022***, compared to $7.2 billion at the end of the third quarter of 2022,
> representing a 1% sequential decrease. The Company will no longer report 12-
> month Pipeline beginning with the first quarter of 2023, as we believe that
> Contracted Backlog is a better indicator of near and medium term revenue given
> the more established nature of the Company's growth trajectory.

386.    The press release revealed Stem had low earnings and non-GAAP gross margins of

13%, and that the Company ended Fiscal Year 2022 with $250 million in cash, cash equivalents,

and short-term investments, disclosing that "the primary uses of cash during the fourth quarter of

2022 related to purchases of hardware for customer projects, which are expected to convert to

revenue in coming quarters." The press release also revealed that the Company's guidance for

2023 was low, with expected revenues between $550 to $650 million, non-GAAP gross margins

of 15 – 20%, and adjusted EBITDA of ($35) to ($5) million.

387.    That same day, on February 16, 2023, the Company hosted a conference call with

investors and analysts to discuss Stem's fourth quarter of 2022 financial results. During the call,

Defendant Carrington boasted of Stem's growth:

> Today we reported solid fourth quarter results, including record revenue of $156
> million, which was 3x higher than the same quarter last year. We also reported
> record bookings of $458 million, which was 2x higher than the same quarter last
> year. Our revenue and bookings in the fourth quarter alone were higher than the
> entire year of 2021, which is a remarkable achievement over a short period of time.
> We achieved these results despite a turbulent environment throughout 2022,
> including supply chain volatility, interconnection and permitting delays, costs
> inflation, and solar import declines from the AD/CVD and UFLPA restrictions.
>
> Our diversified business model across multiple products and geographies helped
> the company navigate these headwinds. As we previewed in our interim update in
> early January, revenue came in within the guidance range and our bookings were
> well ahead of guidance that we had already raised in the middle of 2022. In fact, if

you go back to our 4Q '21 earnings call, our bookings ended 50% higher than our original full year guidance. ***The bookings momentum is a testament to our software and services solutions that are differentiated in the marketplace***. We are also capitalizing on the tremendous macro tailwinds in this industry.

We grew our contracted annual recurring revenue, or CARR, another 7% quarter-over-quarter to $65 million in the range of our guidance that was also raised by $5 million during our 2Q earnings call.

388.    During the Q&A portion of the call, an analyst asked Defendant Carrington the following question:

I just – first one on the guidance for revenue. I mean, given the backlog position here, I'm just kind of curious. What's your assumption around backlog conversion? ***I would have thought you'd be in position to do higher than kind of the revenue guidance here of $600 million at the midpoint. So are you seeing backlog converting more slowly? Or is there something with respect to mix that's maybe not turning over as quickly as you would have thought*** just given the overall headline number seem to be bigger and gave you more coverage than sort of the revenue guidance you're providing here? And then I had a follow-up on the margins.

389.    Defendant Carrington replied, acknowledging that Stem's FTM project backlog was converting slower than expected:

Perfect. So yes. And I think we – ***in terms of the backlog, it is converting slower. I think we've talked about this in the past, as we're taking on larger and larger projects, those tend to be – they tend to be FTM first.*** And then second, they tend to be multiyear installations. And so we saw much quick – when the projects were slow – we're smaller, we saw a much quicker conversion, much like – say, at the end of '21, we had $400-plus million – $450 million in backlog. We did $363 million in revenue this year. So pretty quick conversion in general.

But this year and into – I think going into the future years, we're just going to – we're going to need to build more pipeline because the projects are longer. And so from that standpoint, I would say extension, but still pretty significant growth on a year-over-year basis for revenue.

390.    Similarly, a Guggenheim analyst asked the following question regarding Stem's high number of software bookings but simultaneous low service revenues:

Okay. So – but just to follow on that then, if your operating AUM is doubling and you're bringing additional projects – you're executing on additional projects and it's, I think, reasonable if you look at your CARR and what the annualized run rate

of your revenue – your service revenue is right now. ***I guess I'll ask the question the way a lot of other people have asked it. Why is this service revenue number not going up a lot more? Why is it not doubling?***

391.    Defendant Bush replied, "Well, it is growing at 75% rate. So I think that's pretty significant growth and then when you look at…" The Guggenheim analyst then interjected, stating the following about Stem's CARR metric:

> Not to belabor it, but you put a CARR – an end of year 2023 CARR metric of whatever is 80% to 90% and you're at 65% currently. ***So I guess I'm trying to understand why that CARR number, which is a reasonable bogey for the de-annualized software and services run rate, why that's not going up more given what you're saying about adding to the operating base?***

392.    Defendant Bush replied:

> Well, so CARR wouldn't increase as a result of operating assets first. So, I think that's an important distinction. CARR is the contracted amount. So that CARR is going to increase based on the amount of software, let's say, that is attached on an annual basis to a particular contract. The software number that we recognize as revenue in the business is tied to the operating assets. And so that's where I'd say like when you look at the growth rates that we've had so far about 9% in the third quarter, 17% in the fourth quarter, that's where you're seeing the actual operating assets being able to generate actual revenue and then gross margin. So CARR is an indicator of what will happen not what has happened. And so when we think – when I say, hey, operating assets are going to double, that means that we're going to have a faster conversion of CARR into ARR than what we've had. So that's a distinction that I would make.

393.    Another analyst, from SIG, inquired as to how the Company's software revenues could be lower than expected even though Stem's pipeline of projects was so steady:

> So I guess my question was also related to CARR and sort of, when I sort of looked at – compare your CARR to asset under management, it's been pretty stable through last year. ***Because when I look at the guidance, it seems like there's a step down and that how much of AUM is translating into CARR. I guess, is that related to project size or is there a thing going on in the software attach ratio***?

394.    Defendant Carrington attributed the disparity to the variety of FTM projects Stem was working on:

It's not that everything we sell has – all hardware has 100 software attachment. Really, the dynamic that's happening, and Bill mentioned this in his discussion is we're selling and winning much larger front of the meter deals and some of those are expanding beyond 20 years in term. And so when you see the average length of the software terms expand, that's bringing down the per year CARR conversion.

395.   The SIG analyst then offered a follow-up question to Defendant Carrington:

Got it. That's helpful. And then I think on the last call, you sort of mentioned the – you're starting to see the BTM mix come up with data, I think, in your pipeline. So can you give us sort of an update where you stand now, what are the recent bookings? Are you still sort of setup for the bookings in the 90:10 ratio or has that moved?

396.   Defendant Carrington replied:

We really have, Biju, and thanks for the questions. So one of the – *certainly, one of the things that we've seen is that larger FTM or our ability to win larger FTM deals. So what that tends to do in terms of the bookings and then, of course, the backlog is it weights it heavily towards FTM projects.* So we are absolutely increasing both the percentage and absolute values of the BTM side of our business, but it's a smaller part. It's just – those are just smaller projects by their very nature, they're not going to grow in size nearly as fast as the FTM projects.

* * *

And so that, we've talked pretty consistently about the ability because we're delivering customers more value that we'll be able to drive higher software attach rates and actual dollars. So we're really excited about the BTM or behind the meter side. I think it's going to be a nice growth area for us. But it's always going to – just because of the absolute size of the projects, *it's always going to get a bit swamped by what we're doing on FTM.*

397.   Additionally, when an analyst asked the following question about Stem's gross margins and whether they would be strong into 2023, Defendant Carrington admitted that gross margins would be negatively affected:

Okay. Fair enough. Yes, just on the margins. *I know '22, it sounded like you obviously had some issue that impacted you on the gross margins. You're effectively starting '23 here with the same adjusted gross margin guidance is what you had going into '22. But it seems like some of the headwinds from last year have started to dissipate.* So is there some conservatism baked in here? Or is there some level of margin leverage that you're not seeing that you would have expected? Because my understanding is you've got maybe a little bit more BTM coming back into the mix, supply chain is better. And I know – kudos on the operating leverage

147

side of things. So just wondering what are some of the levers around gross margin leverage that we could look to here in '23? Because just based on the headline guidance, it doesn't seem like you're baking in a ton.

398.    Defendant Carrington responded:

Well, I think – so in terms of the margins, I think, one, is – I think we need to be somewhat conservative, because the solar part of our business has a lot of margin leverage into it. And though we are seeing some green shoots come out – I mean, you can see that in terms of we had 8% service growth in the fourth quarter sequentially. We've got really nice increase in backlog, 42% year-over-year. We want to make sure those numbers are actually there. And because of the – that's a 60% gross margin business in general. *If that doesn't materialize, though we expect – much like in '22, that will have a negative impact on us for 2023.*

So probably is some conservatism. I think to some extent you can always increase the numbers, hard to take them down. And so I think what we'll be doing as we roll into 2023 is continue to monitor the solar part of our business very carefully. But I think the other thing to consider as well is that the hardware side of the storage part of the business continues to be under pressure. *I mean that is definitely going to – as we move up in terms of project size, the margins on those hardware sales, which unfortunately comes before the software, is going to impact the overall gross margin.*

So we kind of went through and tried to appropriately forecast what the mix of those 2 things would be. And I think the ultimate answer is going to depend a lot on what the mix turns out to actually be.

399.    On this news, Stem's stock price declined by $1.44 per share, or 14.78%, from a close of $9.74 per share on February 16, 2023, to close at $8.30 per share on February 17, 2023.

400.    These partial disclosures took the market by surprise. On February 17, 2023, Morningstar analysts cut the Company's target price by $2.00, from $10.00 to $8.00 as "a result of reducing our long-term gross margin forecast as we expect gross margin improvement to be more gradual than our prior forecast." Morningstar also stated that Stem's evolution from a hardware to a software company was going to take much more time than the Individual Defendants had previously represented:

With Stem previously indicating 2022 results were going to be weaker than expected, our focus was on the company's 2023 guidance. Positives include

expected booking growth of 40% year on year and reiteration of achieving breakeven adjusted EBITDA in the second half of 2023. ***However, non-GAAP gross margin guidance of 15%-20% for the full year is in line with original 2022 guidance, showing limited improvement year on year.***

***Stem's long-term strategy remains around its Athena software, but we think its transition from a hardware-dominated business to one with sizable software revenue is going to be more gradual than our prior expectations. As such, we now incorporate a more subdued gross margin improvement into our forecast. We now assume the company does not meet its 15% adjusted EBITDA target until 2026, a year later than its analyst day projections. We would like to see management execute against its 2023 guidance and further scale its software revenue prior to becoming more constructive on shares.***

401.   Morningstar's assessment was not an isolated one. On February 16, 2023, UBS reported "continued ***skepticism in the market about profit potential***" and that "STEM is not currently a profitable company and achieving our estimates profit levels will require commercial execution." On February 17, 2023, Morgan Stanley wrote that Stem had "***Weaker than expected 4Q revenue and gross margin***, offset by opex discipline." Similarly, Bank of America reported that "***2023 guidance unfortunately comes with yet another negative reset vs expectations*** with revs guided to $550-650mm vs consensus at $680mm, gross margins again pointed to a 15-20% range on a non-GAAP basis (same as 2022 which missed this range at 13%) and relatively deep EBITDA drag of ($5)- ($35mm)."

402.   *Seeking Alpha* reported on the Company's disappointing financial results the next day, on February 17, 2023, stating, in relevant part:

> Stem Inc. (NYSE:STEM) -9.1% pre-market Friday after reporting Q4 revenues that missed estimates and FY 2023 guidance that disappointed investors.
>
> Q4 revenues hit a company record $156M that tripled year-ago results and surged 56% Q/Q, but the analyst consensus had forecast $166M; full-year revenues totaled a record $363M.
>
> Q4 net loss was $35.3M, compared to a net loss of $34.1M in the prior-year period; adjusted EBITDA was negative $10M vs. negative $12M in the year-ago quarter.

Q4 bookings more than doubled from a year earlier to $458M, which exceeded the company's entire bookings for FY 2021, and the year-end backlog totaled nearly $1B.

Cowen analysts said earnings were hurt by demand and logistical issues caused by China's COVID resurgence and the U.S. regulatory crackdown on solar, Bloomberg reported.

For FY 2023, Stem (STEM) guided for revenues of $550M-$650M, mostly below analyst consensus of $647M, and an adjusted EBITDA of $5M-$35M.

The company said it is "actively driving towards achieving positive adjusted EBITDA, which we continue to expect to occur in the second half of 2023."

Stem (STEM) shares have gained 15% so far this year but fell 14.5% during the past year.

403.    The conference call presentation featured a slideshow presentation that stated the following about Stem's pipeline and that the projects included in the pipeline "have a reasonable likelihood of execution":

> 12-Month Pipeline[:] ***Pipeline represents the total value (excluding market participation revenue) of uncontracted, potential hardware and software contracts*** that are currently being pursued by Stem direct salesforce and channel partners with developers and independent power producers seeking energy optimization services and transfer of energy storage systems that have a reasonable likelihood of execution within 12 months of the end of the relevant period based on project timelines published by such developers and independent power producers. We cannot guarantee that our pipeline will result in meaningful revenue or profitability.

***February 17, 2023 10-K***

404.    On February 17, 2023, the Company filed its annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2022 (the "2022 10-K"). The 2022 10-K was signed by Defendants Bush, Carrington, Buzby, Daley, Tammineedi, Morgan, Tyson, Troe, Woodward, and non-party Rahul Shukla and contained SOX certifications signed by Defendant Carrington and Bush attesting to the 2021 10-K's accuracy. The 2020 10-K stated the following about Stem's operations in its FTM and BTM segments:

We operate in two key areas within the energy storage landscape: Behind-the-Meter ("BTM") and Front-of-the-Meter ("FTM"). An energy system's position in relation to a customer's electric meter determines whether it is designated a BTM or FTM system. . .. Our FTM systems are designed to decrease risk for project developers, asset owners, independent power producers and investors by adapting to dynamic energy market conditions in connection with the deployment of electricity and improving the combined value of the solar renewable resource and energy storage over the course of their FTM system's useful life. We also help asset owners and operators monitor and manage the health and performance of their clean energy assets. ***As an early participant in the BTM market, we developed operational focus and technical capabilities that position us to have multiple product offerings and services in the evolving market for FTM energy storage services. We believe that Athena's ability to optimize operations in both the BTM and FTM markets is unique in the industry and provides us with a competitive advantage.***

405.    The 2022 10-K stated the following about Stem's pipeline and the likelihood of the

Company executing on the projects contained in the pipeline:

**Pipeline represents the total value (excluding market participation revenue) of uncontracted, potential hardware and software contracts** that are currently being pursued by Stem direct salesforce and channel partners with developers and independent power producers seeking energy optimization services and transfer of energy storage systems **that have a reasonable likelihood of execution** within 12 months of the end of the relevant period based on project timelines published by such developers and independent power producers. We cannot guarantee that our pipeline will result in meaningful revenue or profitability.

406.    The 2022 10-K stated the following about potential risks to Stem's business:

The Company's business prospects are subject to risks, expenses, and uncertainties frequently encountered by companies in the early stages of commercial operations. The attainment of profitable operations is dependent upon future events, including securing new customers and maintaining current ones, securing and maintaining adequate supplier relationships, building the Company's customer base, successfully executing its business and marketing strategy, obtaining adequate financing to complete the Company's development activities, and hiring and retaining appropriate personnel. ***Failure to generate sufficient revenues, achieve planned gross margins and operating profitability, control operating costs, or secure additional funding may require the Company to modify, delay or abandon some of its planned future expansion or development, to seek additional equity or debt financing, or to otherwise enact operating cost reductions available to management, which could have a material adverse effect on the Company's business, operating results and financial condition.***

407.    The 2022 10-K stated the following about potential risks facing Stem's technology:

*Risks Related to Our Business and Industry*

***The distributed generation industry is emerging and our distributed generation offerings may not receive widespread market acceptance.***

The implementation and use of distributed generation at scale is still relatively nascent, and we cannot be sure that potential customers will accept such solutions broadly, or our hardware and software-enabled services more specifically. Enterprises may be unwilling to adopt our offerings over traditional or competing power sources for any number of reasons, ***including the perception that our technology is unproven***, lack of confidence in our business model, unavailability of back-up service providers to operate and maintain the energy storage systems, and lack of awareness of our related hardware and software-enabled services. Because this is an emerging industry, ***broad acceptance of our hardware and software-enabled services is subject to a high level of uncertainty and risk.*** If the market develops more slowly than we anticipate, our business may be adversely affected.

408.    The 2022 10-K also stated the following about potential risks stemming from

Stem's software and hardware products:

> ***If our estimates of useful life for our energy storage systems and related hardware and software-enabled services are inaccurate or if our OEM suppliers do not meet service and performance warranties and guarantees, our business and financial results could be adversely affected.***

> \* \* \*

> Further, ***the occurrence of any defects, errors, disruptions in service, or other performance problems***, interruptions, or delays ***with*** our energy storage systems or ***the Athena platform, whether in connection with day-to-day operations or otherwise, could result in:***

> • ***loss of customers;***

> • ***loss or delayed market acceptance and sales of our hardware and software-enabled services;***

> \* \* \*

> The costs incurred in correcting any material defects or errors in our hardware and software or other performance problems may be substantial and could adversely affect our business, financial condition and results of operations.

409.     The 2022 10-K also stated the following about potential risk factors that could affect Stem's business:

> Our business prospects are subject to risks, expenses and uncertainties frequently encountered by companies in the early stages of commercial operations. To date, we have financed our operations primarily through equity financings, convertible promissory notes and borrowings from affiliates. The attainment of profitable operations is dependent upon future events, including obtaining adequate financing to complete our development activities, obtaining adequate supplier relationships, building our customer base, successfully executing our business and marketing strategy and hiring appropriate personnel. ***Failure to generate sufficient revenues, achieve planned gross margins and operating profitability, control operating costs, or secure additional funding may require us to modify, delay, or abandon some of our planned future expansion or development, or to otherwise enact operating cost reductions available to management, which could have a material adverse effect on our business, operating results, financial condition and ability to achieve our intended business objectives.***

410.     The 2022 10-K also stated the following about potential risks from the Company's intellectual property and technology:

> ***Risks Related to Our Intellectual Property and Technology***
>
> ***If we are unsuccessful in developing and maintaining our proprietary technology, including our Athena platform, our ability to attract and retain partners could be impaired, our competitive position could be adversely affected and our revenue could be reduced.***
>
> Our future growth depends on our ability to continue to develop and maintain our proprietary technology that supports our hardware and software-enabled services, including our Athena platform. ***In the event that our current or future products and services require features that we have not developed or licensed***, or we lose the benefit of an existing license, we will be required to develop or obtain such technology through purchase, license or other arrangements.

411.     The 2022 10-K also stated the following about potential risks from the Company's Athena platform:

> ***Risks Related to Our Intellectual Property and Technology***
>
> ***Our technology, including the Athena platform, could have undetected defects, errors or bugs in hardware or software which could reduce market adoption, damage our reputation with current or prospective customers and/or expose us***

*to product liability and other claims that could materially and adversely affect our business.*

412.     The statements in ¶¶ 404-411 were false and misleading and failed to disclose, *inter alia*, that: (1) the Company was engaged in the Overpayment Misconduct; (2) Legacy Stem's business and competitive standing were overstated, particularly concerning its strategic partnerships and revenues tied to its software; (3) Stem's Athena software platform was not fully automated, was not a "robust AI platform," and did not produce strong gross margins for the Company; (4) the Company's pipeline of contract deals, especially FTM deals, was exaggerated and contained fraudulent entries to inflate the appearance of Stem's business prospects; (5) Legacy Stem needed the capital infusion from the Merger to continue as a going concern; (6) the Company overstated its gross margins and exaggerated its business and financial prospects; (7) the Company's deal with Available Power was illusory; (8) the Company's software revenue did not account for 100% of its services revenue; and (9) Legacy Stem's and Stem's internal controls over financial reporting were wholly inadequate. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Finally Emerges**

413.     On March 29, 2023, the Company revealed it planned to offer $175 million in Convertible Senior Notes, due in 2030, in a private offering to institutional buyers. Stem intended to use the proceeds from the Convertible Senior Notes to purchase and surrender for cancellation a portion of Stem's 2028 Convertible Senior Notes, to pay the cost of entering into the privately negotiated capped call transactions with the purchasers, and for general corporate purposes. In other words, Stem's business modeling was faltering, and the Company needed to raise cash fast.

414.     The very next day, on March 30, 2023, the Company raised the amount it planned to offer from $175 million to $200 million. The Company disclosed that the proceeds would be

utilized in the following fashion: (1) approximately $99.8 million for the purchase of approximately $163.0 million in Stem's 0.50% Green Convertible Senior Notes due 2028; (2) approximately $23.2 million to fund the cost of entering into capped call transactions; and (3) the remainder of the net proceeds of the offering or ~$75 million for general corporate purposes.

415.    On this news, Stem's stock price fell $0.65 per share, or 10.42%, from $6.24 per share on March 28, 2023 to $5.59 per share on March 29, 2023. The stock The stock fell another $0.09, or 1.6%, the following day, to close at $5.50 on March 30, 2023. By that point, the Company's stock price had plummeted 69.32% from its initial closing price of $27.05 per share, representing just how value destructive the Merger has been.

416.    The market reacted with surprised confusion to the news. On March 29, 2023, an analyst from Credit Suisse wrote that "Stem's convert was not expected," and "[t]iming is also surprising given higher interest rates and spreads since their previous 2028 convert issued in mid-November 2021."

417.    Similarly, a Guggenheim analyst report from March 30, 2023 cut the Company's target price from $14.00 to $11.00, reasoning that "we think that STEM could have handled its recent communications more effectively. The transaction is also poorly timed, in our view." Additionally, "***the financing comes on the heels of management having assured investors repeatedly that no additional funding was needed***, and it also comes following a 64% decline in the stock price since September, not including the decline yesterday after the deal was announced." Guggenheim found that Stem's strategy for revenue is "***clearly proving more difficult than STEM expected to generate gross margin on its hardware resale business, especially as the business remains geared mostly to front-of-the-meter business, and that is pushing out overall profitability***."

418.    Finally, on April 4, 2023, Bank of America downgraded the Company's stock from "neutral" to "underperform" and lowered its target price for Stem from $9 to $5. Bank of America also published a report titled, "Waning Confidence on Sharp Ramp: Downgrade to Underperform," stating their "confidence in estimates is increasingly strained." Bank of America explained:

How do we look vs consensus?

The primary differences between our updated estimates and consensus hinge on (1) *lower attribution to a hardware business gross margin which we frankly think aligns more closely to reality and (2) a more reasonable take on opex trends against Stem's scaling plans. We emphasize that while we are lower than consensus on each, we are actually not dissimilar from Stem's long-term guidance on either, which leaves us confident in the prospect of further negative revisions. We lack confidence in Stem's ability to drive margin improvements in the increasingly supply constrained and competitive business of buying and selling batteries*. In 2022, still with the benefits of more BTM hardware delivery mix than what Stem expects long term, its hardware margin hovered in the high single digit range throughout the year. By contrast, consensus estimates provided via Visible Alpha imply that Stem drives its margin mix towards 15% by 2024 and off a 10% level in 2023 despite increasingly unfavorable mix trends and still limited available ESS focused cell supply that should continue to pressure "middle-man" margins. For our part, we assume that hardware margins trend in the high single digits (9-10%) over time. which is arguably still generous vs what we have already seen in 2022. Again, underling the peculiarities in consensus, *Stem readily admits that the "Front of the Meter" (FTM) hardware margin it expects longer term is ~10% which more closely aligns to our view.* It flags increasing FTM exposure specifically as dragging its margin lower in 2022.

419.    Bank of America also discussed how Stem's business model was "confusing" to the market, breeding further uncertainty:

*The notion of what Stem "is" at its core is now more confusing than it used to be given the shifting business mix contemplated within its dramatic top-line ramp from '22 into '25.* While our recent launch contemplated a Neutral rating, *a disappointing 4Q outlook call since and now uncertainty reflected from convertible issuance last week push us to be less generous on estimates* – particularly given the risks reflected in standing up two new services businesses (Dev-serv to 'setup' the battery install initially and Pro-Serv to operate batteries on an ongoing basis) and implicitly keeping opex relatively stable.

* * *

While we do see merits of an opportunistic convert refinancing last week – note

Stem is not the first to execute this strategy, nor will it likely be the last – implicit messaging on cash is still less than ideal given at least some portion of proceeds will help bolster working capital needs. In the end, we still see Stem reaching positive EBITDA in 4Q22, albeit briefly, and purely as a function of back half loaded revenue recognition over ratable overhead spend. But it's not about simply realizing cash inflection – how much cash and how quickly it's growing matters, where even consensus suggests a hockey-stick-like cadence biasing realization to 2025. With a deeper review of what could go wrong in consensus numbers as well as true ups for latest macro concerns, we downgrade to Underperform.

420.    Bank of America further revealed that Stem's software business segment was completely dependent on Stem's low-margin hardware business segment. Therefore, Stem's purported plan to transition completely to software made no sense:

For some time, this company has been pitched as a high margin, software-focused way to play energy storage given its Athena platform focus and vs peers in the space that reap a "typical" hardware margin in the 5-15% range. ***However, out of $550-650mm in revenue guided for FY23, ~$520mm is implied as hardware and we estimate just $45-50mm comes from Stem's recurring software business with the balance in a burgeoning services business.*** Note while Stem talks to a "Contracted Annual Recurring Revenue" metric to describe the software opportunity, the $45-50mm listed aligns to performance obligations in its 10-K that are expected to be realized in the next 12 months. ***The irony here is that while the company's pitch has been predicated for some time on front loaded hardware installs as an enabler of the long-term recurring software business, the latter cannot on its own drive the story to positive EBITDA today and at a corporate level, the 2H23 inflection will rely on a business that Stem intends to divorce longer term.***

421.    On this news, the Company's stock dropped 7.4%, from a close of $5.91 on April 3, 2023, to close at $5.47 per share on April 4, 2023. The Company's stock price continues to trade at exceedingly low prices.

422.    On April 4, 2023, *Seeking Alpha* reported on Bank of America's analysis of Stem's stock:

***Stem pitches itself as a software focused way to play energy storage, but "slow realization of revenues from this business means the company is ultimately dependent on lower margin hardware and service businesses to drive an EBITDA inflection,"*** BofA's [analyst] wrote.

While company management suggests a rapid scale up in services would bridge the

drop in hardware sales, "the pivot towards standing up a novel services business to hit contemplated guide accentuates the uncertainty from the latest capital raise," according to [Bank of America's analyst].

Stem is trading near all-time lows despite rising revenues and margins.

423.    Two days later, Wolfe Research issued a report titled, "STEM: Our view's been de-stemmed; downgrade to PP." Wolfe analysts wrote that "the investment case has not played out as hoped." After taking a "*fundamental review*" of Stem's outlook, the Wolfe concluded that, ***"[t]he thesis for STEM has drifted from targets established during the company's 2021 SPAC listing which were premised on 1) growing share in the front-of-the-meter (FTM) market and 2) Improving margins via increased deployments of Athena, STEM's software platform. Neither have played out as hoped.***" The report also pointed out that while bookings are strong, the "backlog conversion remain[s] elongated," and that management may need to reconsider expectations again and the "sentiment [will likely stay] depressed until execution becomes apparent."

424.    Additionally, Wolfe analysts did not anticipate the Company's Senior Convertible Notes offering, writing that Wolfe had not correctly recognized Stem's "funding needs in 2023 which raises questions about STEM's anticipated cash generation outlook." Wolfe also noted that Stem's Athena software platform was not a "meaningful contributor" to Stem's gross margins:

> ***Disaggregating the Services segment shows Athena not yet a meaningful contributor***. We estimate that in 2022, Athena contributed $5.9mn of gross margin relative to the company's $47.3mn consolidated GM. While Athena did grow by ~2x last year, ***it would have to grow by more than 4x in FY23 in order to move the needle for consolidated margins*** in our new model. Given the company's underwhelming 4Q results and FY23 outlook, ***we don't view this as a probable outcome in the NT.***
>
> ***Hard to justify premium multiples given recent disappointments.***

## DAMAGES TO STEM

425.    As a direct and proximate result of the Individual Defendants' conduct, Stem has lost and will continue to lose and expend many millions of dollars.

426.    Such losses include overpayment made by the Company in consideration of the Merger.

427.    Such losses include compensation paid to Defendants pursuant to the Incentive Plan.

428.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

429.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

430.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

431.    Such expenditures also include, but are not limited to, amounts paid to outside lawyers, accountants, and investigators in connection thereto, and losses of revenues caused by customers' loss of trust in the Company's business and products.

432.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

433.    As a direct and proximate result of the Individual Defendants' conduct, Stem has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

434.    Plaintiff brings this action derivatively and for the benefit of Stem to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' violations of Section 14(a) of the Exchange Act, breaches of fiduciary duties and other violations thereof, including aiding and abetting the same.

435.    Stem is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

436.    Plaintiff is, and has been at all relevant times, a shareholder of Stem. Plaintiff will adequately and fairly represent the interests of Stem in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

437.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

438.    A pre-suit demand on the Board of Stem is futile and, therefore, excused. At the time of filing of this complaint, the Board consists of the following eight individuals: Defendants Carrington, Morgan, Daley, Buzby, Tammineedi, Tyson, and Woodward (the "Director Defendants") and non-party Ira Birns. Plaintiff needs only to allege demand futility as to four of these eight Directors Defendants.

439.    Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while Defendants Carrington, Buzby, Daley, and Tammineedi reaped nearly $22 million in proceeds from their insider sales. These sales occurred at suspicious times shortly after the conference call held on November 9. 2021 regarding Stem's third quarter sales and reaffirmed fiscal year guidance, but before February 24, 2022, when Stem announced disappointing financial results. Additional sales took place before January 5, 2023, when the truth was emerging, except for one sale by Defendant Carrington in March 2023. Even that sale occurred shortly before Bank of America downgraded the Company's shares in April 2023. This renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme. Director Defendants Carrington, Buzby, Daley, Morgan, and Tammineedi also face a substantial likelihood of liability for engaging in and/or otherwise facilitating the Overpayment Misconduct.

440.    Director Defendants Morgan, Daley, Carrington, Buzby, and Tammineedi, as members of either STPK's or Legacy Stem's Board, solicited shareholder to vote to, *inter alia*, approve the Merger and the Incentive Plan, which they each materially benefitted (and continue benefit) from. They each considered and were involved in discussions leading up to the Merger, including during Board meetings held in connection therewith. They each were well aware of and had access to non-public information pertaining to Legacy Stem's business and future prospects. The misrepresentations and omissions set forth herein were material to shareholders in voting on approval of the Merger and Incentive Plan (among other proposals) who would not have approved such proposals had they been informed about the wrongdoing alleged herein. Under the Incentive

Plan, the Company grants restricted stock awards and performance stock awards to executive officers, non-employee directors and other key employees of the Company, including each of the Director Defendants. Such awards provide material benefits to the Director Defendants that render them incapable of evaluating a demand with disinterestedness. Indeed, during the fiscal years ended December 31, 2021, and December 31, 2022, respectively, the Director Defendants received most of their compensation—and over $200,000, each (other than Carrington, who received significantly more), in stock awards, alone. Thus, the Director Defendants would be incapable of considering any demand challenging the Merger, the Merger Proxy, the Incentive Plan, or their own involvement in the Overpayment Misconduct and related claims. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

441.   Additional reasons that demand on Defendant Carrington is futile follow. Defendant Carrington has served as CEO and as Company director since April 2021. Prior to that, he served as the CEO and a director of Legacy Stem from December 2013 up until the Merger closed. Thus, Defendant Carrington is not independent and receives his primary livelihood from the Company. As Legacy Stem's CEO, and later the Company's, throughout the Relevant Period, Defendant Carrington was ultimately responsible for all the false and misleading statements and omissions that were made by or on behalf of the Company and Legacy Stem. He solicited the Merger Proxy, which contained false and misleading elements that contributed to shareholders approving, *inter alia*, the Merger and the Incentive Plan, among other things. Such approvals allowed Defendant Carrington to reap significant profits tied to closing the Merger while effectuating the Overpayment Misconduct to the Company's detriment. By way of example, Defendant Carrington received over $40 million in compensation from the Company the year that

the Merger closed in 2021, approximately $37 million of which comprised of stock awards. As the Company's highest officer, he conducted little, if any, oversight of the scheme to make false and misleading statements; consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes; and consciously disregarded his duties to protect corporate assets. Defendant Carrington also engaged in improper insider sales during the Relevant Period, reaping over $8 million in proceeds. Furthermore, Defendant Carrington is a defendant in the Securities Class Action. For these reasons, Defendant Carrington faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

442.    Additional reasons that demand on Defendant Morgan is futile follow. Defendant Morgan has served as the Company's Chairman of the Board from August 2020 until April 2021. He currently serves as Chair of the Compensation Committee. During the Relevant Period, Defendant Morgan served as managing member of the Sponsor and was the beneficial holder of more than 9 million Founder Shares, which would have been rendered worthless without a business combination. Thus, he was particularly interested in effectuating the Merger and concurrent Overpayment Misconduct. Defendant Morgan is personally responsible for the false and misleading statements contained in the Registration Statement, the 2020 10-K, the 2021 10-K, and the Merger Proxy, which he signed, signed off on, or solicited. As a member of the Company's Board, he owed certain fiduciary duties, which he failed to undertake. Ultimately, his decisions, fueled by his own interests rather than the Company's, enabled the Overpayment Misconduct and caused him to be named as a defendant in the Securities Class Action. For these reasons, Defendant Morgan is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

443.    Additional reasons that demand on Defendant Buzby is futile follow. Defendant Buzby has served as a Company director since April 2021. He also serves as a member of the Compensation Committee. Prior to that, he served on the Board of Legacy Stem from April 2010 until the Merger. Defendant Buzby has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements after the Merger, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, as a member of Legacy Stem's Board, he also solicited the Merger Proxy and aided and abetted the Overpayment Misconduct. Defendant Buzby also engaged in improper insider sales during the Relevant Period, reaping over $1.5 million in proceeds. His decisions were fueled by his own interests rather than the Company's. For these reasons, Defendant Buzby is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

444.    Additional reasons that demand on Defendant Daley is futile follow. Defendant Daley has served as a Company director since August 2020. He also serves as a member of the Audit Committee. Defendant Daley has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements leading up to and after the Merger, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Daley is personally responsible for the false and misleading statements contained in the Registration Statement, the 2020 10-K, the 2021 10-K, and the Merger Proxy, which he signed, signed off on, or solicited. Defendant Daley also engaged in improper insider

sales during the Relevant Period, reaping over $6.3 million in proceeds. Furthermore, Defendant Daley is a defendant in the Securities Class Action. His decisions were fueled by his own interests rather than the Company's. For these reasons, Defendant Daley is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

445.   Additional reasons that demand on Defendant Tammineedi is futile follow. Defendant Tammineedi has served as a Company director since April 2021. He also serves as a member of the Audit Committee. Prior to that, he served on the Board of Legacy Stem from 2019 until the Merger. Defendant Tammineedi has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements after the Merger, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, as a member of Legacy Stem's Board, he also solicited the Merger Proxy and aided and abetted the Overpayment Misconduct. Indeed, Defendant Tammineedi, through his entity, Angeleno, was an investor of Legacy Stem and additionally benefited from the Merger through the stock-rollover, which rendered him a 5% owner of the Company's outstanding shares. Defendant Tammineedi also engaged in improper insider sales during the Relevant Period, reaping over $6 million in proceeds. His decisions were fueled by his own interests rather than the Company's. For these reasons, Defendant Tammineedi is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

446.   Additional reasons that demand on Defendant Tyson is futile follow. Defendant Tyson has served as a Company director since April 2021. She also serves as Chair of the Nominating Committee. She receives significant compensation from the Company for her service

as a director, as set forth above. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements after the Merger, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Tyson is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

447.    Additional reasons that demand on Defendant Woodward is futile follow. Defendant Woodward has served as a Company director since April 2021. She also serves as a member of the Compensation Committee. She receives significant compensation from the Company for her service as a director, as set forth above. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements after the Merger, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.  For these reasons, Defendant Woodward is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

448.    Additional reasons that demand on the Board is futile follow.

449.    As mentioned above, under the Incentive Plan, which is administered by the Compensation Committee and was approved in connection with the Merger Proxy (which contained materially false and misleading statements), each of the Director Defendants is eligible to receive long-term equity-based compensation, the amount and terms of which are approved by the Compensation Committee. During the fiscal year ended December 31, 2021, Defendants Buzby, Daley, Morgan, Tammineedi, Tyson, and Woodward each received RSUs valued at $200,963, whereas their "fees earned or paid in cash" ranged from $18,733 to $37,040. For the

year ended December 31, 2022, those awards increased to $219.124, with cash compensation of $58,000-$99,000. These amounts are undoubtedly substantial in relation to the Director Defendants' compensation without them.

450.     Moreover, as the Company's current CEO, Defendant Carrington received a grant of 1,000,000 RSUs for the fiscal year ended December 31, 2021, under the 2021 Plan, valued at $10 million, and received an incredible $37,815,664 in stock awards that year, alone. Thus, the Merger and related Overpayment Misconduct took Defendant Carrington from a total compensation package of $4,956,211 to $40,565,992 (comparing 2020 compensation with 2021 compensation).

451.     Given their conflicted positions, the Director Defendants are unlikely to take action against those individuals, including the Individual Defendants, who caused Company shareholders to approve a plan that they each have materially benefitted from and continue to materially benefit from. Accordingly, the Director Defendants are not independent or disinterested, and demand upon them is futile and, therefore, excused.

452.     Moreover, certain of the Director Defendants had specified duties as members of Board committees, particularly those serving on the Audit Committee. Defendants Morgan, Daley and Tammineedi further breached the additional duties they had as members of the Audit Committee to ensure the Company's disclosures were accurate, among other things.

453.     The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against the others who were responsible for that wrongful conduct to attempt to recover for the Company any part of the damages the Company suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

454.     The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, the Director Defendants cannot claim exculpation from his violations of duty pursuant to the Company's charter (to the extent such a provision exists). As the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

455.     Thus, for all of the reasons set forth above, the Director Defendants and/or at least four of the Director Defendant, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Defendants Scheyer, Morgan, Wilds, Daley, Litowitz, Rogers, and Shaper for Violation of Section 14(a) of the Exchange Act

456.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

457.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

458.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no

proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

459.    Under the direction and watch of the Individual Defendants, the Merger Proxy failed to disclose, *inter alia*, that: (1) Legacy Stem's business and competitive standing were overstated, particularly concerning its strategic partnerships and revenues tied to its software; (2) the post-Merger Company's business and financial prospects were also exaggerated. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

460.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Merger Proxy were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Merger Proxy, including but not limited to, the Merger itself and the Incentive Plan.

461.    As a result of the material misstatements and omissions contained in the Merger Proxy, Company shareholders voted to, among other things: (1) approve the Merger; and (2) approve the Incentive Plan, materially benefitting the Director Defendants, who joined the post-Merger Company and other Defendants.

462.    As a further result of the material misstatements and omissions in the Merger Proxy, Company shareholders were deprived of their right to make an informed decision in voting on the Merger, were deprived of their right to make an informed redemption decision regarding their STPK shares prior to the Merger and were induced to accepting a loss-producing business

combination.

463.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Merger Proxy.

464.    Plaintiff, on behalf of Stem, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

465.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

466.    Each of the Individual Defendants owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of the Company's business and affairs.

467.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

468.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of the Company.

469.    In breach of their fiduciary duties, the Individual Defendants caused the Company to engage in the Overpayment Misconduct or aided and abetted in such misconduct.

470.    In further breach of their fiduciary duties, the Individual Defendants made false and misleading statements and omissions and failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

471.    Also in breach of their fiduciary duties, the Individual Defendants caused the

Company to fail to maintain internal controls.

472.   Defendants Carrington, Tammineedi, Daley, Buzby, and Bush further breached their fiduciary duties to the Company by engaging in improper insider sales undertaken while they each possessed material non-public information, reaping over $25 million in ill-gotten proceeds.

473.   The Individual Defendants had actual or constructive knowledge of the Overpayment Misconduct and the materially false and misleading statements that enabled and disguised it for so long, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

474.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

475.   These actions were not a good-faith exercise of prudent business judgment to

protect and promote the Company's corporate interests.

476.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Stem has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

477.    Plaintiff, on behalf of Stem, has no adequate remedy at law.

### THIRD CLAIM
### Against the Individual Defendants for Unjust Enrichment

478.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

479.    By their wrongful acts, violations of law, and/or false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants and the Sponsor were unjustly enriched at the expense of, and to the detriment of, Stem.

480.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Stem that was tied to the performance or artificially inflated valuation of Stem, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company. This also includes compensation received under the Incentive Plan, which certain Individual Defendants induced the Company's shareholders to approve through false and misleading representations, and the millions of dollars that certain Defendants cashed out in connection with the close of the Merger.

481.    Plaintiff, as a shareholder and representative of Stem, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, payments to the Individual Defendants under the Incentive Plan, the

redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

482.   Plaintiff, on behalf of Stem, has no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants for Abuse of Control

483.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

484.   The misconduct by the Individual Defendants alleged herein constituted an abuse of their ability to control and influence the Company, for which they are legally responsible.

485.   As a direct and proximate result of the Individual Defendants' abuse of control, Stem has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

486.   Plaintiff, on behalf of Stem, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

487.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

488.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly-held corporation.

489.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Stem has sustained and will continue to

sustain significant damages.

490.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

491.    Plaintiff, on behalf of Stem, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for
### Waste of Corporate Assets

492.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

493.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

494.    Certain of the Individual Defendants caused the Company to engage in the Overpayment Misconduct, to the detriment of STPK's shareholders and the Company. As noted below, certain of the Individual Defendants further aided and abetted this misconduct.

495.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused the Company to waste valuable corporate assets, including by, *inter alia*, by acquiring Legacy Stem on terms unfavorable to STPK shareholders, while Legacy Stem suffered from undisclosed issues and material risks. The Individual Defendants' misconduct has caused the Company to incur many millions of dollars of legal liability and/or costs to defend and settle unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

496.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

497.    Plaintiff, on behalf of Stem, has no adequate remedy at law.

## SEVENTH CLAIM

**Against Defendants Carrington, Bush, Scheyer, Wilds, Morgan, Daley, Litowitz, Rogers, Johnson, Patel, Russo, Ho, and Shaper for Contribution Under Section 10(b) and 21D of the Exchange Act**

498.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

499.   Stem and Defendants Carrington, Bush, Scheyer, Wilds, Morgan, Daley, Litowitz, Rogers, Johnson, Patel, Russo, Ho, and Shaper are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Carrington's, Bush's, Scheyer's, Wilds', Morgan's, Daley's, Litowitz's, Rogers', Johnson's, Patel's, Russo's, Ho's and Shaper's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

500.   Defendants Carrington, Bush, Scheyer, Wilds, Morgan, Daley, Litowitz, Rogers, Johnson, Patel, Russo, Ho, and Shaper, because of their positions of control and authority as officers and/or directors of the Company and/or Legacy Stem, respectively, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

501.   Accordingly, Defendants Carrington, Bush, Scheyer, Wilds, Morgan, Daley, Litowitz, Rogers, Johnson, Patel, Russo, Ho, and Shaper are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

502.     As such, Stem is entitled to receive all appropriate contribution or indemnification from Defendants Carrington, Bush, Scheyer, Wilds, Morgan, Daley, Litowitz, Rogers, Johnson, Patel, Russo, Ho, and Shaper.

## EIGHTH CLAIM
### Against Defendants Scheyer, Wilds, Morgan, Daley, Litowitz, Rogers, and Shaper for Contribution Under Section 11(f) of the Securities Act and 21D of the Exchange Act

503.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

504.     As a result of the conduct and events alleged above, the Company is a defendant in the Securities Class Action brought on behalf of Company shareholders, for claims brought under Sections 11 and 15 of the Securities Act.

505.     Federal law provides Stem with a cause of action against alleged joint tortfeasors under Section 11(f) of the Securities Act.

506.     The plaintiffs in the Securities Class Action allege that the Offering Documents issued in connection with the Company's Merger contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading and omitted to state material facts required to be stated therein.

507.     Stem is the registrant for the shares issued pursuant to the Offering Documents. Defendants Scheyer, Wilds, Morgan, Daley, Litowitz, Rogers, and Shaper were responsible for the contents and dissemination of the Offering Documents.

508.     As issuer of the shares, Stem is strictly liable to the class action plaintiffs and the class for the misstatements and omissions.

509.     The plaintiffs in the Securities Class Action allege that none of the defendants named therein made a reasonable investigation or possessed reasonable grounds for the belief that

the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

510.    Defendants Scheyer, Wilds, Morgan, Daley, Litowitz, Rogers, and Shaper, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

511.    Accordingly, Defendants Scheyer, Wilds, Morgan, Daley, Litowitz, Rogers, and Shaper are liable under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

512.    As such, Stem is entitled to receive all appropriate contribution or indemnification from Defendants Scheyer, Wilds, Morgan, Daley, Litowitz, Rogers, and Shaper.

## NINTH CLAIM
### Against Defendants Carrington, Bush, Buzby, and Tammineedi for Aiding and Abetting Breach of Fiduciary Duty

513.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

514.    Defendants Carrington, Bush, Buzby, and Tammineedi aided and abetted the Individual Defendants at STPK leading up to the Merger, who breached their fiduciary duties to the Company in connection therewith and with the Overpayment Misconduct.

515.    Defendants Carrington's, Bush's, Buzby's, and Tammineedi's misconduct resulted in continuous, connected, and ongoing harm to the Company.

516.    Specifically, these Individual Defendants promoted the Merger by issuing and/or consenting to the issuance of false and misleading statements concerning Legacy Stem's software,

operations, and business prospects. Moreover, Defendants Carrington, Bush, Buzby, and Tammineedi served on the Board and/or management of Legacy Stem, the Company's operational predecessor, and directly made statements during conference calls or in press releases and SEC filings which contained materially false and misleading statements promoting the Company's future operations and prospects.

517.   Defendants Carrington, Bush, Buzby, and Tammineedi are jointly and severally liable to the same extent as the Individual Defendants who served at STPK prior to and at the time of the Merger are liable for breaches of fiduciary duty as set forth herein or violations of any other laws.

518.   As a direct and proximate result of Carrington's, Bush's, Buzby's, and Tammineedi's aiding and abetting of the other Individual Defendants' breaches of duty alleged herein, the Company has sustained and will continue to sustain substantial damages.

519.   Plaintiff, on behalf of Stem, has no adequate remedy at law.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of Stem, and that Plaintiff is an adequate representative of the Company;

(b)   Determining and awarding to Stem the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(c)   Directing Stem and the Individual Defendants to take all necessary actions to reform and improve Stem's corporate governance and internal procedures to comply with applicable laws and to protect Stem and its shareholders from a repeat of the damaging events

described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

    1.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

    2.  a provision to permit the shareholders of Stem to nominate at least four candidates for election to the Board;

    3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

    (d)    Awarding Stem restitution from Individual Defendants, and each of them;

    (e)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

    (f)    Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Date: December 15, 2023

    Respectfully Submitted,

    **FARNAN LLP**

    /s/ _/s/ Brian E. Farnan_____
    Brian E. Farnan (Bar No. 4089)
    Michael J. Farnan (Bar No. 5165)
    919 N. Market St., 12th Floor
    Wilmington, DE 19801

Telephone: (302) 777-0300
Facsimile: (302) 777-0301
Email: bfarnan@farnanlaw.com
        mfarnan@farnanlaw.com

**OF COUNSEL:**

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
Eitan Kimelman
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com
      eitank@bgandg.com